UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

VIKING YACHT COMPANY, a New　　:
Jersey Corporation; and POST　:
MARINE CO., INC., a New Jersey:
Corporation,　　　　　　　　　　:　　HONORABLE JOSEPH E. IRENAS
　　　　　　　　　　　　　　　　　:
　　　　　　　Plaintiffs,　　　　:
　　　　　　　　　　　　　　　　　:　　CIVIL ACTION NO. 05-538(JEI)
　　　v.　　　　　　　　　　　　　:
　　　　　　　　　　　　　　　　　:
COMPOSITES ONE LLC, a Foreign :　　　　　**OPINION**
Limited Liability Company;　　 :
CURRAN COMPOSITES, INC., a　　 :
Missouri Corporation; C TWO　　:
LLC, a Foreign Limited　　　　　:
Liability Company; and TOTAL　:
COMPOSITES, INC., a Delaware　 :
Corporation joint d/b/a/ COOK :
COMPOSITES AND POLYMERS, a　　 :
fictitiously named Delaware　　:
Partnership,　　　　　　　　　　　:
　　　　　　　　　　　　　　　　　:
　　　　　　　Defendants.　　　　 :

**APPEARANCES:**

BRIAN E. RUMPF, Esq.
960 Radio Road
Little Egg Harbor, NJ 08087

HENRY J. TYLER, Esq.
Society Hill Office Park
1874 Route 70 East
Suite #4
Cherry Hill, NJ 08003
　　　Counsel for Plaintiffs

BUCHANAN INGERSOLL PC
By: Meredith Myers LeConey, Esq.
1835 Market Street
14th Floor
Philadelphia, PA 19103

By: Paul Kevin Brobson, Esq.
213 Market Street
3rd Floor
Harrisburg, PA 17101
　　　Counsel for Defendants

**IRENAS**, Senior District Judge:

This case involves the sale and subsequent cracking of gel coat used in manufacturing yachts.  Gel coat, the outer layer of a boat, functions as a cosmetic finish and barrier to prevent water and other materials from damaging the boat.  Defendant Cook Composites and Polymers ("CCP") manufactures gel coat, which is distributed by Composites One ("C-1").[1]  Plaintiffs are the manufacturers of recreational motor yachts who bought 953 Series gel coat ("953 Series") from C-1, made by CCP.  (Compl. ¶¶ 13, 18).[2]  Plaintiffs allege that CCP engaged in deceptive practices and breached various warranties when the 953 Series it purchased cracked when used or stored in cold climates.

Before the Court is CCP's motion for summary judgment on Counts III & IV, breach of the implied warranty of fitness for a particular purpose; Count V & VI, breach of the implied warranty of merchantability; Count VII, fraud; Counts IX & X, breach of an express warranty; and Counts XI & XII, violations of the New Jersey's Consumer Fraud Act.[3]  Plaintiffs cross-move for summary judgment on Counts III, IV, V, VI, IX, X, and XII.

---

[1]  C-1 was originally named as a Defendant, but was dismissed from the litigation on February 14, 2007.  (Docket # 88).

[2]  This Court has jurisdiction pursuant to 28 U.S.C. § 1332.

[3] The Court dismissed Counts I, II, and XIII by an Order dated February 20, 2007. (Docket # 90).

# I.

The manufacturing of recreational motor yachts is a multi-step process.  The hulls, decks, and flybridges of yachts are constructed by molding various materials and then layering them. (Compl. ¶ 9).[4]  First, gel coat is sprayed onto a mold and allowed to harden.  (Compl. ¶ 10).  The remaining materials are then bonded together by layering them into the gel coat.  (Compl. ¶ 10).  The gel coat, or the "skin," of the yacht, is composed of "various polymers and other chemical compounds and is anticipated to have a life span of many years in marine use, which includes use in both salt and fresh water environments, rough seas, and all types of weather conditions." (Compl. ¶¶ 9, 11).

In 1997, Plaintiffs Post Marine Company ("Post") and Viking Yacht Company ("Viking") began purchasing and using CCP's 953 Series gel coat.  Prior to that time, Plaintiffs used CCP's 952 Series and did not experience any cracking with that product. Post built 81 boats using the 953 Series gel coat, and claims that in 2002 it began seeing massive cracking in 32 boats that were built between 1998 and 2002 and used in winter climates.[5] Post stopped using CCP gel coat in 2002.  Viking built 741 boats

---

[4] All references to the Complaint contained herein refer to Plaintiffs' Second Amended Complaint.

[5] Post has allegedly repaired 15 of those boats, at the cost of $1,549,935.10.

3

using Series 953, of which 32 have cracked.[6]  In early 2004,

Viking began to notice massive cracking in boats using 953 Series

gel coat that were built between 1997 and 2002.  Viking stopped

using CCP gel coat in 2004.[7]  Plaintiffs allege that the only

commonality between the boats that experienced extensive cracking

is their use or storage in cold weather.

Plaintiffs assert that CCP knew of the inherent problems in

the 953 Series gel coat and failed to disclose them.  (Compl. ¶

23).  CCP alleges that it had no knowledge that the gel coat was

subject to cracking, and that based upon their express warranties

and disclaimers, it is not liable for any cracking that has

occurred.  CCP further argues that gel coat can crack for various

reasons, none of which are the fault of the manufacturer,

including: "thick gel coat, demodling, impact, over- and under-

cure, air voids, temperature swings from hot to cold, improper

---

[6]  Viking repaired 4 of those yachts. It also allegedly paid
a third party $96,535.53 to repair 6 other cracked yachts, but
does not seek damages for future repairs on these boats because
they were resold.  Viking claims to have spent $2,698,068.25
fixing all 10 boats.

[7] Post estimates that repairing its remaining cracked boats
will cost $279,000.00 per boat.  Viking estimates repairs on each
of its boats will cost $822,407.59.  CCP argues that Plaintiffs
are not entitled to recover damages because they are not legally
obligated to repair any of the yachts at issue in this case under
the terms of their warranties with the purchasers of the yachts.
CCP moves for summary judgment on all claims on this basis.  The
claim that Plaintiffs are not entitled to damages as a result of
Plaintiffs contracts with third parties is an insufficient ground
for summary judgment, and thus the motion will be denied.

drilling of holes for screws, stressed introduced during a boat's life cycle, storing a boat in cold weather and then applying hot water to only the boat while it is still cold, and internal stresses from tight radiuses."  (Defs R. 56.1 Stat, ¶ 35).[8]

## II.

"[S]ummary judgment is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (quoting Fed. R. Civ. P. 56(c)).  In deciding a motion for summary judgment, the Court must construe the facts and inferences in a light most favorable to the non-moving party. *Pollock v. Am. Tel. & Tel. Long Lines*, 794 F.2d 860, 864 (3d Cir. 1986).  "'With respect to an issue on which the non-moving party bears the burden of proof, the burden on the moving party may be discharged by 'showing'– that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case.'" *Conoshenti v. Public Serv. Elec. & Gas*, 364 F.3d 135, 145-46 (3d Cir. 2004)

---

[8] Defendants note that a catamaran manufacturer used some of the same batches of the 953 Series gel coat that Post used, but has not experienced any similar cracking. (Defs R. 56.1 Stat, ¶ 36).

(quoting *Celotex*).  The role of the Court is not "to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).


### III.

The first issue is whether CCP is bound by the choice of law clauses in Plaintiffs' contracts with C-1 and its predecessor, RP Associates ("RP").  Each Plaintiff entered into a series of contracts with C-1 and RP for the purchase of CCP gel coat. (Compl. ¶¶ 28, 35).  The contracts between Plaintiffs and C-1, governing purchases after March 31, 1999, include a Illinois choice of law clause.[9]  Plaintiffs' purchases beginning in 1997 through March 31, 1999, are governed by their contracts with RP, which contain a Rhode Island choice of law clause.[10]  Plaintiffs argue that New Jersey law should govern the claims against CCP because CCP was not a party to Plaintiffs' contracts with C-1 and RP.

CCP argues that because the contracts govern the purchase of the gel coat, they also govern Plaintiffs' claims against CCP. In support of this contention, CCP relies on *Coastal Steel Corp.*

---

[9] C-1's headquarters are located in Illinois.

[10] RP was headquartered in Rhode Island.

6

*v. Tilghman Wheelabrator Ltd.,* 709 F.2d 190 (3d Cir. 1983).

*Coastal Steel* involved a contract between two parties for the manufacture of a product for plaintiff.  The court held that plaintiff was a third party beneficiary to that contract, and bound plaintiff, who was not a party to the contract, to the choice of law clause therein.

In distinguishing *Coastal Steel,* the Third Circuit in *E.I. Dupont de Nemours & Co. v. Rhone Poulenc Fiber & Resin Intermediates, S.A.S.* stated, "if it was not the promisee's intention to confer direct benefits upon a third party, but rather such third party happens to benefit from the performance of the promise either coincidentally or indirectly, then the third party will have no enforceable rights under the contract." 269 F.3d 187, 196 (3d Cir. 2001)(holding that the parent of a company that entered a contract with a third party could not enforce the contractual arbitration clause because there was no evidence that the parent was "anything more than an incidental beneficiary").  Furthermore, the Restatement of Contracts provides this example: "B contracts with A to buy a new car manufactured by C.  C is an incidental beneficiary, even though the promise can only be performed if money is paid to C." *Restat. 2d of Contracts*, § 302 (1981).

Like *Dupont* and the example in the Restatement 2d of Contracts*,* CCP benefitted from the Plaintiff's contracts with C-1

7

and RP, but there is no evidence that the contracts were made to benefit CCP.  Thus, because CCP was neither a party nor a third-party beneficiary to Plaintiff's contracts with RP or C-1, CCP cannot invoke the choice of law clause for its benefit.

"Subject to constitutional limitations, a court will generally apply the statutory law of the forum[.]" *Boyes v. Greenwich Boat Works*, 27 F. Supp. 2d 543, 547 (D.N.J. 1998). Moreover, New Jersey is the only state with an interest in this litigation.

> As a general rule New Jersey applies a governmental interest test to choice of law issues.  This test parallels the most significant relationship test of the Restatement, 2d, of Conflict of Laws.  Under this test, the court must first determine whether a conflict exists between the law of the interested states.  This determination must be made on an issue-by-issue basis.  If the court finds that a conflict does exist, it must then determine the state with the greatest interest in governing the particular issue.  To do this, the court must identify the governmental policies underlying the law of each state and how those policies are affected by each state's contacts to the litigation and the parties.  It is the qualitative, not the quantitative, nature of a state's contacts [that] ultimately determines whether its law should apply.

*Boyes v. Greenwich Boat Works*, 27 F. Supp. 2d 543, 547-548 (D.N.J. 1998)(internal citations and quotations omitted)(brackets in the original).  Both Viking and Post are New Jersey corporations with their principal places of business in Burlington County and Atlantic County respectively.  There is no indication that either Plaintiff manufactured yachts in any other

location.  The only arguments for the application of Illinois
and/or Rhode Island law are that (1) C-1 is headquartered in
Illinois and RP was headquartered Rhode Island and (2) C-1 and RP
included choice of law clauses in their contracts with
Plaintiffs.  C-1, however, has been dismissed from this action,
and the contracts containing the choice of law clauses do not
bind CCP.  Therefore, the Court will apply New Jersey law.

## IV.

CCP moves for summary judgment, and Plaintiffs cross move
for summary judgment, on Plaintiffs' breach of express warranty
claims in Counts IX and X of the Complaint.  CCP claims that it
provided a limited warranty that does not cover gel coat
cracking, and that all other "warranties" were expressly
disclaimed.  Plaintiffs argue that the disclaimer is
unenforceable and that representations made in the gel coat
product materials constitute express warranties.

It is undisputed that CCP gave Plaintiffs its product
literature, including a description of the gel coat's
characteristics and a Product Bulletin, which discusses the
improvement of the 953 Series over the 952 Series.  The product
bulletin, PB-58, describes the "improved flexibility and
weathering characteristics" of the 953 series over the 952

series.  (LeConey Cert., 50).[11]  CCP provided Plaintiffs with test data in support of this statement.[12]  (Defs R. 56.1 Stat, ¶ 50).  Defendants also gave Plaintiffs samples of the 953 Series gel coat to test prior to purchase, and advised them to test the gel coat.[13]  Plaintiffs do not dispute the test data, but rather contend that the 953 Series lacks the improved flexibility and weathering characteristics that CCP's materials claim it has.

CCP offers an express limited warranty that the 953 Series gel coat will meet its specifications at the time of shipment. The terms of the joint warranty and disclaimer, entitled "Disclaimer and Limitation of Liability" are the following:

FOR INDUSTRIAL USE AND PROFESSIONAL APPLICATION ONLY,
KEEP OUT OF REACH OF CHILDREN.
DISCLAIMER AND LIMITATION of LIABILITY
(8/14/95)

The products sold hereunder shall meet Seller's applicable

---

[11]  Flexibility is associated with the likelihood of cracking, i.e., the greater the flexibility, the lower the risk the gel coat will crack. (Malle Dep., 168).

[12] CCP maintains that the testing it conducted prior to representing the 953 Series' characteristics to Plaintiffs demonstrates that it has improved flexibility and weathering characteristics over the 952 Series gel coat.  (Defs R. 56.1 Stat, ¶ 57).  In fact, CCP continues to believe in the accuracy of this data, even after receiving of complaints of cracking.

[13]  Plaintiffs expressly told Post to test the 953 Series. (Defs R. 56.1 Stat, ¶¶ 41, 43).  Viking's Vice President of Engineering & Design testified that Viking tests gel coat it seeks to purchase by making a test boat or test piece to ensure it functions as the manufacturer claims it should.  (LeConey Cert., 6, p. 16).

specifications at the time of shipment.  Seller's applicable
specifications may be subject to change at any time without
notice to Buyer.  Buyer must give Seller notice in writing
of any alleged defect covered by this warranty (together
with all identifying details, including the Product Code(s),
description and date of purchase) within thirty (30) days of
the date of shipment of the product or prior to the
expiration of the shipment's quality life, whichever occurs
first.  THE WARRANTY DESCRIBED HEREIN SHALL BE IN LIEU OF
ANY OTHER WARRANTY, EXPRESS OR IMPLIED, INCLUDING BUT NOT
LIMITED TO, ANY IMPLIED WARRANTY OF MERCHANTABILITY OR
FITNESS FOR A PARTICULAR PURPOSE.  THERE ARE NO WARRANTIES
THAT EXTEND BEYOND THE DESCRIPTION ON THE FACE HEREOF.
The Buyer's sole and exclusive remedy against Seller shall
be for the replacement of the product or refund of the
purchase price in the event that a defective condition of
the product should be found to exist by Seller.  NO OTHER
REMEDY (INCLUDING, BUT NOT LIMITED TO, INCIDENTAL OR
CONSEQUENTIAL, DAMAGES FOR LOST PROFITS, LOST SALES, INJURY
TO PERSON OR PROPERTY, OR ANY OTHER INCIDENTAL OR
CONSEQUENTIAL LOSS) SHALL BE AVAILABLE TO THE BUYER.

The sole purpose of the exclusive remedy shall be to provide
Buyer with replacement of the product or refund of the
purchase price of the product if any defect in material or
workmanship is found to exist.  This exclusive remedy shall
not be deemed to have failed its essential purpose so long
as Seller is willing and able to replace the defect products
or refund the purchase price.

To the best of our knowledge, the information contained
herein is accurate.

Final determination of the suitability of the material for
the use contemplated, the manner of use and whether the
suggested use infringes any patents is the sole
responsibility of the buyer.

    Viking admits that it received the following documents

containing CCP's disclaimer and warranty: the Liquid Property

Data Sheets; Product Warranty Statement; and Material Safety Data

Sheets.  Post admits that it received the Cook Book and Material

Safety Data sheets, both of which contained the CCP disclaimer

11

and warranty.[14]

Plaintiffs do not contest that the gel coat complied with CCP's specifications at the time of purchase.  (Compl., ¶ 90).  They argue, however, that the warranty is a "sham," and that CCP's express warranty is instead comprised of the representations, descriptions and affirmations in the Product Bulletin that the 953 Series would perform better than the 952 Series.  Plaintiffs specifically rely on the language in PB-58, which represents that the 953 Series has "improved flexibility and weathering characteristics."  Defendants argue that this language did not create an express warranty, and that Plaintiffs were not induced to purchase the product based on the representations of improved flexibility.  Rather, Plaintiffs admittedly were in the market for a gel coat with better buffback qualities[15] than the 952 Series they were using.  Thus, Plaintiffs conclude, any representations about the 953 Series' flexibility were not part of the bargain.

Express warranties are governed by the UCC, embodied in N.J.

---

[14] CCP alleges that it published the warranty in numerous places, including in its: Product Bulletin; sales literature; the back of the "Cook Book," an application manual; Material Safety Data Sheets for the 953 Series; Liquid Properties Data Sheets; Product Warranty Statement; product Packing Lists; and on the label affixed to the drums of the 953 Series gel coat sent to Plaintiffs.

[15] Buffback qualities refer to the product's ability to retain luster over time.

Stat. § 12A:2-313(1), which provides that express warranties are created by any "affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain" or "description of the goods which is made part of the basis of the bargain." *See also Liberty Lincoln-Mercury, Inc. v. Ford Motor Co.,* 171 F.3d 818, 824 (3d Cir. 1999)(an express warranty is created when "[t]he seller promises that the good sold will conform to some standard which may be established by a model, a level of quality, an assurance, a description or a list of specifications."). Moreover, "[a]ny sample or model which is made part of the basis of the bargain creates an express warranty that the whole of the goods shall conform to the sample or model." N.J. Stat. § 12A:2-313(1).

Under New Jersey law, a representation is presumed to be part of the basis of the bargain "'once the buyer has become aware of the affirmation of fact or promise'" and can be rebutted by "'clear affirmative proof' . . . that the buyer knew that the affirmation of fact or promise was untrue." *Liberty Lincoln-Mercury, Inc. v. Ford Motor Co.*, 171 F.3d 818, 825 (3d Cir. 1999)(quoting *Cipollone v. Liggett Group, Inc.*, 893 F.2d 541, 568 (3rd Cir. 1990), overruled on other grounds, 505 U.S. 504 (1992)). Words such as "warrant" or "guarantee" need not be used to create an express warranty. N.J. Stat. § 12A:2-313(2).

*Interco, Inc. v. Randustrial Corp.*, 533 S.W.2d 257 (Mo. Ct.

13

App. 1976) is analogous to this case.  Plaintiff purchased a
floor covering product, Sylox, based on its "favorable
experience" with the product in the past, and the following
representation in defendant's catalogue: "Sylox is a hard yet
malleable material which bonds firm to wood floors for smooth and
easy hand-trucking.  *Sylox will absorb considerable flex without
cracking* and is not softened by spillage of oil, grease or
solvents." *Id.* at 261.  The product, however, began to
deteriorate soon after it was applied, and made hand-trucking
more difficult due to the fact that the floor had "too much
give."  *Id.*  The court held that plaintiff clearly sought a
product that could "withstand flex without breaking" and that it
was "entitled to take the catalogue description of Sylox at its
face value and plain meaning." *Id.* at 261.  The court held that
an express warranty was created, stating "[i]t is manifest that
the words so used were meant to induce purchases through the
assurance that considerable flex would be absorbed and were not
mere opinion.  The words were an affirmation of fact within the
meaning of [the UCC provision governing express warranties]."
*Id.* at 263.  It concluded, however, that the language warranting
that Sylox would "absorb considerable flex" was imprecise, and
that a jury must determine whether the product conformed to that
promise.  *Id.*

      The Court is also guided by *George Campbell Painting, Corp.*

14

*v. Tennant Co.,* in which defendant sold floor coating to plaintiff for use at JFK Airport.  1995 WL 224410 (D.N.J. 1995). Approximately five months after the sale, Plaintiffs realized that the coating did not adhere to the concrete floor at the site.  The court held that employee representations that "the [floor coating] system was suitable for the site," that "the system would perform as represented," and that "it would 'hold up' in the future," constituted express warranties. *Id.* at *3. It further held that the disclaimer was insufficiently conspicuous to dismiss the claim on that basis. *Id.*

Here, the language in PB-58 was a promise made to the buyer that the gel coat would contain certain characteristics.  The featured characteristics of the gel coat on the product bulletin are that the 953 Series are "high performance, ISO/NPG products which display HIGH GLOSS-BUFFBACK qualifies similar to our 952 series, except the 953's *have improved flexibility and weathering characteristics."* (LeConey Cert. 50)(emphasis included in original).  Defendants gave PB-58 to Plaintiffs to induce them to purchase the 953 Series instead of the 952 Series they were using, and Plaintiffs were entitled to rely on the representations therein.  The promise was made on the first page of a five-page packet, the fifth page of which contained the limited warranty and disclaimer.  It was part of the basis of the bargain, as Defendants have offered no clear affirmative proof

15

that Plaintiffs knew the representations to be untrue.

CCP contends that any express warranty was disclaimed under its "Disclaimer and Limitation of Liability" provision, which Plaintiffs admit receiving.  Disclaimers of express warranties must be "clear and conspicuous."  *Gladden v. Cadillac Motor Car Div.*, 83 N.J. 320, 331 (1979).  To be conspicuous, a disclaimer must be "so written that a reasonable person against whom it is to operate ought to have noticed it." *Id.*; N.J.S.A. § 12A:1-201(10).

A disclaimer meeting these requirements, however, may nevertheless be deemed inoperable if "unreasonably inconsistent" with the express warranties given.  *Gladden v. Cadillac Motor Car Division, General Motors Corp.*, 83 N.J. 320, 332 (N.J. 1980).  While the disclaimer here was clear and conspicuous, it is ineffective to the extent that it is inconsistent with the promise of promise of improved flexibility found in the PB-58.

The Court, having held that CCP's representations in the PB-58 created an express warranty that was not disclaimed, cannot decide as a matter of law whether this warranty was breached.  The warranty for "improved flexibility" is vague.  A reasonable jury could find that a warranty for improved flexibility does not include a warranty against cracking after use and/or storage in cold climates by the end purchaser of the yachts.

Plaintiffs concede that any remedy for breach of express

16

warranty, however, is limited by the four year statute of limitations for contract-based claims.  *See* N.J. Stat. § 12A:2-725; *Commissioners of Fire Dist. No. 9 v. American La France*, 176 N.J. Super. 566, 569 (App. Div. 1980).  "A cause of action accrues when the breach occurs, regardless of the aggrieved party's lack of knowledge of the breach.  A breach of warranty occurs when tender of delivery is made, except that where a warranty explicitly extends to future performance of the goods[.]"  N.J. Stat. § 12A:2-725(2); *see also Foodtown v. Sigma Marketing Systems, Inc.*, 518 F. Supp. 485, 488 (D.N.J. 1980)(citing cases holding that accrual occurs on delivery).  Because the warranty here does not extend to future performance, Plaintiffs' claims accrued upon delivery of the 953 Series.  Thus, Post and Viking are barred from any potential recovery for breach of the express warranty on yachts built before November 4, 2000 and December 18, 2000 respectively.

### IV.

\_\_\_\_\_Both CCP and Plaintiffs move for summary judgment on Counts III through VI, alleging breach of the implied warranties of merchantability and of fitness for a particular purpose, as provided by N.J. Stat. § 12A:2-314-15.  Pursuant to N.J. Stat. § 12A:2-316(2), both of these warranties may be disclaimed, provided that the disclaiming language, when written, is

17

conspicuous.  Additionally, the former must contain the word "merchantability."

CCP expressly disclaimed both of those warranties, and Plaintiffs do not dispute that these requirements are satisfied. The disclaimer was conspicuous, as it was written so that a reasonable person would notice it.  The heading is in all capital letters and reads "DISCLAIMER AND LIMITATION OF LIABILITY," and the actual language disclaiming these implied warranties is also in all capitals.  Moreover, this language is found on numerous documents and items that Plaintiffs admittedly received.

Plaintiffs claim, without citing any authority, that the disclaimers should not be upheld because they disclaim liability in favor of an illusory express warranty.  There is, however, no requirement that a party can only disclaim implied warranties if it has a sufficient and enforceable express warranty.

Because these disclaimers meet the statutory requirements and Plaintiff does not contend that they were unaware of them at the time of purchase, summary judgment will be entered in favor of CCP Counts III, IV, V, and VI.  Plaintiffs' cross-motion for summary judgment on these counts will be denied.


**IV.**

CCP moves for summary judgment on Count VII of the Complaint, in which Plaintiffs allege that CCP's representations

18

about the 953 Series induced them to continue to purchase the gel coat despite the fact that CCP knew that it was defective. (Compl., 58).[16]

The elements that Plaintiffs must establish to support their claim for fraudulent misrepresentation are: "(1) a material misrepresentation of a presently existing or past fact; (2) knowledge or belief by the defendant of its falsity; (3) an intention that the other person rely on it; (4) reasonable reliance thereon by the other person; and (5) resulting damages." *Konover Constr. Corp. v. E. Coast Constr. Servs. Corp.*, 420 F. Supp. 2d 366, 370 (D.N.J. 2006)(Irenas, J.)(quoting *Gennari v. Weichert Co. Realtors*, 148 N.J. 582, 610, 691 A.2d 350 (1997)).

To defeat a summary judgment motion, a plaintiff alleging fraud "carries the burden of presenting evidence which could permit a reasonable jury to find by clear and convincing evidence the existence of fraud." *Atlantic City Racing Assoc. v. Sonic Fin. Corp.*, 90 F. Supp. 2d 497, 504 (D.N.J. 2000).  However, "where a claim for fraud is based on silence or concealment, New Jersey courts will not imply a duty to disclose, unless such

---

[16]  Although Plaintiffs characterize their claim as one for "fraud," their allegations and arguments demonstrate that the claim is really one of fraudulent misrepresentation.  Moreover, in its motion for summary judgment, CCP treats the claim as one for fraudulent misrepresentation, and Plaintiffs do not object to this characterization in their opposition papers.  Therefore, the Court will treat Count VII as a claim for fraudulent misrepresentation.

disclosure is necessary to make a previous statement true or the parties share a 'special relationship.'" *Lightning Lube v. Witco Corp.*, 4 F.3d 1153, 1185 (3d Cir. 1993)(quoting *Berman v. Gurwicz*, 189 N.J. Super. 89 (Ch. Div. 1981)).

Plaintiffs claim that after they began experiencing gel coat cracking, they contacted CCP, and CCP failed to disclose that they it investigated similarly cracked boats of five other boat builders.[17]  CCP, however, did not deny such knowledge when asked.  Plaintiffs also allege that CCP changed its opinion about the flexibility of the gel coat.  This claim is based upon the fact that CCP published test results in January, 2002, that demonstrate a different range in flexibility than did its previously published results.  Specifically, CCP published information that the 952 Series' elongation, which represents flexibility, is between 1.1% and 1.5%.  When it tested the 953 Series, it found that its elongation was between 1.3% and 1.7%.  In January of 2002, CCP published new elongation information indicating that range of the 953 Series is between 1.2% and 1.4%.

Regardless of the significance of the 2002 test results, the record is unambiguous that prior to 2002, CCP's tests indicated that the 953 Series was more flexible than the 952 Series.  Thus, to the extent the claim of fraud is based upon CCP's actions or

---

[17]  CCP purportedly conducted these investigations from 1998 to 2003.

omissions prior to 2002, summary judgment for CCP will be granted.  Summary judgment for CCP as to Post's fraud claim will also be granted, as Post stopped using the 953 Series in 2002.

Because New Jersey law imposes a duty of disclosure when necessary to make a previous statement true, Viking argues that CCP had an obligation to disclose the results of the 2002 testing, and CCP's failure to do so constitutes fraud.  The fact that CCP re-tested the elongation of the gel coat suggests that, upon investigation of boats that experienced cracking, CCP suspected that the cracking was a result of the characteristics of its product.  Even if the testing were unrelated to any complaints of cracking CCP received, however, the results of the testing reveal differences that purchasers and users of the product may have found significant.

CCP argues that it did not have a duty to disclose because the record reflects that gel coat can crack for a variety of reasons, and CCP determined that the 953 Series used by Plaintiffs was not defective but cracked due to reasons out of its control.[18]  This argument is not persuasive.  New Jersey has

_____

[18] Edward Malle of CCP investigated the cracking in a Viking yacht.  He found that the gel coat CCP manufactured was made within CCP's manufacturing specifications.  He also opined that that the gel coat was slightly thicker than recommended, but that Viking generally applied the gel coat properly.  He concluded that the cracking "was a result of treatments or conditions outside of the control of either CCP or Viking Yacht Company."  CCP also investigated Post boats that experienced cracking, and opined that one reason for the cracking was because the gel coat

adopted the reasoning of the Second Restatement of the Law of Torts, which "requires a party to disclose to another party 'facts basic to the transaction, if he knows that the other is about to enter into it under a mistake . . . and that the other, because of the relationship between them, the customs of the trade or other objective circumstances, would reasonably expect a disclosure of those facts.'" *Lithuanian Commerce Corp., Ltd. v. Sara Lee Hosiery,* 179 F.R.D. 450, 478 (D.N.J. 1998)(quoting Restatement (Second) of Torts § 551(2) (1977)).

Based upon this standard and the facts presented, the Court concludes that CCP had a duty to disclose the 2002 test results, but only if those results indicate that the 953 Series is less flexible than CCP initially represented.  Whether the data reflects that the 953 Series is less flexible, however, cannot be determined as a matter of law.  CCP's explanation for the change - that the tests were performed under different conditions at different times and thus produced different results - is not challenged by Plaintiffs.  However, Plaintiffs maintain that the results of the tests show that the 953 Series is not more flexible than the 952 Series.

The reasonableness of Viking's reliance on the original data in its continued use of the 953 Series after it began to experience cracking is also a question of fact.  "Although the

---

was applied thicker than recommended.

recipient of a fraudulent misrepresentation is not barred from recovery because he could have discovered its falsity if he had shown his distrust of the maker's honesty by investigating its truth, he is nonetheless required to use his senses[.]" *Lithuanian Commerce Corp., Ltd. v. Sara Lee Hosiery*, 179 F.R.D. 450, 476 (D.N.J. 1998)(denying summary judgment on the claim of fraud because the record showed that a reasonable inspection would not have revealed a defect in the product).

The Court cannot determine as a matter of law whether, upon inspection, Viking could have discovered that the cracking was caused by the gel coat. If it could have, reliance on CCP's representations would have been unreasonable. However, since Viking admits that it stopped using the 953 Series in 2004, it cannot prove that it relied on CCP's representations after its last use. Thus, a juror could find that Viking's reliance on CCP's initial representations was reasonable, and that CCP's failure to disclose the 2002 test results constitutes fraud. Therefore, summary judgment will be denied as to Vikings claim against CCP from 2002 until 2004.

## V.

### A.

CCP also moves for summary judgment on Plaintiffs' claims under the New Jersey Consumer Fraud Act, N.J. Stat. § 56:8-2

("NJCFA" or "the Act"), contained in Counts XI and XII.
Plaintiffs cross-move for summary judgment on Count XII.  "The
Consumer Fraud Act declares it to be an unlawful practice for
'any person' to use an 'unconscionable commercial practice,
deception, fraud, false pretense, false promise,
misrepresentation, or the knowing concealment, suppression, or
omission of any material fact . . . in connection with the sale
or advertisement of any merchandise.'"  *Coastal Group, Inc. v.
Dryvit Systems, Inc.*, 274 N.J. Super. 171, 179 (App. Div.
1994)(quoting N.J. Stat. § 56:8-2).

       To bring a NJCFA claim, Plaintiffs must demonstrate that
they are "consumers," and that the items they purchased are
"merchandise."  *See R.J. Longo Constr. Co. v. Transit Am.*, 921 F.
Supp. 1295, 1311 (D.N.J. 1996).  A "consumer," while not defined
by the NJCFA, has been described as "'one who uses (economic)
goods, and so diminishes or destroys their utilities.'" *Windsor
Card Shops v. Hallmark Cards*, 957 F. Supp. 562, 567 (D.N.J.
1997)(quoting *Hundred E. Credit Corp. v. Eric Schuster*, 212 N.J.
Super. 350, 355 (1986)).  "Merchandise" is defined by the NJCFA
as "any objects, wares, goods, commodities, services or anything
offered, directly or indirectly to the public for sale." N.J.
Stat. § 56:8-1(c).[19]  Plaintiffs must also show that the alleged

---

       [19] CCP argues, without citing any authority, that gel coat is
not merchandise because it is not mass produced for sale to the
general public and is not a product the average person would know

fraud occurred in connection with a "sale."  "'Sale' is also defined broadly to include 'any sale, rental or distribution, offer for sale, rental or distribution or attempt directly or indirectly to sell, rent or distribute.'"  *Coastal Group, Inc.,* 274 N.J. Super. at 179 (quoting N.J.S.A. 56:8-1(e)).[20]

A business entity can qualify as a member of the public, or "person," when it is in a consumer - oriented situation.  *See J & R Ice Cream Corp. v. California Smoothie Licensing Corp.*, 31 F.3d 1259, 1273 (3d Cir. 1994)(citing New Jersey cases holding that purchasers of yachts, tow trucks, computer peripherals, and prefabricated wall panels are all "consumers" under the NJCFA). In determining whether the NJCFA applies, the Court should look to the character of the transaction and not to the identity of

---

how to use.  This argument is not persuasive.  The fact that CCP markets its gel coat for sale to manufactures rather than household users is insignificant because the Act is expressly not limited to the sale of items for "personal, family, or household use." *Hundred E. Credit Corp.*, 212 N.J. Super. at 354.  Moreover, contrary to CCP's assertion, there is no requirement that "the average person walking down the street" know how to use a product for it to be considered "merchandise" under the Act.  *See, e.g., Coastal Group, Inc.,* 274 N.J. Super. at 174 (holding that a purchaser of prefabricated wall panels for installation could bring a claim under the NJCFA).  Accordingly, we hold that the gel coat at issue is "merchandise" under the Act.

[20]  The fact that Plaintiffs purchased the gel coat from C-1, rather than from CCP directly, does not affect their claim under the NJCFA.  "[T]he Consumer Fraud Act [] encompass[es] the acts of remote suppliers, including suppliers of component parts, whose products are passed on to a buyer and whose representations are made to or intended to be conveyed to the buyer.  *Perth Amboy Iron Works, Inc. v. Am. Home Assur. Co.*, 226 N.J. Super. 200, 211 (App. Div. 1988).

the purchaser.  *Id.*

Under New Jersey law, "purchasers of wholesale goods for
resale are not consumers within the meaning of the NJCFA.'"
*Bracco Diagnostics, Inc. v. Bergen Brunswig Drug Co.*, 226 F.
Supp. 2d 557, 560-61 (D.N.J. 2002)(holding that a manufacturer
who sold its health care products to a wholesaler for
distribution, and in return received sales reports and records
from the wholesaler, is not a "consumer" under the NJCFA)(quoting
*Lithuanian Commerce Corp. v. Sara Lee Hosiery*, 179 F.R.D. 450,
469 (D.N.J. 1998)); *see also Windsor Card Shops,* 957 F. Supp. at
567 n.6 (a wholesale purchaser and seller of greeting cards is
not a "consumer").

However, New Jersey courts have found that businesses who
purchase and use products are "consumers" under the NJCFA.  *See,
e.g., Naporano Iron & Metal Co. v. American Crane Corp.*, 79 F.
Supp. 2d 494, 509 (D.N.J. 1999)(holding that a plaintiff who
purchased a crane for business use is a "consumer"); *Hundred E.
Credit Corp.*, 212 N.J. Super. at 357 (holding that a company who
purchased computer parts to use in its computers is a
"consumer").  Plaintiffs cite to these cases in support of their
contention that, as commercial purchasers of raw materials used
in manufacturing, they are "consumers."  Plaintiffs purchased gel
coat for their own use in manufacturing yachts for sale to the
public.  Unless it can be said that the gel coat is being resold

26

to members of the public, Plaintiffs can assert claims under the NJCFA.

Plaintiffs are not simply a wholesalers. They remove gel coat from the containers in which it is sold and use it as a component part in the manufacture of boats. Plaintiffs then offer these boats, whose outer layer is composed of gel coat, for sale to the public. Thus, Plaintiffs consume the gel coat in the same sense that any purchaser who opens a product from its packaging and uses the product consumes it. The sole question is whether Plaintiffs' re-sale of the product after use makes Plaintiffs more like wholesalers, who lack the protection of the NJCFA, or like companies who purchase merchandise for their own use and are protected by the Act.

In support of its contention that Plaintiffs are not true consumers under the Act, CCP relies upon *Arc Networks, Inc. v. Gold Phone Card Co., Inc.,* 333 N.J. Super. 587 (Law Div. 2000*),* in which the defendant purchased access to plaintiff's long distance services that it sold to retail outlets in the form of telephone cards. Defendant counterclaimed under the NJCFA, and the court held that the defendant did not diminish, destroy or consume the value of plaintiff's phone service, but instead sold the service to others through its phone cards. *Id.* It further held that the long distance services were not available to the general public because they could only be accessed through the

27

purchase of phone cards, and thus dismissed the NJCFA allegations. *Id.* at 591-92.

The defendant in *Arc Networks* is akin to the wholesaler who buys a product in bulk for distribution.  The only relevant distinction is that defendant re-sold the product through phone cards, which were essentially a type of packaging for plaintiffs's long distance services.  Plaintiffs here undeniably did more than simply re-package the gel coat for resale.  After Plaintiffs applied the gel coat to the boats, they could not have turned around and re-sold the gel coat in its original state. The gel coat became part of a greater product sold by Plaintiffs. Thus, due to Plaintiffs' use of the gel coat prior to sale, we hold that Plaintiffs diminished the value of the gel coat and are "consumers" under the Act.

**B.**

This Court must next determine whether Plaintiffs have adduced sufficient proof of consumer fraud to withstand CCP's motion for summary judgment.  In Count XI, Plaintiffs claim that CCP violated the NJCFA by presenting unreliable data about the 953 Series' flexibility and by omitting to inform Plaintiffs of problems with the 953 Series after the 2002 tests.

A party can be liable under the NJCFA as a result of both affirmative misrepresentations and omissions.  Claims of actionable omission require a finding that defendant acted

"knowingly." *Ji v. Palmer*, 333 N.J. Super. 451, 461 (App. Div. 2000). However, "[o]ne who makes an affirmative misrepresentation is liable even in the absence of knowledge of the falsity of the misrepresentation, negligence, or the intent to deceive." *Id.* (internal citations and quotations omitted). This is so because the NJCFA is "intended to protect consumers from deception and fraud, even when committed in good faith." *Id.*

The state of the record is unclear for purposes of summary judgment at this time. The Court is unable to determine the veracity of CCP's initial representations or the significance of the 2002 testing. Accordingly, CCP's motion for summary judgment on Count XI will be denied.

**C.**

Plaintiffs and CCP move for summary judgment on Count XII, in which Plaintiffs allege violations of the NJCFA due to CCP's "sham" warranty. Under New Jersey law, a mere breach of warranty does not constitute a violation of the NJCFA. *See Cox v. Sears Roebuck & Co.*, 138 N.J. 2, 18 (1994)("'a breach of warranty, or any breach of contract, is not per se unfair or unconscionable * * * and a breach of warranty alone does not violate a consumer protection statute.'")(quoting *D'Ercole Sales v. Fruehauf Corp.*, 206 N.J. Super. 11, 25 (App. Div. 1985)); *Coastal Group, Inc.*, 274 N.J. Super. at 180.

Plaintiffs attempt to circumvent this rule by asserting that

CCP not only breached its warranty, but also acted unconscionably by offering and attempting to rely upon an illusory express warranty.  We have concluded that CCP's disclaimer is ineffective inasmuch as it is inconsistent with the terms of PB-58.  However, Plaintiffs must show that "substantial aggravating circumstances" accompanied any breach of warranty in order to recover under the Act.  *See Suber v. Chrysler Corp.*, 104 F.3d 578, 587 (3d. Cir. 1997).  There is no evidence in the record of any aggravating circumstances.  Accordingly, CCP's motion for summary judgment on Count XII will be granted, and Plaintiffs' cross-motion will be denied.

## VI.

For the reasons set forth above, the Court will grant CCP's motion for summary judgment on Counts III, IV, V, VI, and XII. The Court will partially grant and partially deny CCP's motion for summary judgment on Count VII, alleging fraudulent misrepresentation.  The Court will deny CCP's motion for summary judgement on Counts IX and X alleging breach of express warranty, and on Count XI, alleging NJCFA violations.  The Court will deny Plaintiffs' cross motion for summary judgment in its entirety. The Court will issue an appropriate order.


Dated: July 26th, 2007.

_____   s/ *Joseph E. Irenas*
                                  **JOSEPH E. IRENAS, S.U.S.D.J.**