Steven E. Bizar (Admitted *Pro Hac Vice*)
Landon Y. Jones (LJ-0236)
BUCHANAN INGERSOLL & ROONEY PC
1835 Market Street, 14th Floor
Philadelphia, PA 19103-2985
Tel: (215) 665-8700
Fax: (215) 665-8760

P. Kevin Brobson (PB-8169)
BUCHANAN INGERSOLL & ROONEY PC
213 Market Street, 3rd Floor
Harrisburg, PA 17101
Tel: (717) 237-4845
Fax: (717) 233-0852
*Attorneys for Cook Composites and Polymers Co.*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| VIKING YACHT COMPANY, a New Jersey Corporation and POST MARINE CO., INC., a New Jersey Corporation, | CIVIL ACTION NO. 05-cv-538 (JEI/JS) |
| Plaintiffs, | HON. JOSEPH E. IRENAS |
| v. | **Defendant's Memorandum of Law in Support of Motion to Exclude the Opinions and Testimony of David E. Jones** |
| COMPOSITES ONE LLC, a Foreign Limited Liability Company, and CURRAN COMPOSITES, INC., a Missouri Corporation, C TWO LLC a foreign Limited Liability Company, and TOTAL COMPOSITES, INC., a Delaware Corporation jointly d/b/a COOK COMPOSITES AND POLYMERS, a fictitiously named Delaware Partnership, | *Filed Electronically*<br><br>Motion Date: August 18, 2008 |
| Defendants. | ***ORAL ARGUMENT AND EVIDENTIARY HEARING REQUESTED*** |

# TABLE OF CONTENTS

I.      INTRODUCTION ..................................................................................... 1

II.     RELEVANT FACTS ................................................................................ 2

III.    ARGUMENT ............................................................................................ 5

        A.      Expert Opinions That Are Not Based On Reliable
                Methodologies and Do Not Fit the Facts of the Case Must Be
                Excluded. ....................................................................................... 5

        B.      Jones's Opinions Are Premised on Unreliable Methodologies. .......... 7

                1.      Jones's Process of Elimination Methodology is
                        Unreliable Because He Does Not "Rule In" Many
                        Plausible Causes of Gelcoat Cracking, But Does "Rule
                        In" An Unspecified Gelcoat Defect. ........................................ 9

                2.      Jones's Process of Elimination Methodology is
                        Unreliable Because He "Rules Out" Possible Causes
                        Using Nothing Other than Expert Intuition. ............................ 15

                3.      Jones's "Purported" Methodology is Unreliable Because
                        He Extrapolates Without Reliable Foundation His
                        Conclusions Regarding a Single Yacht to Form Opinions
                        Regarding 271 Other Yachts. ................................................... 20

                4.      Jones's Opinions Regarding Viking's and Post's
                        Manufacturing Processes Are Unreliable Because They
                        Are Not Based on an Independent Analysis. ............................ 23

                5.      Jones Engages in Non Sequitur When He Concludes,
                        Based On His Determination That "the Only Common
                        Denominator" Among Yachts Exhibiting Cracking is the
                        Gelcoat, That A Gelcoat "Material Defect" Must Have
                        Caused the Cracking. ............................................................... 30

                6.      Jones's "Methodology" Satisfies None of the Indicia of
                        Reliability Identified in Daubert or in Milanowicz. ................ 34

        C.      Jones's Opinions Do Not Fit the Facts of This Case Because
                They Attribute the Gelcoat Cracking to an Unspecified "Material
                Defect" Lacking Any Nexus to the Claims at Issue. ............................ 36

IV.     CONCLUSION ....................................................................................... 39

## <u>TABLE OF AUTHORITIES</u>

## CASES

*Booth v. Black & Decker, Inc.*, 166 F. Supp. 2d 215 (E.D. Pa. 2001).............. 16, 18

*Clausen v. M/V New Carissa*, 339 F.3d 1049 (9th Cir. 2003)................................ 10

*Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993).......................... passim

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 43 F.3d 1311 (9th Cir. 1995)..... 29

*General Elec. Co. v. Joiner*, 522 U.S. 136 (1997)................................................. 21

*Hall v. Baxter Healthcare Corp.*, 947 F. Supp. 1387 (D. Or. 1996) ...................... 10

*Heller v. Shaw Indus., Inc.*, 167 F.3d 146 (3d Cir. 1999)....................................... 10

*In re Paoli R.R. PCB Litig.*, 35 F.3d 717 (3d Cir. 1994)................................. passim

*In re TMI Litig.*, 193 F.3d 613 (3d Cir. 1999) ..........................................................7

*Kerns v. Sealy*, 2007 WL 2012867 (S.D. Ala. July 6, 2007)...................... 14, 18, 23

*Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999) ...............................................6

*Michigan Millers Mutual Ins. Corp. v. Benfield*, 140 F.3d 915 (11th Cir. 1998)........................................................................................................... 15

*Milanowicz v. The Raymond Corp.*, 148 F. Supp. 2d 525 (D.N.J. 2001)..... 6, 14, 35

*Myrlak v. Port Authority of New York and New Jersey*, 723 A.2d 45 (N.J. 1999)............................................................................................................ 36

*Norris v. Baxter Healthcare Corp.*, 397 F.3d 878 (10th Cir. 2005) ................. 10, 21

*Oddi v. Ford Motor Co.*, 234 F.3d 136 (3d Cir. 2000)........................ 16, 18, 35, 37

*Pappas v. Sony Elec., Inc.*, 136 F. Supp. 2d 413 (W.D. Pa. 2000)................... 29, 35

*Pineda v. Ford Motor Co.*, 520 F.3d 237 (3d Cir. 2008)....................... 5, 14, 34, 35

*Stibbs v. Mapco, Inc.*, 945 F. Supp. 1220 (S.D. Iowa 1996) ................................. 19

*United States v. Downing*, 753 F.2d 1224 (3d Cir. 1985) ........................................6

*Weisgram v. Marley Co.*, 169 F.3d 514 (8th Cir. 1999)......................................... 12

*Willis v. Besam Automated Entrance Sys., Inc.*, 2005 WL 2902494 (E.D. Pa. Nov. 3, 2005)............................................................................................. 14, 30

*Zenith Elec. Corp. v. WH-TV Broad. Corp.*, 395 F.3d 416 (7th Cir. 2005) ..... 18, 19

**RULES**

Fed. R. Civ. P. 702 ................................................................................. 5, 6

Fed. R. Evid. 702 advisory committee's note to 2000 Amendments .................... 29

## I.   INTRODUCTION

Plaintiffs Viking Yacht Company ("Viking") and Post Marine Company ("Post") intend to offer at trial the opinion of David E. Jones that the gel coat cracking allegedly experienced in 272 Viking and Post yachts was caused by a single factor, a claimed "material defect" in 953 Series gel coat manufactured by Defendant Cook Composites and Polymers ("CCP"). Jones arrived at this opinion after inspecting only one of those 272 yachts—Viking Hull No. 55-945, the "Tortora yacht"—and when he did so, prior to being retained by plaintiffs in this case, he concluded that he could not determine a cause for the cracking. Nevertheless, after he was hired by Plaintiffs, based on the same inspection of that one Viking yacht, along with blind reliance on self-interested blanket generalizations made by Plaintiffs, and a set of documents cherry-picked by Plaintiffs' counsel, Jones now asserts that the cracking in the Tortora yacht was caused by some unknown "material defect" in 953 Series gel coat. He has no basis to believe that a "material defect" in gel coat could cause the type of cracking he identifies, yet through a supposed process of elimination that failed to eliminate numerous other possible causes of gel coat cracking, he arrived at that conclusion. Incredibly, he extrapolates from his newly-asserted conclusion regarding the Tortora yacht to form opinions regarding the cause of cracking in every single yacht at issue in this lawsuit (including the Post yachts, none of which he has

inspected), and even some that are not. Jones's opinions are not the product of reliable methodologies and should be excluded.

Even accepting Jones's opinions on their own terms, however, his opinions do not fit the facts of the case and will not assist the jury. It is Plaintiffs' burden not just to prove that the cracking at issue resulted from some unknown "defect", but to prove that the cracking resulted from one of the limited avenues for liability available to Plaintiffs after this Court's summary judgment ruling. Namely, Plaintiffs must prove that the cracking resulted from a breach of CCP's express warranty that 953 Series gel coat has improved flexibility relative to 952 Series or that it is linked to CCP's alleged provision of unreliable test results or failure to disclose later test results. As offered, Jones's opinion would move the jury no closer to making such determinations, and, more likely, would lead the jury to misunderstand its task.

For those reasons, and the reasons described below, CCP respectfully moves the Court to exclude Jones's opinions and testimony.

## II.    RELEVANT FACTS

The Court is familiar with the underlying facts of this litigation and CCP will not repeat them in detail here. As the Court knows, the underlying basis for Plaintiffs' suit is that CCP manufactured 953 Series gel coat that Plaintiffs

2

purchased and used in constructing 822 yachts between 1997 and 2004.[1] Plaintiffs brought a thirteen-count complaint against CCP and Composites One LLC,[2] seeking damages under multiple theories based upon claims that some of the yachts they built using 953 Series gel coat have suffered from catastrophic gel coat cracking. This Court has already granted summary judgment against Plaintiffs on all but four counts of the complaint, *see generally* S.J. Op., and has limited the scope of the remaining claims in significant respects.

Plaintiffs' claims are for (1) breach of express warranty – based upon the claim that the 953 Series gel coat did not conform to CCP's warranty that 953 Series gel coat has "improved flexibility" characteristics relative to the 952 Series that Plaintiffs had been using until 1997; (2) violation of the New Jersey Consumer Fraud Act, based upon the claims that CCP allegedly provided inaccurate testing data in 1998 comparing the elongation characteristics of the 953 Series to the 952 Series, and then failed to disclose the results of 2002 tests (conducted under

---

[1] Plaintiff Post Marine Co., Inc. used the 953 Series gel coat on new yachts from 1997 to 2002.  Plaintiff Viking Yacht used the 953 Series gel coat on new yachts from 1997 to 2004. (Opinion at 4 (July 26, 2007), Docket Entry No. 109 ("S.J. Op.").)

[2] Composites One LLC was a distributor through whom Plaintiffs purchased 953 Series gel coat. Plaintiffs did not oppose Composites One LLC's motion for summary judgment and stipulated to the dismissal with prejudice of all claims against Composites One on February 14, 2007. (*See* "Stipulation of Dismissal With Prejudice of All of the Plaintiffs' Claims Against Defendant Composites One LLC As Set Forth In Their Second Amended Complaint," Docket Entry No. 88 (Feb. 14, 2007).)

3

different conditions) allegedly showing materially different elongation; and (3) for common law fraudulent misrepresentation by omission, for failing to disclose the results of the 2002 test results.

To support their claims, Plaintiffs intend to offer the opinion evidence of David E. Jones, a naval architect and marine engineer who specializes in structural composites. Ex. 2[3] (Jones Dep. at 7:24-8:2). Jones opines that the gel coat cracking allegedly present in the yachts manufactured by Viking and Post was caused by "a material defect in the gelcoat product itself," and was not caused by "the manufacturing process of building the parts or the application and handling of the material itself." Ex. 1 (Jones Rep. at 3). As described in greater detail throughout this memorandum, Jones's reasoning  and methodology can be summarized as follows: 1) one Viking yacht—"the Tortora yacht"—shows unusual global gel coat cracking; 2) visual inspection of samples taken from the Tortora yacht does not suggest that the cracking was caused by Viking's manufacturing process; 3) Plaintiffs told Jones that many other Viking and Post yachts exposed to a variety of conditions have the same "highly uncommon" form of gelcoat cracking; 4) Viking and Post are experienced boat builders that use similar quality control and fabrication methods; 5) therefore, the "only common denominator" that can

---

[3] "Ex." references are to Exhibits to the Certification of Landon Y. Jones, filed concurrently with this memorandum.

explain the cracking on all Viking and Post yachts is a "material defect" in the gel coat used to manufacture the yachts. Ex. 1 (Jones Rep. at 2-3).

Jones's reasoning is both logically flawed and dependent on unreliable and non-replicable methodologies. His Report is nothing more than a transparent effort to launder the layman opinions of Plaintiffs themselves so that they can be presented to the jury under the guise of a "scientific" expert's "reasoned" opinion.

### III.    ARGUMENT

**A.    Expert Opinions That Are Not Based On Reliable Methodologies and Do Not Fit the Facts of the Case Must Be Excluded.**

Rule 702 permits qualified experts to offer opinion evidence within their area of expertise when their testimony "will assist the trier of fact to understand the evidence or to determine a fact in issue" and if "(1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." Fed. R. Civ. P. 702; *see also Pineda v. Ford Motor Co.*, 520 F.3d 237, 244 (3d Cir. 2008) (describing three major requirements of Rule 702). The party offering the expert opinion has the burden of satisfying Rule 702's requirements of qualifications, reliability and fit. *See In re Paoli R.R. PCB Litig.*, 35 F.3d 717, 744 (3d Cir. 1994).

The underlying objective of Rule 702's gatekeeping requirement "is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999). To that end, the Supreme Court and Court of Appeals have identified a non-exhaustive set of factors that courts should consider when evaluating a proffered expert's methodology:

> (1) whether a method consists of a testable hypothesis; (2) whether the method has been subject to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial uses to which the method has been put.

*Paoli*, 35 F.3d at 742 n.8 (citing *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993) and *United States v. Downing*, 753 F.2d 1224, 1238-39 (3d Cir. 1985)). To the extent possible, these factors should be applied even "to seemingly recalcitrant technical subjects such as engineering," because those fields "nevertheless rely on established principles of physics, material sciences, and industrial design and often utilize technologically sophisticated and carefully calibrated testing methods and devices." *Milanowicz v. The Raymond Corp.*, 148 F. Supp. 2d 525, 531-32 (D.N.J. 2001) (Irenas, J.).

Rule 702 "mandates that the challenged testimony 'assist the trier of fact to understand the evidence or to determine a fact in issue.' This requirement is one of relevance and expert evidence which does not relate to an issue in the case is not helpful." *In re TMI Litig*., 193 F.3d 613, 670 (3d Cir. 1999) (quoting *Daubert*, 509 U.S. at 591). An "expert's testimony must 'fit,' and admissibility depends, in part, on a connection between the expert opinion offered and the particular disputed factual issues in the case." *Id*. (quoting *Paoli*, 35 F.3d at 743).

Finally, "even if an expert's proposed testimony constitutes scientific knowledge, his or her testimony will be excluded if it is not scientific knowledge *for purposes of the case*." *Paoli*, 35 F.3d at 743. In other words, "the requirement of reliability, or 'good grounds,' extends to each step in an expert's analysis all the way through the step that connects the work of the expert to the particular case." *Id*. The purpose of these rules, of course, is to ensure that the purported expert opinion testifying meets some standard of reliability for use in the litigation context that is equivalent to the standard that would obtain in the expert's field and that the opinion testimony fits the facts and issues of the case and will therefore assist the trier of fact.

**B.     Jones's Opinions Are Premised on Unreliable Methodologies.**

An expert may not rely on a process of elimination to arrive at conclusions regarding causation when the expert does not begin with a reliable set of possible

causes and does not eliminate those causes using reliable methods. Here, though Jones claims to rely principally on a process of elimination[4], Jones has offered no replicable methodology by which he arrived at a set of possible causes—indeed, the set of possible causes he considered is unascertainable from his Report. Nor has Jones eliminated possible causes through the use of any reliable methodology. Rather, Jones offers only his *ipse dixit* that an unspecified gel coat "material defect" and nothing else caused the cracking in the Tortora yacht. Then, Jones extrapolates his conclusion regarding the Viking Tortora yacht to *271 other* yachts[5] manufactured by Viking *and Post*, based on nothing more than the self-interested statements of the Plaintiffs and a narrow set of documents selected by Plaintiffs' counsel with no input from Jones.

Finally, Jones's conclusion that because the gelcoat used is the "only common denominator" among the yachts suffering cracking, then therefore some unspecified defect in the gelcoat must be the cause of the cracking, suffers from a

_____

[4] Jones claims to base his opinions on a "process of elimination" analysis, coupled with his historical knowledge that "[t]his is an incredibly unique situation." (Ex. 2 (Jones Dep. at 90:4-91:2.))

[5] Plaintiffs claim that 272 of the 822 yachts manufactured by Viking and Post with 953 Series gel coat have experienced gel coat cracking. (*See* Ex. 3 (Viking Yacht Company Damages Summary (June 30, 2008)); Ex. 4 (Post Marine Company, Inc. Damages Summary (June 30, 2008)).) Based on Plaintiffs' representations, up to 677 yachts, and up to 127 yachts with cracking, are potentially at issue under the six-year statute of limitations governing Plaintiffs' New Jersey Consumer Fraud Act claim.

fatal logical flaw: 953 Series gelcoat is also a "common denominator" to the vast majority of yachts built by Viking, Post, and other manufacturers, that have not experienced any gel coat cracking at all.  Jones has no answer to this inconvenient fact except to rely on wholly unsupported speculation that perhaps the "only" common denominator causing cracking is really two factors: 953 Series gel coat coupled with exposure to cold weather. This theory is nowhere mentioned in Jones's Report and, in fact, directly contradicts Jones's stated opinion in his Report that the yachts exhibiting gelcoat cracking were "exposed to a wide variety of climate and environmental conditions." Ex. 1 (Jones Rep. at 2). Moreover, Jones has made no effort whatsoever to examine the climate exposure of yachts and other boats with and without cracking. Accordingly, Jones's last-ditch effort to rehabilitate his opinion also does not withstand meaningful scrutiny.

     1.     *Jones's Process of Elimination Methodology is Unreliable Because He Does Not "Rule In" Many Plausible Causes of Gelcoat Cracking, But Does "Rule In" An Unspecified Gelcoat Defect.*

When analyzing the cause of a particular condition through a process of elimination—or in the analogous medical context, a differential diagnosis—the first step is to "rule in" the universe of possible causes.[6] *See, e.g., Clausen v. M/V*

---

[6] Much of the caselaw evaluating process of elimination methodologies arises in the medical context, where "differential diagnosis", which at its core involves a process of elimination, is a standard means of determining the cause of

9

*New Carissa*, 339 F.3d 1049, 1057 (9th Cir. 2003). It goes without saying that the suspected cause at issue in the lawsuit should only be "ruled in" if there is a reliable basis to believe that such a cause could generally produce the symptom. *See Norris v. Baxter Healthcare Corp.*, 397 F.3d 878, 885 (10th Cir. 2005) ("*It is [important] to recognize that a fundamental assumption underlying [differential diagnosis] is that the final, suspected 'cause' remaining after this process of elimination must actually be capable of causing the injury*. That is, the expert must 'rule in' the suspected cause as well as 'rule out' other possible causes.") (emphasis and alterations in original) (quoting *Hall v. Baxter Healthcare Corp.*, 947 F. Supp. 1387, 1413 (D. Or. 1996)). Finally, once the expert establishes the universe of possible causes, if an expert is to winnow down the list to a single possible cause, the expert must do so using reliable methodologies. *Paoli*, 35 F.3d at 745 (noting that any step in the expert's analysis lacking "good grounds" renders the expert's opinion inadmissible under *Daubert*).

In his analysis of cracking on the Tortora yacht, Jones's process of elimination methodology fails to meet those established legal principles at every step: first, he failed to "rule in" an appropriate set of possible causes; second, he included as a possible cause an unspecified "material defect" in the gelcoat that he

---

symptoms in a patient. *See, e.g., Heller v. Shaw Indus., Inc.*, 167 F.3d 146, 156 (3d Cir. 1999).

had no basis to believe could even generally cause the evidenced cracking; and third, he failed to eliminate possible causes using reliable methodologies.

Jones acknowledges that there are many possible causes of gelcoat cracking. For example, Jones acknowledges in his Report that gel coat cracking can result from "laminate problems," "a void beneath the gelcoat surface," "delamination," impact stresses in "the de-molding cycle," and "early failure of a laminate or substructure." Ex. 1 (Jones Rep. at 1). In addition, at deposition, Jones acknowledged that it is a "well-known fact" that "gel coat thickness can cause gel coat cracking," Ex. 2 (Jones Dep. at 56:8-14), that "moisture" and "temperature conditions" in the manufacturing plant can affect the performance of gel coat, Ex. 2 (Jones Dep. at 124:12-17, 134:15-20, 136:12-14), and that "use conditions," "environmental conditions," and "temperature" all can affect gel coat cracking, *id.* at 148:22-149:7. Despite acknowledging these many causes of cracking, in his Report, Jones only expressly considers "visible voids, delamination or other manufacturing defects" as possible causes of the gelcoat cracking on the Tortora yacht. Even then, his methodology for ruling them out, as explained below, is impenetrable. To the extent Jones considered other causes without expressly mentioning them in his Report, Jones's methodology for ruling them out as causes was likewise wholly unreliable, as explained below.

Further, Jones "rules in," with no basis whatsoever, an unspecified "material defect" in 953 Series gelcoat as a potential cause of the cracking. Nowhere in his Report or in his deposition testimony does Jones suggest that he had experience with "material defects" in gel coat causing gel coat cracking, let alone the widespread cracking he saw on the Tortora yacht. Jones testified repeatedly that the gelcoat cracking on the Tortora yacht was highly unusual and that—with one exception—he had never seen anything like it. *E.g.,* Ex. 2 (Jones Dep. at 90:24-91:2 ("This is an incredibly unique situation. I've only seen it one time before.") That one exception when Jones had seen global cracking of the sort seen on the Tortora yacht involved application of a gel coat to a laminate with an incompatible coefficient of thermal expansion. *See* Ex. 2 (Jones Dep. at 96:18-23). Jones makes no claim that the single instance involved a "material defect" in the gel coat. Nor does Jones conduct any type of test to establish that a "material defect" in 953 Series gel coat was capable of causing the widespread cracking he witnessed on the Tortora yacht. *Compare Weisgram v. Marley Co.*, 169 F.3d 514, 519-20 (8th Cir. 1999) (holding district court abused its discretion in admitting "rank speculation" of expert that unspecified heater malfunction caused fire based on view that "[e]verything else is ruled out" when expert "did no testing to bolster his theory and admitted that he knew of no tests that anyone had conducted to support a similar theory of fire cause and origin") *with* Ex. 2 (Jones Dep. at 89:3-90:11

(acknowledging complete failure to test 953 Series gel coat)). In fact, at the time Jones examined the Tortora yacht (then on behalf of Atlantic Mutual), Jones's opinion was that "the source of the gel coat cracking witnessed on the Tortora yacht was inconclusive as to cause." Ex. 2 (Jones Dep. at 186: 9-14); *see also* Ex. 5 (VK004124 ("the work was inconclusive as to a direct cause")). Nevertheless, in his Report, he now assumes that some unspecified "material defect" in 953 Series gel coat was capable of causing the cracking he saw on the Tortora yacht.[7]

Jones's reasoning relies on tautology and nothing else: Jones "rules in" as a potential cause a material defect in the gel coat that he implicitly assumes is capable of causing the unique cracking on the Tortora yacht. With equal legitimacy, Jones could have "ruled in" some "defect" in the New Jersey air at the time the yachts were built, or some "defect" in the Atlantic Ocean that all of the yachts were placed in. There is no reason to believe that a defect or abnormality in any one of these things—953 Series gel coat, New Jersey air, or the Atlantic Ocean—, all of which are "common denominators" to the Viking and Post yachts exhibiting cracking, was capable of causing the gel coat cracking at issue. Jones

---

[7] Notably, Jones expressly disavowed reliance on Dr. Caruthers's flawed report. *See* Ex. 2 (Jones Dep. 212:17-213:20 ("Q: Is your report in any way or your opinion in this case in any way contingent upon any of his findings? A: No. Q: Is it in any way based on any of his findings? A: Well, I've never seen his report, so no.")). Even had Jones relied on the Caruthers Report, because Dr. Caruthers's opinions are unreliable, any opinions based on the Caruthers Report would likewise be unreliable.

performed no test to establish that a "material defect" in 953 Series gel coat was capable of causing widespread cracking and had no other basis to conclude that it was. *See Paoli*, 35 F.3d at 764 (affirming exclusion of opinion that amounted to no more than "a hypothesis which [the expert] had yet to attempt to verify or disprove by subjecting it to the rigors of scientific testing"); *Milanowicz*, 148 F. Supp. 2d at 535 ("[T]he absence of testing is a consistent factor in court decisions excluding expert testimony."); *Kerns v. Sealy*, 2007 WL 2012867, at *5 (S.D. Ala. July 6, 2007) (excluding expert testimony that particular batch of foam had manufacturing defect regarding its core temperature that caused fire when expert "performed no tests. He made no chemical examination or inspection of this batch of foam"); *id.* at *6 ("There was no discernable methodology and no discernable scientific or technical ground for that conclusory opinion, which contradicted other parts of [the expert's] deposition in which he admitted the existence of other possible causes that he [had] been unable to rule out. This aspect of [the expert's] testimony more closely resembles a lawyer's closing argument than an expert's considered opinion."); *Willis v. Besam Automated Entrance Sys., Inc.*, 2005 WL 2902494, at *6 (E.D. Pa. Nov. 3, 2005) (excluding expert opinion when, among other things, expert "conducted no tests"); *cf. Pineda*, 520 F.3d at 248-49 (testing not necessary when causation obvious).

14

Moreover, because Jones identifies no particular "material defect" in 953 Series gel coat that could have caused the cracking, Jones's methodology is inherently biased. There is no way to ever "rule out" such an amorphous cause, but after ruling out all other causes, Jones is necessarily left with his assumed cause remaining as his only candidate. *See Michigan Millers Mutual Ins. Corp. v. Benfield*, 140 F.3d 915, 921 (11th Cir. 1998) (affirming exclusion of expert opinion that fire was intentionally set when expert's opinion was based solely on the fact that he was unable to identify the source of the ignition of the fire).

    2.    *Jones's Process of Elimination Methodology is Unreliable Because He "Rules Out" Possible Causes Using Nothing Other than Expert Intuition.*

Setting aside Jones's inappropriate assumption that an unspecified material defect in 953 Series gel coat was capable of causing the evidenced cracking, the process by which Jones eliminated all other competing causes is plagued with unreliability. For those few potential causes of gel coat cracking that Jones addresses in his Report, he rules them out based on nothing other than his *ipse dixit.* Jones bases his opinion solely on his unquantifiable and nonreplicable judgment that nothing seemed out of the ordinary in the few samples taken from the one Viking yacht he inspected. Ex. 1 (Jones Rep. at 2 (asserting that six samples taken from the Tortora yacht "had no visible voids, delamination or other manufacturing defects that could have caused the failures")); Ex. 2 (Jones Dep. at

75:12-15 ("Everything looked, you know, fairly normal, fairly consistent with what I would expect . . .")). Jones testified that when looking at samples from the Tortora yacht under a microscope, "[s]o far as manufacturing issues, there was nothing that really jumped out at me." *Id.* at 74:24-75:2. Whether or not causes "jump out" at a particular expert when the expert visually examines them, is not a reliable, let alone replicable, methodology by which to rule out acknowledged causes of gel coat cracking. *Daubert* requires more than the "haphazard, intuitive inquiry" engaged in by Jones. *Oddi v. Ford Motor Co.*, 234 F.3d 136, 156 (3d Cir. 2000); *see Booth v. Black & Decker, Inc.*, 166 F. Supp. 2d 215, 219 (E.D. Pa. 2001) (excluding expert's opinion based on expert's microscopic inspection when expert failed to "offer any source for his conclusion beyond his own personal experience" with the particular markings at issue).

Though Jones made no mention in his Report of the methodology he used to rule out other widely acknowledged causes of gel coat cracking, Jones claimed at deposition to have reasons. In particular, to rule out the possibility that overly thick gel coat application may have caused the gel coat cracking on the Tortora yacht, Jones claimed to have visually inspected the thickness levels on the few samples he examined and found them to be "all appropriate." Ex. 2 (Jones Dep. at 75:2-7); *see also id.* at 56: 3-7 (acknowledging failure to make systematic review of the Tortora yacht for gel coat thickness).) There are, of course, far more reliable methods for

gauging gel coat thickness levels than rough "eyeball" analysis of a limited number of samples drawn from only one yacht—namely, one can directly measure gel coat thickness and employ a legitimate statistical sample. In fact, Plaintiffs were in possession of a document that contained a comprehensive set of such measurements for the Tortora yacht itself, but Plaintiffs declined to provide it to Jones and Jones accordingly did not see or consider it. *See* Ex. 6 (VK003599-VK003603); Ex. 2 (Jones Dep. at 105:20-24). This Viking-produced document shows that in more places than not the thickness measurements from various places on the Tortora yacht far exceeded the manufacturer specifications of 18 to 22 thousandths of an inch. *Compare, e.g.,* Ex. 6 at VK003601 (showing gel coat thickness measurements of 35, 34, 40, 33, 42, 62, and 80 thousandths of an inch for section of Tortora yacht)) *with* Ex. 2 (Jones Dep. at 80:24-81:6 (stating that when "properly applied" the gel coat should be "18 to 22 thousandths wet")) *and* Ex. 7 (VK002121-25 at VK002123 (CCP product bulletin showing recommended wet film thickness of "18 + 2 mils" and stating that "[f]ilms above 24 mils may pre-release, trap porosity, crack and are more subject to weathering discoloration" and that "cracking resistance could suffer" with film thicknesses of 20 to 24 mils)). Jones offers no explanation for why his rough visual determination that the gel coat thicknesses on the Tortora yacht were "all appropriate" should trump the careful measurements conducted by Viking that show the thickness levels of the gel coat

17

far exceeding manufacturer specifications. Accordingly, his exclusion of gel coat thickness as a cause of the cracking renders his opinion unreliable. *See Paoli*, 35 F.3d at 759 (holding that when expert offers no explanation for why he or she has excluded plausible alternative cause, the expert's opinion should be excluded).

It is well-established that an expert may not jettison available reliable testing methodologies in favor of his own intuition to form his opinions. *See Oddi*, 234 F.3d at 158 (affirming exclusion of expert testimony when expert "conducted no tests," "used little, if any methodology beyond his own intuition," there was "nothing . . . to submit to peer review," "it [was] impossible to ascertain any rate of error," "no standards control[led] [the expert's] analysis, and no 'gatekeeper' [could] assess the relationship of [the expert's] method to other methods known to be reliable and the non-judicial uses to which it has been put."); *Booth,* 166 F. Supp. 2d at 221 (excluding expert testimony when expert "performed no tests of his own to determine whether his hypotheses were true," based his opinions solely "on his own training and experience, and he provided the Court with no objective anchor for his conclusions"); *Zenith Elec. Corp. v. WH-TV Broad. Corp.*, 395 F.3d 416, 419 (7th Cir. 2005) ("An expert must offer good reason to think that his approach produces an accurate estimate using professional methods, and this estimate must be testable. Someone else using the same data and methods must be able to replicate the result."); *Kerns*, 2007 WL 2012867, at *5 (excluding expert

testimony when expert "performed no tests," despite availability of allegedly defective product); *Stibbs v. Mapco, Inc.*, 945 F. Supp. 1220, 1224 (S.D. Iowa 1996) (holding that expert testimony "lacks the support to rise above speculation because it remains untested in many important respects").

Jones's eyeball analysis and reliance on his gut impression that everything seemed "normal" as a means of excluding every possible cause of gel coat cracking other than a defect in the gel coat is just the type of impenetrable, non-replicable expert intuition that gatekeepers cannot assess and a jury cannot meaningfully evaluate. *See Zenith*, 395 F.3d at 419 ("'[E]xpert intuition,' is neither normal among social scientists nor testable—and conclusions that are not falsifiable aren't worth much to either science or the judiciary."). This is all the more true when Jones had at his disposal, but chose not to employ, objective means of evaluating the samples he took from the Tortora yacht, objective means of taking samples from the numerous other allegedly affected yachts he ignored, and objective means of obtaining and evaluating the other available information. Accordingly, the Court should exclude his opinions regarding the source of cracking.

3.  *Jones's "Purported" Methodology is Unreliable Because He Extrapolates Without Reliable Foundation His Conclusions Regarding a Single Yacht to Form Opinions Regarding 271 Other Yachts.*

As tenuous as Jones's conclusions are with respect to the Viking Tortora yacht—the only yacht Jones examined—Jones's conclusions rest on pure speculation with respect to the 214 other Viking yachts and 57 Post yachts for which Jones purports to offer an opinion regarding causation. Jones freely admits that he personally examined only a single yacht manufactured by Viking, the Tortora yacht, and did not inspect even one yacht manufactured by Post. *See* Ex. 2 (Jones Dep. at 63:14-64:23). Jones admits that he merely extrapolated from his examination of the Tortora yacht to other Viking yachts and to all of the Post yachts.[8] He based this extrapolation on nothing more than self-interested representations from the Plaintiffs themselves that all of the other yachts are "all the same." *See id*. at 146:7-11 ("And what has been represented to me by people that I trust and have confidence in, that the other boats are, I'll say in quotes, all the same."). "Although '[t]rained experts commonly extrapolate from existing data,' neither *Daubert* nor the Federal Rules of Evidence 'require[] a district court to

---

[8] *See* Ex. 2 (Jones Dep. at 101:6-16:
  Q:   And you've extrapolated from your examination of the Tortora boat to other Viking boats and to all the Post boats, isn't that right?
  A:   That's correct.
  Q:   You haven't done any work on these boats yourself?
  A:   No.
  Q:   It's purely by extrapolation.
  A:   That's correct.).

admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered.'" *Norris,* 397 F.3d at 886 (quoting *General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)). Here, there is too great a gap between Jones's sole data point, the Tortora yacht, and the breadth of his opinion, encompassing 271 *other* yachts.

The basis for Jones's extrapolation is entirely unreliable. Jones chose to rely on self-interested representations from Plaintiffs, despite the fact that many yachts—both Viking and Post yachts—were available for his inspection. As the Third Circuit stated in an analogous medical context, "a physician who evaluates a patient in preparation for litigation should seek more than a patient's self-report of symptoms or illness and hence should either examine the patient or review the patient's medical records simply in order to determine that a patient is ill and what illness the patient has contracted." *Paoli*, 35 F.3d at 762 (affirming exclusion of expert testimony because based on unreliable source of information). Even if Jones were in a position to rule out alternative causes of cracking for the Tortora yacht based on his personal inspection, Plaintiffs' self-serving statement that the other 271 yachts with cracking were "the same" is not a reliable basis for ruling out alternative causes in those yachts. *See Paoli*, 35 F.3d at 764 ("[W]ith respect to those plaintiffs whom Dr. Sherman did not examine, she had little, if any data with

21

which to rule out alternative causes of their illnesses. There is no evidence in the record showing the extent to which medical histories were present in the plaintiffs' medical records, and she performed no reliable laboratory tests."). Jones's reasoning is directly analogous—if not weaker—than the testimony of Dr. DiGregorio, who also relied on self-interested representations of plaintiffs instead of reliable sources of information, that the Third Circuit excluded in *Paoli*. 35 F.3d at 763-64. As the Court there summarized:

> Presumably, Dr. DiGregorio's general reasoning was that all of the plaintiffs had significant exposure to PCBs, that PCBs are a known cause of the illnesses of the various plaintiffs, and that, in the absence of any indication that any plaintiff had been exposed to something more likely to cause his or her illness than PCBs, it was reasonable to conclude that PCBs were a likely cause. But Dr. DiGregorio did not point to any evidence showing that PCB exposure was so likely to produce the type of illnesses the plaintiffs had in comparison to other possible causes to which plaintiffs had likely been exposed that it was reliable to conclude that PCBs were the cause without further analysis. We think that the district court essentially, and properly, read Dr. DiGregorio's testimony as showing that his opinion that PCBs caused plaintiffs' illnesses was only a hypothesis which he had yet to attempt to verify or disprove by subjecting it to the rigors of scientific testing.

*Id.*

Further, the jury would not be assisted by an expert that merely repeats generalizations made by Plaintiffs, without undertaking any independent inquiry requiring specialized expertise. Even if the Court were to admit, and the jury to

accept, Jones's view that the gel coat cracking in the Tortora yacht was caused by some "material defect" in the gel coat, the jury would be well-equipped to evaluate directly the credibility of Plaintiffs' blanket assertions that the other yachts were "all the same", rather than having the generalization filtered through or buttressed by the imprimatur of a purported expert. As the Court in *Kerns* held with respect to similar testimony of an expert in that case:

> Damant's elimination of the defective batch theory based solely on purported testimony that defendants had never had problems with that batch before is not in any way related to his expertise, as far as this Court can discern. Damant is no more able to eliminate the defective batch theory based on alleged facts that defendants had used that batch before without trouble than a lay person would be. Plaintiffs have not shown that Damant utilized his expertise in any way, shape or form in rendering his opinion that the fire was not caused by a defective batch. The notion that the batch had never caused a fire before, so it could not have caused this fire, at least as postured here, is mere common-sense reasoning well within the of the average juror. Plaintiffs have not shown that Damant's special expertise is in any way instructive, illuminative, or helpful in reaching that quite straightforward conclusion.

*Kerns*, 2007 WL 2012867, at *10 (noting also that the court's opinion might differ had the expert actually conducted tests, inspections or analysis).

### 4. Jones's Opinions Regarding Viking's and Post's Manufacturing Processes Are Unreliable Because They Are Not Based on an Independent Analysis.

Jones's examination of Viking's and Post's manufacturing processes was entirely controlled and directed by Plaintiffs themselves. Jones examined an

extremely limited subset of documents provided to Jones by Plaintiffs' counsel, without any independent guidance from Jones.[9] Notably, Jones did not examine a single Post document, visit a Post plant, or examine a single Post yacht. Jones's opinions are based almost entirely on interviews with Plaintiffs themselves conducted after the initiation of litigation. Even assuming that Jones was in a position to assess the present-day manufacturing processes of Viking and Post based on this limited and inherently subjective set of information, the relevant

---

[9] *See* Ex. 2 (Jones Dep. at 204:21-205:22:

Q:    Okay. And this information was compiled or selected for you by Mr. Weisz?

A:    Yes, sir.

Q:    What criteria did he employ?

A:    I have no idea.

Q:    Did you tell Mr. Weisz what to provide you?

A:    No, no.

Q:    So he decided—he selected documents to provide to you; is that right?

A:    Yes, I would assume so.

Q:    And you understand that the documents that have been provided to you in this case, which are listed in your report in the reference list of materials, are not the entirety of the documents that have been produced in this lawsuit; is that right?

A:    Oh, I understand that.

Q:    And you didn't tell Mr. Weisz what information to give you?

A:    No, sir.)

question for purposes of this litigation is not what Viking's and Post's manufacturing processes are in the present day, but what they were at the time the yachts at issue were manufactured, mostly in the period 1999 to 2002. In that regard, rather than conducting a comprehensive review of contemporaneous records, Jones depended entirely on blanket self-serving retrospective assertions of Plaintiffs. *See* Ex. 2 (Jones Dep. 59:14-20 ("I asked if their procedures had changed at all from the time that the boat was built to the time that I was there, and they said that their equipment had remained pretty much the same. Their procedures had pretty much remained the same.")) In other words, Jones, at best, evaluated Plaintiffs' present procedures and practices, viewed in the context of litigation, and then merely accepted their blanket representation that little had changed from the time they manufactured the yachts at issue in this litigation.

Moreover, it is clear that Plaintiffs' shielding of inconvenient documents from Jones caused Jones to overlook important abnormalities and inconsistencies in Viking's and Post's manufacturing processes. For example, as discussed above, Jones developed his opinion that overly thick application of gel coat did not cause the cracking on the Tortora yacht without the benefit of a comprehensive set of measurements made by Viking showing that, in fact, the gel coat had been applied in thicknesses far exceeding CCP's specifications. *See supra* at III.B.2. And Jones developed his opinions regarding Viking's gel coat thickness safeguards without

the benefit of contemporaneous written statements by Viking employees that, "We have a problem with the thickness of gel coat in our fiberglass parts." Ex. 2 (Jones Dep. at 122:1-124:8).

It is reflective of the limitations of Jones's analysis that his only answer to the measurements and contemporaneous documents that conflict with his assessment is that, in the present day, Viking employs a "standard procedure" for the gel coat operator to "have a gel coat thickness gauge." Ex. 2 (Jones Dep. 111: 16-20). But this present-day generalized practice is a far less reliable indicator of the actual gel coat thicknesses on the yachts now at issue than a comprehensive set of direct measurements of gel coat thicknesses made by Viking or contemporaneous admissions that "we have a problem with the thickness of our gel coat". The documents were clearly the most reliable means of evaluating the 1999 through 2002 practices of Viking and Post, but Plaintiffs' counsel concealed that information from Jones.

Likewise, Jones developed his opinion that Post's gel coat application procedures were "nearly the same" as Viking's—and presumably not susceptible to overly thick gel coat application—without the benefit of available documents containing direct measurements of gel coat thicknesses on Post yachts (or any other document from Post's files, inspection of a single Post yacht, or visit to a Post facility). *See* Ex. 8 (CCP06822-24); Ex. 2 (Jones Dep. at 117:5-119:20). Jones

acknowledged at deposition that analysis of one Post yacht showed gel coat thickness measurements of 70-75 thousandths of an inch, "substantially thicker" than the recommended levels of 18-22 thousandths of an inch. *Id.* Yet, Jones was content to rely on Post's self-serving representations regarding their own manufacturing practices, without even asking to see if such documents were available in the discovery record. *Id.* at 205:19-22.

Other examples where Plaintiffs' counsel concealed reliable information about Viking's and Post's manufacturing practices during the relevant time period abound. For example, Jones was not provided with documents showing substantial water leaks in the roofs over Viking's hull molds and laminate, even though Jones acknowledges that such moisture could affect gel coat performance. *Id.* at 124:12-129:14; Ex. 9 (VK132447, VK132448). Nor was Jones provided with a Viking document discussing "a big problem with the dust when we patch in gel coating and allgrip, this machines [sic] blow air and dust all over the place and contaminate all areas." Ex. 2 (Jones Dep. at 131:15-133:17); Ex. 10 (VK132685, VK132687). Nor was Jones provided with documents showing that heaters were broken in Viking's manufacturing plant, even though Jones acknowledges that temperature conditions in the plant can be significant in the manufacturing of fiberglass. Ex. 2 (Jones Dep. at 133:21-137:3); Ex. 11 (VK132669-70); Ex. 12 (VK132666-68). Indeed those same documents acknowledge that Viking would "have problems

later with things not curing right" as a result of the heaters not working.[10] Ex. 13 (VK132668).

Finally, Jones's opinions regarding Viking's and Post's manufacturing processes are wholly removed from any meaningful standard. Despite suggesting at the start of his Report that one of the principal reasons he was hired was to "determin[e] if the procedures, methods or equipment used in the gelcoat application process varies from that used within the marine industry," Ex. 1 (Jones Rep. at 1), Jones never offers an opinion on that issue in his Report. Jones only findicates that both Viking and Post's "quality control and fabrication methods . . . are nearly the same." *Id.* at 2. And though Jones went far beyond the text of his

---

[10] The constraints of a seven-hour deposition limited the number of documents about which CCP could directly ask Jones. However, the list of additional documents in the record that contain evidence of alternate explanations for gel coat cracking on yachts at issue, but were concealed from Jones, is extensive. *See, e.g.,* Ex. 14 (VK013020 (gel coat void)); Ex. 15 (VK103568-69 ("bad buffing, scratches and swirl marks")); Ex. 16 (VK066849-50 (stress cracks)); Ex. 17 (VK067697 (air void)); Ex. 18 (VK015880-88 (stress cracks)); Ex. 19 (VK066078 (gel coat void)); Ex. 20 (VK066081 (air void)); Ex. 21 (VK066083 (stress cracks)); Ex. 22 (VK066087 (stress cracks)); Ex. 23 (VK078090 (gel void)); Ex. 24 (VK001503 (gel coat chips)); Ex. 25 (VK073324 (gel coat void)); Ex. 26 (VK129985 (stress cracks)); Ex. 27 (VK006059 (gel coat voids)); Ex. 28 (VK070438 (gel coat voids)); Ex. 29 (VK031619 (gel coat void)); Ex. 30 (VK031627 (gel coat void)); Ex. 31 (VK061340 (gel coat chip)); Ex. 32 (VK061342 (damaged gel coat)); Ex. 33 (VK035873 & VK035875 (gel coat peeling too thick)); Ex. 34 (VK086912 & VK086915 (gelcoat voids)); Ex. 35 (VK086962 (voids, chips)); Ex. 36 (VK086966-67 (gel coat chips)); Ex. 37 (VK012391-92 (heavily oxidized gel coat)); Ex. 38 (VK056042 (stress cracks)); Ex. 39 (VK111831 (gel coat void)).

Report at deposition in suggesting that Viking's and Post's quality control practices are "probably an order of magnitude better than the standard in the industry," Ex. 2 (Jones Dep. at 138:7-14), Jones nowhere indicates his methodology for arriving at this conclusion. Rather, the Court is left to presume that this opinion is somehow the product of Jones's general impressions of Viking's and Post's practice coupled with his "experience" in the industry. As the advisory committee's notes to the 2000 amendments to Rule 702 themselves explain:

> If the witness is relying solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts. The trial court's gatekeeping function requires more than simply "taking the expert's word for it."

Fed. R. Evid. 702 advisory committee's note to 2000 Amendments; *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 43 F.3d 1311, 1319 (9th Cir. 1995) ("We've been presented with only the experts' qualifications, their conclusions and their assurances of reliability. Under *Daubert*, that's not enough."); *Pappas v. Sony Elec., Inc.*, 136 F. Supp. 2d 413, 425 n.16 (W.D. Pa. 2000). Jones utterly failed to explain both why his experience is a sufficient basis for his opinions and how he employed his experience to reach his conclusions.

In sum, Jones's willingness to accept Plaintiffs' self-serving blanket assertions at face value coupled with his limited inquiry brought about both by his own decisions and the decisions of Plaintiffs' counsel to provide Jones with a highly selective set of documents, render Jones's opinions regarding Viking's and Post's manufacturing processes utterly unreliable. *See Willis*, 2005 WL 2902494, at *5 (excluding expert opinion when, "[i]nstead of conducting his own independent investigation, [the expert] merely relies on documents provided to him by Plaitniff's counsel").

> 5. *Jones Engages in* Non Sequitur *When He Concludes, Based On His Determination That "the Only Common Denominator" Among Yachts Exhibiting Cracking is the Gelcoat, That A Gelcoat "Material Defect" Must Have Caused the Cracking.*

Even assuming that 953 Series gel coat is the "only common denominator" to the Viking and Post yachts exhibiting catastrophic cracking, it is a fallacy to infer causation from that purported fact. First, Jones relies on an unstated and unsupported assumption that there must be a single underlying cause to all instances of cracking on Viking and Post yachts. This is in the face of Jones's acknowledgement that there are a host of causes of gel coat cracking, many of which he did not examine even on the single yacht he inspected. *See supra* at III.B.1. Second, and more critically, 953 Series gel coat has been in wide usage in the marine industry for more than ten years, and is a "common denominator" to the vast majority of Viking and Post yachts—550 of 822 yachts—, as well as

*thousands* of boats made by other manufacturers, that have shown no signs of catastrophic gel coat cracking to date. Therefore, the mere fact that 953 Series is "common" to the yachts with cracking cannot establish that it is the cause.

Among the pieces of information that Plaintiffs' counsel declined to share with Jones was that Performance Cruising, another boat manufacturer, has used 953 Series gel coat from 1999 to the present, and even used the very same *batches* of gel coat as used by Post on yachts with reported cracking, but Performance Cruising's customers have not experienced catastrophic gel coat cracking. Ex. 2 (Jones Dep. at 142:1-146:20); Ex. 40 (Smith Dep. at 41:17-21; 55:13-20; 57:17-58:8; 59:12-60:12; 61:23-62:6; 63:20-64:9; 66:6-14; 67:17-23; 68:15-69:5; 70:12-71:1; 72:4-10; 73:5-16; 74:10-22; 75:24-76:13; 77:19-78:5); Ex. 41 (Smith Decl. ¶¶ 6, 9-13). When asked about this indispensable fact, and the fact that most Viking and Post yachts built with 953 Series gel coat have *not* cracked, Jones raised, for the first time, a new theory of causation. Jones's revised theory is that there is not one "common denominator", 953 Series gel coat, but there are two "common denominators" necessary to cause the witnessed cracking. Jones now believes that the cracking is caused not simply by some unspecified defect in 953 Series gel coat, but also is "related to environmental exposure". Ex. 2 (Jones Dep. at 147:21-148:2). Jones made no mention of this theory in his Report—in fact, the only statement in his Report regarding climate exposure directly contradicts his

new view that all yachts with cracking were exposed to similar environmental conditions. *See* Ex. 1 (Jones Rep. at 2 ("The boats come from all over the country and are exposed to a wide variety of climate and environmental conditions.")). Jones has no basis for his new views regarding climate exposure, aside from his "understanding that the major portion of the boats that were affected have been cold climate boats." Ex. 2 (Jones Dep. at  150:2-151:16).

Jones admittedly made no study whatsoever of the environmental exposures of Viking's and Post's yachts, let alone the boats made by Performance Cruising or other manufacturers. *Id.* at 150:14-151:3. Had he done so, he would know that many Performance Cruising boats are also "cold climate boats" that have not experienced gel coat cracking. *See* Ex. 42 (Performance Cruising advertisement showing Performance Cruising boat surrounded by ice in southern Chile); Ex. 40 (Smith Dep. at 38:8 – 39:6 (describing advertisement)); *id.* at 133: 9-23 ("Gemini is literally the most popular catamaran in the world. And you're going to see Geminis in every creek and inlet and every boat yard from Florida to Canada.") Rather, Jones's "understanding" is based solely on Viking and Post employees telling Jones that the "major portion" of *their* boats with cracking "have been cold climate boats." Ex. 2 (Jones Dep. at 151:4-16). Even accepting Viking's and Post's representations at face value, which Jones apparently did, Jones has no information about the climate exposure of boats *not* manufactured by Viking and Post and he

has no explanation for the implied remaining portion of Viking and Post yachts with cracking that were not "cold climate boats."

In order to have a reasonable basis to believe that some interaction between a material defect in 953 Series gel coat and exposure to cold weather explains away the fact that the vast majority of boats built with 953 Series gel coat have not cracked, more is required than blind reliance on self-interested blanket assertions of the Plaintiffs themselves. Jones claims that he cannot form an opinion with regard to the relevance of climate exposure for Performance Cruising's boats because he does not have enough information about their climate exposure:

> A: . . . And the fact that this Performance—you say that Performance catamaran has been using the same batch or did use the same batch and their boats went to cold climates, I know nothing about how long they were there, whether—the duration, you know, how many times, what the cycle of temperature was. I know nothing about it. So I couldn't respond to that. I wouldn't know.
>
> Q: So you can't respond because you don't have enough information?
>
> A: I don't have enough information. And even if everything that you have told me, if it were all true, it still wouldn't change my opinion. What I saw is what I saw and—
>
> Q: What you saw in the one boat, the Tortora boat?
>
> A: Yeah. And what has been represented to me by people that I trust and have confidence in, that the other boats are, I'll say in quotes, all the same. You know, no, it doesn't change my opinion at all.

Ex. 2 (Jones Dep. at 145:8-146:12).

33

Yet, if Jones cannot form an opinion with regard to Performance Cruising without information regarding its boats' duration of exposure to cold weather, the number of exposures to cold weather, and the pertinent temperature cycles, that begs the question of how he was able to form opinions with regard to Viking and Post's yachts without that very same information.[11] At the very least, Jones should have undertaken some basic independent inquiry into whether boats built with 953 Series gel coat that have cracked actually were exposed to cold weather conditions and whether boats built with 953 Series gel coat that have not cracked were not exposed to such conditions. Jones made no attempt in this regard—his only independent inquiry into this question apparently consists of his recollection that "it was a very cold winter" preceding the time when the Tortora yacht's cracking first presented itself. *Id.* at 55:18-21 ("Q: And did you review weather records? A: I only recall that it was a very cold winter.").) This is simply not enough.

6.      *Jones's "Methodology" Satisfies None of the Indicia of Reliability Identified in* Daubert *or in* Milanowicz.

Finally, Jones's "methodology", looked at as a whole, satisfies none of the indicia of reliability identified in *Daubert* or in this Court's reconfiguration of *Daubert* for purposes of technical or other specialized subjects. *See Pineda*, 520

---

[11] Jones's fall-back position that, even if Performance Cruising's boats had been exposed to identical environmental conditions as Viking and Post yachts with cracking, Jones's position would not change because "what [he] saw is what [he] saw," is the very epitome of unexplained expert *ipse dixit*.

F.3d at 248; *Milanowicz*, 148 F. Supp. 2d at 533-36. Jones's methodology is not testable; it is not subject to peer review; there is no known rate of error; there are no standards controlling his technique's operation; he does not claim his methodology is generally accepted; he does not claim any relationship between his methodology and other established methodologies; and he presents no non-judicial uses to which the method has been put.[12] *See Pineda*, 520 F.3d at 248 (describing *Daubert* factors)[13]; *Oddi*, 234 F.3d at 158 (affirming exclusion of testimony when expert failed to satisfy *Daubert* indicia of reliability); *Pappas*, 136 F. Supp. 2d at 422-25 (same). Similarly, Jones presents no relevant federal standards, no relevant independent standards, no relevant literature,[14] no visual aids, and no scientific testing to support his opinions. *See Milanowicz*, 148 F. Supp. 2d at 533-36 (listing those factors as relevant to technical and other specialized disciplines). *Milanowicz* also counsels courts to consider industry practice, or "whether other manufacturers and consumers in the industry utilize the allegedly defective design," and product design and accident history. 148 F. Supp. 2d at 533-34. Those factors undoubtedly

---

[12] Notably, Jones does identify non-judicial uses of a number of relevant testing practices that Jones chose not to employ, even though his lab has been engaged to perform such tests on a routine basis outside of the litigation context. Ex. 2 (Jones Dep. at 43:12-46:22).

[13] CCP does not challenge, for purposes of this motion, Jones's "qualifications" based on the methodology.

[14] Jones claims to have relied on a single page from a "Sounding Trade article", but Jones does not identify in what way, if any, that article informed his opinions. Ex. 1 (Jones Rep. at 4).

cut *against* acceptance of Jones's opinion that there is some material defect in 953 Series gel coat. It is undisputed that 953 Series gel coat continues to be widely used today in the marine industry and in the vast majority of cases—including the majority of Viking and Post yachts—there have been no reports of catastrophic gel coat cracking. Aside from Jones's unwarranted speculation regarding climate exposure, Jones has utterly failed to account for these facts.

**C.     Jones's Opinions Do Not Fit the Facts of This Case Because They Attribute the Gelcoat Cracking to an Unspecified "Material Defect" Lacking Any Nexus to the Claims at Issue.**

Jones's opinion that the gel coat cracking evidenced in the Tortora and other Viking and Post yachts was caused by some unspecified "material defect" in 953 Series gel coat does not fit the facts of this case. Though the point appears lost on Plaintiffs, this is not a strict liability product defect case where Plaintiffs need only prove that "something was wrong" with 953 Series gel coat. *Cf. Myrlak v. Port Authority of New York and New Jersey*, 723 A.2d 45, 52 (N.J. 1999) ("The law is 'settled in this State that in a products liability case the injured plaintiff is not required to prove a specific manufacturer's defect. Proof that a product is not fit for its intended purposes requires only proof that something was wrong with the product.") (citations and quotation marks omitted). Plaintiffs' claim is first and foremost based on CCP's alleged breach of an express warranty that 953 Series gel

coat has "improved flexibility" characteristics relative to 952 Series gel coat. Plaintiffs' additional claims are based solely on: 1) CCP's alleged provision of unreliable test data regarding 953 Series gel coat elongation properties in 1998; and 2) CCP's alleged failure to disclose 2002 test results showing 953 Series gel coat elongation properties. Even if Plaintiffs were to establish that CCP breached the express warranty of "improved flexibility" or violated some duty pertaining to the 1998 and 2002 test results and also established that "something was wrong" with 953 Series gel coat that caused gel coat cracking, that would not entitle Plaintiffs to recover all damages resulting from the cracking. Rather, there must be some nexus between Plaintiffs' claimed damages and the source of liability. In other words, Plaintiffs' damages must have been proximately caused by the liability-creating breach of warranty or duty. *Cf. Oddi*, 234 F.3d at 158 (noting "obvious gap" in expert's opinion when expert failed to connect injury with source of potential liability under governing legal theory).

Jones's opinion is limited to his view that the gel coat cracking was caused by an unspecified "material defect" in 953 Series gel coat. He has made no effort to link the cracking to any of Plaintiffs' limited remaining avenues for liability. For example, Jones offers no opinion that the gel coat cracking was caused by a relative lack of flexibility between 953 Series and 952 Series gel coat. Indeed, Jones did no testing of CCP's gel coat at all for purposes of his Report, let alone

testing comparing 953 versus 952 Series gel coat, or testing of the gel coat as applied to Plaintiffs' respective laminates—the fiberglass structure of their yachts. Ex. 2 (Jones Dep. at 89:3-23.) Nor has Jones offered an opinion that suggests a nexus between the gel coat cracking and the elongation measurements reported in the 1998 and 2002 test results.

Accordingly, even were a jury able to accept every aspect of Jones's opinion and conclude that the source of the gel coat cracking in all of Viking's and Post's yachts was a "material defect" in 953 Series gel coat, the jury would be in no better position to attribute the cracking to any of the sources of potential liability actually at issue in the lawsuit. For that reason, Jones's opinion does not "fit" the facts of the case. Moreover, Jones's opinion—divorced as it is from the legal realities—has the potential to confuse the jury into thinking that it only need find that "something" was wrong with 953 Series gel coat to find CCP liable, not find, as it must, that CCP breached a particular express warranty or made a particular fraudulent representation or omission that proximately caused Plaintiffs' claimed damages. For that reason as well, Jones's opinion should be excluded in its entirety.

# IV.    CONCLUSION

Jones's opinions are replete with insurmountable logical leaps and unreliable methodologies, and, even on their own terms, do not fit the facts of this case. For those reasons, and the reasons discussed above, his purported expert opinions and testimony should be excluded.

 /s/ Landon Y. Jones
Steven E. Bizar (Admitted *Pro Hac Vice*)
Landon Y. Jones  (LJ-0236)
**BUCHANAN INGERSOLL & ROONEY PC**
1835 Market Street, 14th Floor
Philadelphia, PA 19103-2985
Tel: (215) 665-8700
Fax: (215) 665-8760

P. Kevin Brobson (PB-8169)
**BUCHANAN INGERSOLL & ROONEY PC**
213 Market Street, 3rd Floor
Harrisburg, PA 17101
Tel: (717) 237-4845
Fax: (717) 233-0852
***Attorneys for Cook Composites and Polymers Co.***

Dated: July 15, 2008.