# EXHIBIT "2"

# CONDENSED TRANSCRIPT

### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF NEW JERSEY

VIKING YACHT COMPANY, a
New Jersey Corporation and
POST MARINE CO., INC., a
New Jersey Corporation,

    Plaintiffs,

    vs.          NO. 05-CV-538 (JEI/JS)

CURRAN COMPOSITES, INC.,
a Missouri Corporation,
C TWO LLC, a foreign
Limited Liability Company,
and TOTAL COMPOSITES, INC.,
a Delaware Corporation
jointly d/b/a COOK
COMPOSITES AND POLYMERS,
a fictitiously named
Delaware Partnership,

    Defendants.

       Videotaped deposition of
DAVID E. JONES, III, taken at the law
offices of BUCHANAN INGERSOLL &
ROONEY, P.C., 1835 Market Street,
14th Floor, Philadelphia, PA, on
Wednesday, January 30, 2008,
commencing at approximately 9:09 a.m.
before Joanne Rose, a Registered
Professional Reporter, Certified
Realtime Reporter and Notary Public,
pursuant to notice.



## James DeCrescenzo Reporting, LLC
INNOVATING LITIGATION
1880 JFK Blvd., 6th Floor • Philadelphia, PA 19103
www.jdreporting.com

215.564.3905
PHONE

215.751.0581
FAX

Case 1:05-cv-00038-JEJS-JIE DEPOSITION OF DAVID E. JONES, JR. 07/19/08 Document 162-5 Filed 07/19/08 Page 3 of 58 PageID: 5085

2 (Pages 2 to 5)

## 2

```
 1   APPEARANCES:
 2   BERGER SINGERMAN
         MICHEL O. WEISZ, ESQUIRE
 3       mweisz@bergersingerman.com
         200 South Biscayne Boulevard
 4       Suite 1000
         Miami, Florida 33131-5308
 5       305-755-9500
         and
 6   HENRY J. TYLER. ESQUIRE
         htylerlaw@comcast.net
 7       Society Hill Office Park
         1874 Route 70 East, Suite 4
 8       Cherry Hill, New Jersey 08003
         856-751-2282
 9       Appearing on behalf of Plaintiffs
10   BUCHANAN INGERSOLL & ROONEY, P C
         STEVEN E. BIZAR, ESQUIRE
11       steven.bizar@bipc.com
         MEREDITH MYERS LeCONEY. ESQUIRE
12       meredith.leconey@bipc com
         1835 Market Street
13       14th Floor
         Philadelphia, Pennsylvania 19103
14       215-665-8700
         Appearing on behalf of Defendants
15
     ALSO PRESENT:
16
         Jack Lynch. Videographer
17
18       EXAMINATION INDEX
19   DAVID E. JONES
         BY MR. BIZAR          7
20
21
22
23
24
```

## 3

```
 1         EXHIBIT INDEX
 2                        MARKED
 3   Jones
         1  Curriculum Vitae of David    12
 4         E. Jones, III
 5      2  Five-page letter/report      61
           to M. Weisz from D  Jones
 6
        3  Two-page letter/e-mail to    66
 7         D Jones from S  Murphy
           dated 4/7/04
 8
        4  Five-page Viking document    104
 9         with boat dimensions
           Nos. VK003599-VK003603
10
        5  Three-page CCP Internal      116
11         Report document dated
           9/17/03, Nos.
12         CCP06822-CCP06824
13      6  Two-page document            119
           containing e-mail series
14         the first of which is
           dated 5/20/05 to J
15         Kasinski from B. Heller
           Nos  VK003952-VK003953
16
        7  Two-page document from       121
17         Juan Beltran dated
           1/19/2000, Nos.
18         VK132461-VK132462
19      8  One-page e-mail dated        124
           6/19/03 to S  Blair from
20         J. Beltran, No. VK132448
21      9  One-page e-mail to Drew      127
           Davala. et al. from J
22         Beltran. No. VK132447
23
24
```

## 4

```
 1         EXHIBIT INDEX (CONTINUED)
 2                        MARKED
 3   Jones
        10 Four-page document           129
 4         containing e-mail dated
           3/23/05 to F. Moser, et
 5         al. from Y. Colon and
           attached documents, Nos.
 6         VK132781-VK132784
 7      11 Two-page document            131
           containing note from the
 8         Desk of Juan Beltran with
           attached e-mail, Nos.
 9         VK132685 and VK132687
10      12 Two-page document            133
           containing e-mail dated
11         12/4/02 to Al Uhl, et al.
           from J. Beltran with
12         attached note, Nos.
           VK132670 and VK132669
13
        13 Three-page document          135
14         containing e-mail dated
           12/9/02 to D. Passarelli
15         from J. Beltran with
           attached handwritten
16         notes, Nos. VK132668
           -66 and -67
17
        14 U.S. District Court          140
18         Subpoena
19      15 Multi-page document          153
           indicating results of
20         exposure testing, Nos.
           DEJ00648-DEJ00710
21
22      16 Multi-page document          157
           containing Technical
23         Requests, e-mails and
           analytical reports, Nos.
24         DEJ00712-DEJ000773
```

## 5

```
 1         EXHIBIT INDEX (CONTINUED)
 2                        MARKED
 3   Jones
        17 One-page e-mail series,      172
 4         the first of which is
           dated 9/10/04 to J
 5         Kasinski, et al. from I.
           Rutt, No  VK004124
 6
        18 Five-page document           177
 7         containing fax
           transmittal dated 9/20/04
 8         to Mr Jones with
           attached e-mail and
 9         thermogram graphs, Nos
           VK004116-VK004120
10
        19 Multi-page CCP report        187
11         entitled "Determination
           of the Root Cause of
12         Cracking in Viking Boat
           #55-945 and attached
13         letter," Nos. DEJ
           00191-DEJ197
14
        20 Three-page letter dated      196
15         4/23/04 to D  Sweetman
           from R. Mannella, Nos
16         VK001622-VK001624
17      21 Four-page document           202
           containing DJ&A invoices
18         Nos
           DEJ-002-000002-DEJ-002-000005
19
20
21
22
23
24
```

**JDR**

**James DeCrescenzo Reporting**, LLC

InnovatingLitigation
1880 JFK Blvd , 6ᵗʰ Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                    FAX  215.751.0581

**6**

1 THE VIDEOGRAPHER: We're
2 now on the video record.
3 This is the videotape
4 deposition of David Evan Jones taken
5 by the defense in the matter of
6 Viking Yacht Company and Post Marine
7 Co., Incorporated v. Curran
8 Composites, Incorporated, C Two LLC,
9 Total Composites, Incorporated,
10 jointly Cook Composites And Polymers,
11 in the United States District Court
12 for the District of New Jersey,
13 Number 05-CV-538.
14 Held at the offices of
15 Buchanan Ingersoll & Rooney, PC, 1835
16 Market Street, 14th Floor,
17 Philadelphia, Pennsylvania, on
18 Wednesday, January 30, 2008, at
19 9:09 a.m.
20 I'm Jack Lynch, the
21 videographer. The court reporter is
22 Joanne Rose. We are from the firm of
23 James DeCrescenzo Reporting in
24 Philadelphia, Pennsylvania.

**7**

1 Will counsel please
2 introduce themselves.
3 MR. WEISZ: Michel Weisz
4 and Henry Tyler on behalf of the
5 plaintiffs.
6 MR. BIZAR: Steve Bizar and
7 Meredith LeConey on behalf of the
8 defendant.
9 THE VIDEOGRAPHER: The
10 reporter will swear in the witness.
11 DAVID E. JONES, III, having
12 been duly sworn, was examined and
13 testified as follows:
14 EXAMINATION
15 BY MR. BIZAR:
16 Q. Mr. Jones, good morning.
17 A. Good morning.
18 Q. Would you please state your
19 full name for the record?
20 A. My name is David Evan Jones
21 and I'm a third.
22 Q. What is your occupation,
23 sir?
24 A. I'm a naval architect and a

**8**

1 marine engineer. My specialty is
2 structural composites.
3 Q. When you say your specialty
4 is structural composites, what do you
5 mean by that?
6 A. Essentially it's all the
7 ingredients, the fibers, resins,
8 cores that go into the building of a
9 composite yacht or a fiberglass yacht
10 or a marine craft of some sort.
11 Q. And with regard to those
12 ingredients that you just identified,
13 what do you do as a specialist in
14 structural composites relative to
15 those ingredients?
16 A. I owned a test laboratory
17 for 11 years and we tested strictly
18 composites. The failure modes and
19 the strengths and weaknesses of the
20 composites.
21 I've designed composite
22 structures for a variety of yachts.
23 I've done a lot of failure analysis
24 of why boats break and how to repair

**9**

1 them.
2 Q. Take me briefly through
3 your educational background, if you
4 would.
5 A. I have a Bachelor's of
6 engineering, mechanical engineering,
7 from Steven's Institute of Technology
8 in Hoboken, New Jersey, and with a
9 specialization in small craft design.
10 Q. Do you have any additional
11 degrees beyond that?
12 A. No, sir.
13 Q. Do you have any special
14 training beyond the Bachelor's degree
15 of mechanical engineering?
16 A. No formal education other
17 than that.
18 Q. You're not a chemist?
19 A. No, sir.
20 Q. You're not a chemical
21 engineer?
22 A. No, sir.
23 Q. You're not a lawyer?
24 A. No, sir.

**JDR**
**James DeCrescenzo Reporting**, LLC

215.564.3905     InnovatingLitigation     FAX 215.751.0581
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

10

1  Q.  People always laugh when I
2  ask that question.  I can never quite
3  grasp why.
4      You have no special
5  training in warranty law?
6      A.  No, sir.
7  Q.  Do you see warranties in
8  your practice?
9      A.  Quite often.
10 Q.  Do you see warranties for
11 materials?
12     A.  Occasionally, yes.
13 Q.  Do you see warranties for
14 gel coats?
15     A.  Yes.
16 Q.  Do you see warranties by
17 boat builders for their boats?
18     A.  Yes, sir.
19 Q.  Are you aware of any boat
20 builders who warrant gel coat
21 cracking?
22     A.  No, sir, I'm not.
23 Q.  Are you aware of any gel
24 coat manufacturers who warrant gel

11

1  coat cracking as opposed to that the
2  gel coat would meet its
3  specifications as manufactured?
4      A.  No, sir.
5  Q.  No, sir, you're not aware
6  of any?
7      A.  I'm not aware of any.
8  Q.  Now, tell me -- you've
9  identified some of the things that
10 you've done.  Just -- well, let me do
11 it this way.
12     You've provided us together
13 with the report that you issued in
14 this case, which we'll be discussing
15 shortly, a curriculum vitae, a CV,
16 that listed your work history and
17 some other things.
18     Do you recall that?
19     A.  Yes, sir.
20 Q.  Was that accurate as of the
21 date it was provided to us, which was
22 August 24, 2007?
23     A.  As far as my work history
24 and publications and things of that

12

1  nature, yes.
2  Q.  Let's just mark that and
3  we'll be sure that we're on the same
4  page.  That will save us some time.
5      A.  Yeah.
6      MR. BIZAR:  This will be
7  Jones Exhibit 1.
8      (Exhibit Jones 1 was marked
9  for identification.)
10 BY MR. BIZAR:
11 Q.  Mr. Jones, the court
12 reporter has handed you a copy of the
13 CV that I just mentioned and we've
14 had that marked as Jones Exhibit 1.
15 Take a moment, look through it.  Just
16 confirm for me, if you would, that
17 that's accurate as of August 2007.
18     A.  Yes, sir.
19 Q.  Have there been any
20 developments in your professional
21 work since August 2007 that you need
22 to report to me to make this
23 up-to-date and current?
24     In other words, have you

13

1  taken on any additional positions or
2  jobs beyond those that are identified
3  in this document, Exhibit 1?
4      A.  No.  The only thing that
5  may not be up-to-date is the trial
6  and deposition cases.
7  Q.  Have you testified in any
8  cases beyond those listed on the
9  second-to-last page of Exhibit 1?
10     A.  Yes, sir.
11 Q.  Tell me the names of those
12 cases.
13     A.  Matthew Trainer vs.
14 Charleston Harbor Marina; Gary Wyatt
15 vs. Luhrs; Frank Feltham vs. Luhrs.
16 Q.  Can you spell Mr. Feltham's
17 name?
18     A.  Capital F-e-l-t-h-a-m.
19 Q.  And Luhrs is?
20     A.  L-u-h-r-s.
21 Q.  Okay.  Any other cases
22 beyond those three?
23     A.  Well, I was engaged in
24 another one which was Austin Spencely



**James DeCrescenzo Reporting**, LLC

215.564.3905

InnovatingLitigation
1880 JFK Blvd . 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

FAX  215.751.0581

---

**14**

1    vs. Luhrs but before my deposition
2    that one was settled.
3        Q.  You did work and issued a
4    report in that case?
5        A.  Yes, sir.
6        Q.  I take it from this list of
7    cases you've been through this
8    process before.
9            So just let me tell you, if
10   you have a question or you don't
11   understand one of my questions, let
12   me know.  I'll reformulate the
13   question.  I want to make sure you
14   understand the question.
15           If you answer a question
16   without telling me, I'm going to
17   assume that you understood the
18   question and that the answer you gave
19   was in response to my question.  Is
20   that fair?
21       A.  That's fair.
22       Q.  Okay.  Tell me what the
23   business of D.E. Jones & Associates
24   is.

---

**15**

1        A.  D.E. Jones & Associates has
2    been a consulting company since 1987.
3            We have performed services,
4    everything from designing new
5    facilities for production boat
6    builders, establishing quality
7    control procedures for builders,
8    originating original designs for
9    various builders, quality
10   inspections, forensic analysis, a lot
11   of why did my boat break and how do I
12   fix it kind of things.
13       Q.  And is that the business
14   through which you do your work as an
15   expert witness for litigated,
16   contested matters in court?
17       A.  Yes, sir.
18       Q.  And have you been involved
19   in that field since 1987?
20       A.  Working with lawyers in
21   litigation and things of that nature
22   probably didn't happen until about
23   '90, '91.
24       Q.  But since 1990, 1991 you

---

**16**

1    began — withdrawn.
2            Since 1990, 1991 an aspect
3    of your work has included working
4    with lawyers in contested matters —
5        A.  Yes, sir.
6        Q.  — involving marine issues?
7        A.  Yes, sir, composite issues.
8        Q.  Okay.  And how many such
9    matters have you worked on since
10   1990, 1991?
11       A.  That's hard to say, maybe
12   20 or so.
13       Q.  Would it be more than 30?
14       A.  I don't think so.
15       Q.  If there are ten listed on
16   your CV and an additional three that
17   have occurred since your CV was
18   provided to us, plus this one, that
19   takes us to 14.
20           Do you think there are an
21   additional six or ten out there
22   beyond these?
23       A.  There's probably another
24   six.  I don't think there would be

---

**17**

1    another ten.
2        Q.  Okay.  And Revenge Advanced
3    Composites, which is listed as
4    something that you're also involved
5    in, tell me what the business of that
6    company is.
7        A.  Revenge Advanced Composites
8    is a builder of high-end sport
9    fishing boats and special purpose
10   craft.  We use — we use techniques
11   from the aerospace industry to
12   construct the product.
13       Q.  Where is Revenge Advanced
14   Composites based?
15       A.  They're in Clearwater,
16   Florida.
17       Q.  Are you an owner of that
18   business?
19       A.  Yes, sir.
20       Q.  And you're an owner of D.E.
21   Jones & Associates?
22       A.  Yes, sir.
23       Q.  Do you have any partners?
24       A.  In D.E. Jones?

---

**JDR**

**James DeCrescenzo Reporting**, LLC

215.564.3905          InnovatingLitigation          FAX  215.751.0581
1880 JFK Blvd , 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

18

1    Q.  Yes.
2    A.  No, sir.
3    Q.  Do you have any partners in
4  Revenge Advanced Composites?
5    A.  Yes, I do.
6    Q.  How many?
7    A.  Oh, I have three major
8  partners and maybe a dozen what we
9  call class B partners.
10    Q.  Are any of your major
11  partners affiliated in any way with
12  Viking Yacht Company?
13    A.  No, sir.
14    Q.  Are any of your major
15  partners affiliated with Post Marine
16  Company?
17    A.  No, sir.
18    Q.  Are any of your class B
19  partners affiliated with either of
20  those two companies?
21    A.  No, sir.
22    Q.  With regard to your
23  testifying experience, let's talk
24  about that.

19

1        Your work on the Trump Taj
2  Mahal Associates vs. Dumont matter,
3  what were you asked to do in that
4  case?
5    A.  That was a failure of the
6  coatings and what I did there was
7  analyze what the issues were, how
8  widespread it was and what the cause
9  of the problem was.
10    Q.  What were the coatings in
11  question?
12    A.  They were mostly metal
13  flake gel coats and clear coats.
14    Q.  Who manufactured them?
15    A.  I don't think I recall.
16    Q.  On what were they applied?
17    A.  They were applied onto what
18  I affectionately call gingerbread.
19  It's architectural cladding that goes
20  on the side of a building to
21  represent a theme.
22    Q.  And they're exposed to the
23  elements on the side of the building?
24    A.  Yes, sir.

20

1    Q.  And who hired you in that
2  matter, the plaintiff or the
3  defendant?
4    A.  That was Trump Towers.
5    Q.  And they were the
6  plaintiff?
7    A.  Trump Taj Mahal, they were
8  the plaintiff.
9    Q.  They were the party that
10  experienced the failure?
11    A.  Yes, sir.
12    Q.  And what was your opinion
13  as to the cause of the failure in
14  that matter?
15    A.  That was the -- the dyes on
16  the metal flake were inferior and
17  experienced color shifts, dramatic
18  color shifts.  There were also some
19  manufacturing issues where on some
20  parts they had applied a clear coat
21  and some parts they had not.
22    Q.  Manufacturing issues with
23  regard to the dyes or manufacturing
24  issues -- I'm sorry.  Withdrawn.

21

1        Manufacturing issues with
2  regard to the coatings themselves or
3  with regard to the application of the
4  coatings to whatever they were
5  applied to?
6    A.  It was just the
7  application, whether they put the
8  clear coat on or not.
9    Q.  Okay.  So part of your
10  opinion cast blame on the coating
11  manufacturer and part on the builder
12  of the piece?
13    A.  Yes, sir.
14    Q.  And were you -- did you
15  testify in a deposition in that
16  matter?
17    A.  Yes, I did.
18    Q.  And did you testify at
19  trial?
20    A.  No, sir.
21    Q.  Do you know what the
22  resolution of the matter was?
23    A.  There was a settlement
24  offer.



**James DeCrescenzo Reporting**, LLC

215.564.3905                InnovatingLitigation                FAX  215.751.0581
1880 JFK Blvd , 6ᵗʰ Floor, Philadelphia, PA 19103
www.JDReporting.com

22

1    Q.  In the Underwriters at
2  Lloyds London matter vs. Michael T.
3  and Eric V. Gray, what was the
4  subject of your work in that case?
5    A.  Louisiana.  Let's see.
6  Hang on.  Oh, I remember that one.
7  That was a keel that fell off a
8  sailboat.
9    Q.  So your opinion did not
10  have anything to do with coatings in
11  that matter?
12    A.  Correct.
13    Q.  And did you testify in that
14  case?
15    A.  Yes, sir.
16    Q.  By deposition?
17    A.  By deposition and in court.
18    Q.  Were you found qualified as
19  an expert in that case?
20    A.  Yes, sir.
21    Q.  Have you ever not been
22  found to be qualified as an expert?
23    A.  No, sir.
24    Q.  Each time that you've been

23

1  offered, you've been accepted as an
2  expert?
3    A.  That's correct.
4    Q.  In the Black & Gold
5  Construction Company case what
6  opinion did you offer?
7    A.  There was a construction
8  error and a faulty repair in that
9  boat.
10    Q.  Who engaged you in the
11  Black & Gold Construction case, the
12  plaintiff or the defendant?
13    A.  The plaintiff.
14    Q.  And going back to the
15  Underwriters case, who hired you
16  there?
17    A.  That would have been the —
18    Q.  The plaintiff again?
19    A.  I think that was
20  Underwriters.
21    Q.  Which was the plaintiff?
22    A.  Yes, sir.
23    Q.  And did you testify at
24  trial in the Black & Gold

24

1  Construction case?
2    A.  No, sir.
3    Q.  Deposition?
4    A.  Yes.
5    Q.  In the Backwin, Global
6  Insurance and Albany Insurance
7  Company of New York vs. Delta Marine,
8  who hired you, the plaintiff or the
9  defendant?
10    A.  That was Delta Marine.
11  That would be the defendant.
12    Q.  And what was the subject of
13  your work in that case?
14    A.  There was a claim of faulty
15  construction.
16    Q.  Of what?
17    A.  Of the hull and the rudder
18  configuration.
19    Q.  And your claim was that the
20  construction — your opinion was that
21  the construction was not faulty?
22    A.  Correct.
23    Q.  And what was the resolution
24  of that case?

25

1    A.  Delta prevailed.
2    Q.  You testified at trial?
3    A.  No.
4    Q.  By deposition?
5    A.  Yes, sir.
6    Q.  Did the case settle or did
7  it not go to trial?
8    A.  I'm not sure I know.
9    Q.  Chase-Freedman Family Trust
10  vs. Broward Marine, what was the
11  subject of your work in that case?
12    A.  That one, it was a claim
13  that the boat was unstable and this
14  was after nine years of use.  The
15  owner of the boat decided that the
16  boat was a little tippy and he sued
17  Broward and I represented Broward.
18    Q.  And your conclusion in that
19  case was that the boat was not tippy
20  as a result of any manufacturing
21  problem?
22    A.  That's correct.
23    Q.  Did you testify at trial?
24    A.  Yes, sir.



**James DeCrescenzo Reporting**, LLC

215.564.3905                    Innovating Litigation                    FAX  215.751.0581
1880 JFK Blvd , 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

---

26

1    Q. And in deposition?
2    A. Yes, sir.
3    Q. And what was the result in
4  that case?
5    A. Broward prevailed.
6    Q. Who did you -- who hired
7  you in the Northern Island Nautical
8  Associates, Limited case?
9    A. Doug Nash.
10   Q. The plaintiff, in other
11 words?
12   A. Yes, sir.
13   Q. And what was the subject of
14 your work in that case?
15   A. That was mainly
16 hydrodynamics and stability of the
17 vessel.
18   Q. And what was your opinion?
19   A. That the boat really was
20 okay.
21   Q. And did you testify in
22 court in that case?
23   A. No, sir.
24   Q. Deposition?

---

27

1    A. Yes, I believe I did.
2    Q. What was the result; do you
3  know?
4    A. It was settled so I really
5  don't know the result.
6    Q. That's fine. The next case
7  listed on your list is John F.
8  Inganamort & Pleasurecraft, Inc. vs.
9  Insurance Company of North America.
10       Who hired you in that
11 matter?
12   A. That was John Inganamort.
13   Q. So the plaintiff?
14   A. Yes, sir.
15   Q. And what was the subject of
16 your work in that matter?
17   A. That was a boat that was
18 dropped in the travel lift. The
19 travel lift transmission failed and
20 dropped the boat and we were -- I was
21 there talking about extent of damage
22 and what it would take to repair the
23 boat.
24   Q. Did you testify at

---

28

1  deposition?
2    A. Deposition and trial.
3    Q. And what was the resolution
4  there?
5    A. I think there was a little
6  give-and-take on that one.
7    Q. It was resolved, settled?
8    A. Yes.
9    Q. Mariah Boats, Inc. vs.
10 Owens-Corning, who hired you in that
11 matter?
12   A. That was Mariah, the
13 defendant.
14   Q. Mariah is the plaintiff.
15   A. Or plaintiff.
16   Q. Yes. What was the subject
17 of your work?
18   A. That was -- that was a case
19 where boats were blistering before
20 they even got out of the factory and
21 it was due to a change in resin made
22 by the resin supplier.
23       And as we found out, it was
24 a bad formulation of resin that

---

29

1  continued on for three years.
2    Q. And did you testify in
3  court in that matter?
4    A. No. That one never got to
5  court.
6    Q. You testified in
7  deposition?
8    A. Yes, I believe I did.
9    Q. The case was settled?
10   A. Yes, sir.
11   Q. And when you say resin, you
12 don't mean gel coat? You mean a
13 different back-up or a laminating
14 resin?
15   A. That's correct.
16   Q. Just so we're on the same
17 page, if you're referring to gel
18 coat, I'd appreciate it if you'd
19 refer to gel coat. And if you're
20 referring to some other type of
21 resin, just use the term resin.
22   A. I will.
23   Q. It makes it easier for us.
24       MR. WEISZ: I'm just going

**James DeCrescenzo Reporting**, LLC

215.564.3905    InnovatingLitigation    FAX  215.751.0581
1880 JFK Blvd , 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

| 30 | 32 |
|---|---|
| 1 to object to that, but we can discuss | 1    Q. So your client did not |
| 2 that later. I just want to note an | 2 prevail? |
| 3 objection on the record as to the | 3    A. Correct. |
| 4 form. | 4    Q. In the Matthew Trainer vs. |
| 5    MR. BIZAR: Okay. | 5 Charleston Harbor Marina case that |
| 6 BY MR. BIZAR: | 6 you mentioned -- |
| 7    Q. The Weinstein matter, who | 7    A. Yes, sir. |
| 8 did you work for in that matter? | 8    Q. -- what was your -- who |
| 9    A. The plaintiffs. | 9 hired you in that matter? |
| 10    Q. And what was the subject of | 10    A. Charleston Harbor. |
| 11 your work? | 11    Q. And what was the subject of |
| 12    A. That was a series of, I | 12 your work? |
| 13 believe, five boats that all had the | 13    A. There was a claim of bad |
| 14 same structural issues and I | 14 fuel caused the boat to sink. |
| 15 testified on these structural issues. | 15    Q. And I take it your opinion |
| 16    Q. Did you testify at | 16 put the blame on some other factor? |
| 17 deposition and in trial? | 17    A. Yes, sir. |
| 18    A. Both. | 18    Q. Where was the case pending? |
| 19    Q. What was the result in that | 19    A. Charleston Harbor or |
| 20 case? | 20 Charleston, South Carolina. |
| 21    A. The court awarded repair | 21    Q. Okay. In federal or state |
| 22 costs. | 22 court? |
| 23    Q. The Domenech matter, who | 23    A. I believe that was federal |
| 24 did you work for in that matter? | 24 court. |

| 31 | 33 |
|---|---|
| 1    A. I believe that was | 1    Q. What was the year? I guess |
| 2 Domenech. | 2 it was -- I'm sorry. It's not listed |
| 3    Q. And what was the subject of | 3 here. |
| 4 your work in that matter? | 4    A. It would have been just |
| 5    A. That was a case where the | 5 last year. |
| 6 owner claimed faulty construction, | 6    Q. End of 2007? |
| 7 blisters, poor blister repair and | 7    A. Yeah. Mid 2007 maybe. |
| 8 things of that nature. | 8    Q. And the Gary Wyatt matter, |
| 9    Q. And your opinion was | 9 did you testify for the plaintiff or |
| 10 supporting those claims? | 10 the defendant? |
| 11    A. Well, actually, no. No, it | 11    A. That one is ongoing. And I |
| 12 didn't. The repair was adequate, but | 12 worked with Gary Wyatt. |
| 13 the blisters were just an artifact of | 13    Q. In all of these matters |
| 14 the construction. | 14 involving Luhrs, is it fair to say |
| 15    Q. And what was the result in | 15 that you're working for the plaintiff |
| 16 that matter? Well, first of all, did | 16 against Luhrs? |
| 17 you testify in court? | 17    A. Yes, sir. |
| 18    A. Yes, sir. | 18    Q. Have you testified yet in |
| 19    Q. And in deposition as well? | 19 the Gary Wyatt matter? |
| 20    A. That's correct. | 20    A. No, sir. |
| 21    Q. And what was the result in | 21    Q. What court is that pending |
| 22 that case? | 22 in? |
| 23    A. I don't believe the | 23    A. I'm not really sure I know. |
| 24 plaintiff got any relief. | 24    Q. Okay. And the Feltham |

**JDR**

**James DeCrescenzo Reporting**, LLC

215.564.3905     InnovatingLitigation     FAX 215.751.0581
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

34

1   matter, what court is that pending
2   in?
3       A.  That was also Charleston.
4       Q.  Do you know if it's federal
5   or state?
6       A.  That I think is federal and
7   they settled.
8       Q.  Did you give testimony in
9   that matter, the Feltham matter?
10      A.  I wrote a report and I
11  believe I had a deposition on that
12  one.
13      Q.  Are there any other
14  litigated cases that you can remember
15  by name in which you've been
16  involved?
17      A.  Not off the top of my head,
18  no, sir.
19      Q.  Is the only case in which
20  you've been involved and given
21  testimony that directly involves gel
22  coat or coatings of a gel coat sort,
23  the Trump Taj Mahal case?
24      A.  Yes.  The Mariah case vs.

35

1   AOC was also a gel coat blistering
2   phenomenon, but it was related to the
3   substrate and not the gel coat.
4       Q.  You're familiar with the
5   concept of blistering, obviously?
6       A.  Yes, sir.
7       Q.  And you're also familiar, I
8   presume, with the concept of
9   porosity?
10      A.  Yes, sir.
11      Q.  And you're familiar with
12  the concept of chalking?
13      A.  Yes, sir.
14      Q.  And you're familiar with
15  the problem of color matching?
16      A.  Yes, sir.
17      Q.  All of these issues relate
18  to gel coats, among other coatings?
19      A.  Gel coat formulations, yes.
20      Q.  Okay.
21      A.  With the exception of
22  blistering.  Blistering may or may
23  not be a gel coat phenomenon.
24      Q.  With regard to the opinion

36

1   you've issued in this case, which
2   we'll be talking about, I take it
3   that your opinion does not address in
4   any way, shape or form blistering,
5   porosity, chalking or color matching?
6       A.  Correct.
7       Q.  So those issues, to the
8   extent they exist or are phenomena of
9   gel coat or gel coat and some
10  combination of substrates, are not
11  subjects that you'll be offering
12  testimony about at trial?
13      A.  Correct.
14      Q.  Now, you have provided a
15  written report in this case?
16      A.  Yes, sir.
17      Q.  And you understand that you
18  have an obligation in that report to
19  make a full and complete disclosure
20  of the materials that you consulted
21  and relied upon in your work; is that
22  right?
23      A.  That's correct.
24      Q.  And you've done that in

37

1   your report?
2       A.  Yes, sir.
3       Q.  In other words, the
4   materials listed in your report are
5   the materials that you consulted and
6   relied on in forming your opinions?
7       A.  Yes, sir.
8       Q.  And other than maybe your
9   own experience and learning from
10  working in the field in which you
11  work, there are no other materials
12  that directly bear on this case that
13  you considered in forming your
14  opinions; is that right?
15      A.  That is also right.
16      Q.  And your written report
17  contains the opinions that you would
18  testify to if accepted at trial; is
19  that right?
20      A.  That's correct.
21      Q.  There are no other opinions
22  not in that report that you would
23  offer?
24      A.  No, sir.

**JDR**

**James DeCrescenzo Reporting**, LLC

215.564.3905          InnovatingLitigation          FAX  215.751.0581
1880 JFK Blvd , 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

38

1    Q. Have you worked previously
2  prior to this case with Mr. Weisz?
3    A. No.
4    Q. Have you worked previously,
5  meaning prior to this case, with Mr.
6  Tyler?
7    A. No, sir.
8    Q. Did you do anything to
9  prepare for your deposition
10 testimony?
11   A. I read my report again.
12   Q. Other than that? Did you
13 do anything to prepare for your
14 deposition testimony?
15   A. No, sir.
16   Q. You didn't review any
17 documents?
18   A. No.
19   Q. You didn't speak to
20 anybody?
21   A. I had dinner with Mr. Weisz
22 last night.
23   Q. I hope he picked up the
24 tab.

39

1    A. Yes.
2    Q. Have you worked previously
3  with Viking Yacht Company prior to
4  your engagement as an expert in this
5  case?
6    A. Yes, I believe I have.
7    Q. Tell me about that work.
8  What have you done previously in any
9  prior assignments with Viking Yacht
10 Company?
11   A. I believe it was mostly
12 with Sigma Laboratories. Sigma was a
13 division of D.E. Jones & Associates
14 and I believe we did some testing for
15 them.
16      Just through being in the
17 industry for the last 20-some-odd
18 years, I've known the Healeys through
19 business associates.
20   Q. Let's break those down.
21      What work did you do
22 through Sigma Laboratories for Viking
23 Yacht Company?
24   A. I'd really have to go back

40

1  in my records. Sigma has been -- I
2  sold the business, I believe, in '99
3  and I'd really have to go back to my
4  records to find out exactly what we
5  did. Most likely it was laminate
6  testing.
7    Q. So this was a situation
8  where Viking would have hired you or
9  this company, Sigma Laboratories, to
10 do testing on some laminates that
11 they were considering using or using?
12   A. You're correct.
13   Q. And is that something that
14 your business at that time, Sigma
15 Laboratories, did a fair amount of?
16   A. Yes, sir. We did quite a
17 bit.
18   Q. And was that the first
19 engagement that Viking had with you?
20   A. Well, I've known the
21 Healeys from about 1983. They
22 actually bought the company that I
23 was working for at the time in 1987
24 or late 1986.

41

1    Q. What company was that?
2    A. That was Gulfstar Yachts.
3    Q. And did you continue
4  working for Gulfstar Yachts after
5  they purchased it?
6    A. The deal actually went
7  through in the fall of '87 and I
8  departed Gulfstar in March of '87.
9    Q. So you had a brief overlap
10 before the deal closed?
11   A. Yes, sir.
12   Q. In which you were working
13 for the Healeys?
14   A. Not actually working. They
15 took over in the fall of '87.
16   Q. I see.
17   A. So I never actually worked
18 for them.
19   Q. Okay. But since that time
20 you've known them?
21   A. Yes, sir.
22   Q. And how has that -- how has
23 knowing them manifested itself? Have
24 you seen them socially?


**James DeCrescenzo Reporting**, LLC

215.564.3905          InnovatingLitigation          FAX  215.751.0581
              1880 JFK Blvd , 6ᵗʰ Floor, Philadelphia, PA 19103
                            www.JDReporting.com

VIDEOTAPED DEPOSITION OF GARY PHINEAS JONES, III 1/30/08

12 (Pages 42 to 45)

42

1    A. No. No. I don't believe
2  I've ever had a social engagement
3  with them.
4    Q. Have you seen them
5  professionally?
6    A. Yes. It would be at boat
7  shows and things of that nature.
8    Q. And the Healeys are the
9  owners of Viking; is that right?
10   A. Correct. And particularly
11 I'm talking about Bob and Bill.
12   Q. Not Pat?
13   A. I know Pat, but I just
14 recently met him.
15   Q. Did you meet him in
16 connection with this case?
17   A. Yes, sir.
18   Q. When did you meet Pat in
19 connection with this case?
20   A. It would have been when I
21 first went to see the Tortora boat,
22 which was a Viking 55. And I guess
23 this was early...
24   Q. 2004, 2005?

43

1    A. Yeah, probably '5 I think.
2    Q. So that was before you were
3  hired to be an expert on behalf of
4  Viking in this lawsuit; is that
5  right?
6    A. That's correct.
7    Q. Do you recall why it was
8  that Viking was testing a laminate
9  through your laboratory, Sigma
10 Laboratories?
11   A. No, I wouldn't recall.
12   Q. Do boat manufacturers often
13 test the materials that they'll be
14 using or that they are using in their
15 composites?
16   A. Very often.
17   Q. And why do they do that?
18   A. Well, they do it to verify
19 the mechanical properties for their
20 engineering, a prediction of early
21 failures, whether it meets the
22 strength and stiffness requirements,
23 things of that nature.
24   Q. Do they test flexibility as

44

1  well?
2    A. Oh, certainly.
3    Q. Do manufacturers also have
4  the ability to test the way that gel
5  coat or coatings interact with their
6  laminates or their laminate
7  structures?
8    In other words, if the
9  manufacturer wanted to test a
10 particular gel coat with its
11 laminate, would that be something
12 that could be done?
13   A. There's a couple of ways of
14 testing gel coat, yes, sir.
15   Q. And is that something that
16 has been available to manufacturers,
17 boat manufacturers, since the late
18 1990s?
19   A. Yes.
20   Q. Was it available to boat
21 manufacturers in 1997?
22   A. Oh, sure.
23   Q. What are those ways of
24 testing gel coats and laminates

45

1  together?
2    A. Well, the typical ways that
3  builders will take a look at gel
4  coats is the weatherability and this
5  would be QUV testing, exposure
6  testing.
7    There would also be what we
8  used to call the boil test, but we
9  don't actually use boiling water
10 anymore. It's about 150 degrees or
11 so. And that's mainly for blister
12 resistance.
13   There are some thin-film
14 permeability tests that can be
15 performed. But usually when they --
16 and there would be first cracking of
17 the gel coat and that would normally
18 be performed in a flex test.
19   Q. And all of those tests were
20 available to boat manufacturers in
21 the late 1990s?
22   A. Yes, sir.
23   Q. From 1997 on?
24   A. Earlier.



**James DeCrescenzo Reporting**, LLC

215.564.3905          InnovatingLitigation          FAX  215.751.0581
                1880 JFK Blvd , 6th Floor, Philadelphia, PA 19103
                         www.JDReporting.com

**46**

1    Q. Earlier than 1997?
2    A. Yes, sir.
3    Q. And how much do they cost
4  to do these tests?
5    A. A set of tests back then, I
6  don't know what they cost now.
7    Q. But back then, when you
8  were in the business?
9    A. Back then it would be
10  roughly $30 a sample. And you do a
11  minimum of five and most often you do
12  six or seven and that would give you
13  one number.
14    Q. So these tests could be
15  done for several thousands of
16  dollars?
17    A. Yes, sir.
18    Q. And in your experience, as
19  a laboratory owner in this field, did
20  boat manufacturers engage your lab to
21  do these tests on a routine basis?
22    A. Yes, sir.
23    Q. And are there other labs,
24  aside from Sigma Labs --

**47**

1  Laboratories, that were involved in
2  this field?
3    A. There was a competitive
4  lab, Structural Composites, that did
5  some similar testing at the time.
6  There's laboratories all over the
7  country, Orange County, out in
8  California; Broutman in Chicago.
9    A number of universities
10  will do some testing, but there
11  really was only two that I recall
12  that specialized in marine
13  composites.
14    Q. And that was your lab and
15  Structural Composites?
16    A. That's correct.
17    Q. And Structural Composites
18  is Dr. Reichard's company?
19    A. Yes, sir.
20    Q. Now, aside from this
21  engagement of Sigma Laboratories, a
22  division of D.E. Jones, for testing
23  in the late 1990s and your knowing
24  the Healeys, prior to this engagement

**48**

1  have you done any work for Viking
2  Yacht Company?
3    A. No, sir.
4    Q. And what about Post Marine?
5  Have you done work for Post Marine
6  prior to this?
7    A. No, sir.
8    Q. Does this case represent
9  your first encounter with Post Marine
10  professionally?
11    A. On a professional level,
12  yes.
13    Q. I mean, other than seeing
14  their boats in marinas or at boat
15  shows.
16    A. Yes, sir, that's correct.
17    Q. Tell me about the process
18  by which you were hired as an expert
19  on behalf of the plaintiffs? What do
20  you recall about that?
21    A. Well, I was hired to come
22  up. The first time I went up was for
23  Atlantic Mutual.
24    Q. Yeah, I'm going to cover

**49**

1  that. I'm actually -- in my mind I
2  distinguish that from the work that
3  you did --
4    A. Okay.
5    Q. -- as an expert. But I
6  will come up and do that.
7    Tell me what the first
8  contact was in which you were being
9  engaged to provide expert opinion or
10  consulting services for the
11  plaintiffs in this lawsuit.
12    A. I believe the very first
13  contact was from Atlantic Mutual
14  allowing me to share my records with
15  Viking and Post and Michel Weisz.
16    Q. Did Atlantic tell you why
17  they had agreed to allow you to share
18  your records, what had prompted them
19  to do that?
20    A. No. I don't believe they
21  did share that with me.
22    Q. Did it surprise you that
23  you were being allowed to share these
24  records or...



**James DeCrescenzo Reporting**, LLC

215.564.3905        Innovating Litigation        FAX  215.751.0581
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

50

1    A.  No.
2    Q.  What records did you have
3  to share?
4    A.  Photographic records and
5  notes and a report that I wrote.
6    Q.  A report that you had
7  written to Atlantic Mutual?
8    A.  Yes, sir.
9    Q.  What was the conclusion of
10  that report to Atlantic Mutual?
11    A.  Essentially I could not
12  find any fault of the builder, the
13  manufacturer, and that it was my
14  opinion that it was a material defect
15  on the part of the gel coat.
16    Q.  And this report, what was
17  the date of it?
18    A.  I don't recall, '04 or '05.
19    Q.  Do you recall whether this
20  report was ever shared by Atlantic
21  Mutual with anyone?
22    A.  No.  I wouldn't know that.
23    Q.  Do you know whether it was
24  ever shared with CCP?

51

1    A.  I don't know that either.
2    Q.  And you had this report in
3  your possession at the time that you
4  were contacted by Atlantic Mutual and
5  given permission to share your
6  records with Viking?
7    A.  Yes, sir.
8    Q.  And was this report
9  provided to Viking?
10    A.  I wouldn't know.
11    Q.  Well, did you share your
12  records with --
13    A.  Did I share?  No.  Not that
14  I know of, not that I could recall.
15    Q.  I don't understand.
16     Atlantic Mutual gave you
17  permission to share your records with
18  Viking?
19    A.  They said that I could
20  assist in their endeavor.
21    Q.  Okay.  And did you share
22  this report with Viking?
23    A.  I don't recall.
24    Q.  Do you have this report?

52

1    A.  I would have it in my
2  office, yes.
3    Q.  And what was the basis for
4  your conclusion in your written
5  report to Atlantic Mutual that it was
6  a material defect in the gel coat?
7    A.  Well, I reviewed the
8  manufacturing procedures, their QA
9  procedures, their quality control
10  procedures.  I looked at Mr.
11  Tortora's boat and the pattern of the
12  gel coat cracking phenomenon was not
13  coincident with a structural issue.
14     It wasn't a laminate issue.
15  And it did not appear to be a
16  production or a manufacturing issue,
17  a fabrication issue.
18     It was so random and so
19  widespread through a series of
20  processes, different fabrication
21  processes, that the only common
22  denominator really was the gel coat.
23    Q.  So did you -- well, in
24  describing what you considered,

53

1  you've identified those factors that
2  were within Viking's control,
3  manufacturing procedures, QA
4  procedures, laminate and so forth.
5     And from that you've
6  concluded that it was the gel coat.
7     Were you able to also
8  examine -- withdrawn.  Let me do it
9  this way.
10     You've identified a number
11  of factors as the basis for your
12  opinion in your report to Atlantic
13  Mutual that it was the gel coats -- a
14  material defect on the part of the
15  gel coat that caused the cracking in
16  the Tortora boat.
17     And you seem to have
18  addressed in your review, Viking's
19  manufacturing, QA, and construction
20  processes.
21     What about the care of the
22  boat once it was in Mr. Tortora's
23  possession?  Did you analyze that?
24    A.  Yes.  Yes, I did.

**JDR**
**James DeCrescenzo Reporting**, LLC

215.564.3905          InnovatingLitigation          FAX  215.751.0581
1880 JFK Blvd , 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

54

1  Q. What was the basis for your
2 analysis of that?
3  A. Well, it was --
4  Q. What did you look at?
5  A. What did I look at? Well,
6 I discussed with Mr. Tortora his care
7 for the boat, also Viking's
8 description of Mr. Tortora, which was
9 he was described as being quite fussy
10 about the appearance of the boat.
11    And the boat had been
12 covered during the winter. When it
13 was uncovered, the phenomenon
14 appeared.
15    I wasn't there so I don't
16 know if it was instantaneous or if it
17 was progressive. But I did section
18 the samples, the representatives
19 samples, from different areas that I
20 took on the boat.
21    And the gel coat failure
22 was only within the gel coat layer
23 and did not extend into the laminate.
24  Q. That's not true for all the

55

1 samples.
2    Do you recall that?
3  A. Well, there was one sample
4 that it did go into the skin coat, I
5 believe.
6  Q. With regard to Mr. Tortora,
7 you didn't review any records that he
8 provided to you about how the boat
9 had been cared for, right? You spoke
10 to him?
11  A. Yeah. I spoke to him.
12  Q. And you didn't review any
13 records relating to materials that
14 had been used on the boat by Mr.
15 Tortora or the marina where the boat
16 was stored?
17  A. No, sir.
18  Q. And did you review weather
19 records?
20  A. I only recall that it was a
21 very cold winter.
22  Q. Did you review the
23 thickness of the gel coat on the
24 Tortora yacht?

56

1  A. There was a couple places
2 that I did, yes.
3  Q. But you didn't make a
4 systematic review of the Tortora
5 yacht for gel coat thickness?
6  A. No, sir. It was just
7 mainly in the sample areas.
8  Q. Gel coat thickness can
9 cause gel coat cracking; is that
10 right?
11  A. That's correct.
12  Q. That's a well-known fact,
13 isn't it?
14  A. I believe it is, yeah.
15  Q. And did you review -- with
16 regard to your review of the
17 manufacturing procedures and the
18 quality control or quality assurance
19 procedures at Viking, what did you do
20 to review those procedures?
21  A. Well, I walked through the
22 plant. I saw their incoming raw
23 materials, QC procedures, where they
24 did it. I witnessed calibration of

57

1 the guns, the spray guns.
2    I verbally went through
3 what their procedures were. I asked
4 them questions and they -- you know,
5 this was something that was just a
6 Q&A with them.
7  Q. Your walk-through of the
8 plant and your review of the
9 calibration of the guns, your
10 witnessing of that and your verbal
11 Q&A, all occurred in 2004, 2005 when
12 you were engaged?
13  A. Yes, sir.
14  Q. It didn't occur at the time
15 that the Tortora yacht was built; is
16 that right?
17  A. No, sir.
18  Q. Am I right?
19  A. That's correct.
20  Q. And at the time that you
21 spoke with Viking, walked through
22 their plant, and reviewed their QC
23 procedures and their materials
24 handling procedures, Viking was

58

```
1    financially interested in the results
2    of your report; isn't that right?
3         Mr. Tortora was requesting
4    that the boat be fixed by Viking?
5         A.  Yes, sir.
6         Q.  And they were financially
7    interested in the outcome of what you
8    were investigating; isn't that right?
9         A.  I know they were
10   interested.  What the reasons were
11   I'm not privy to.
12        Q.  They stood -- okay.
13        It mattered to Viking that
14   they not be held accountable for the
15   issues in the Tortora yacht?
16        A.  Again, I'm not privy to
17   what they were thinking and I
18   wouldn't want to assume anything.
19        Q.  Okay.  Did Viking provide
20   to you in connection with your review
21   of their manufacturing procedures a
22   comprehensive list of issues related
23   to the manufacturing conditions at
24   the plant during the period when the
```

59

```
1    Tortora boat was built?
2         A.  I don't -- I'm not sure I
3    know what you mean.
4         Q.  Did Viking provide to you
5    full access to all of their
6    documentation of issues, problems,
7    conditions at their facility during
8    the period of time when the Tortora
9    boat was built?
10        A.  They provided me anything
11   that I asked for and --
12        Q.  Did you ask for that
13   information?
14        A.  I asked if their procedures
15   had changed at all from the time that
16   the boat was built to the time that I
17   was there, and they said that their
18   equipment had remained pretty much
19   the same.  Their procedures had
20   pretty much remained the same.
21        Q.  I'm asking you a slightly
22   different question.  I'm asking you
23   about manufacturing conditions in the
24   plant.
```

60

```
1         Were you provided documents
2    reflecting problems or manufacturing
3    condition problems in the Viking
4    plant during the time period when the
5    boat, the Tortora boat, was built as
6    part of your review?
7         A.  I don't think I know what
8    you mean by manufacturing problems.
9         Q.  When was the Tortora boat
10   built; do you know?
11        A.  No.  I don't recall off the
12   top of my head.
13        Q.  Let's do it this way.
14        MR. BIZAR:  Let's mark the
15   report.  If you could hand it to me,
16   that would be helpful.
17   BY MR. BIZAR:
18        Q.  I don't have a copy of your
19   report to Atlantic Mutual.  I will
20   request that, but I don't have it
21   today so I'm somewhat constrained in
22   the questions I can put to you.
23        But I do have a copy of the
24   report that you've issued in this
```

61

```
1    case.  And so I'm going to ask you to
2    look at it after we have it marked
3    and I'm going to ask you some
4    questions about it.
5         (Exhibit Jones 2 was marked
6    for identification.)
7    BY MR. BIZAR:
8         Q.  Mr. Jones, the court
9    reporter has marked as Jones Exhibit
10   2 a copy of a three-page document
11   that is a letter to Michel Weisz
12   dated August 24, 2007.
13        Do you recognize this?
14        A.  Yes, sir, I do.
15        Q.  And is that the report that
16   you issued in this case?
17        A.  Yes, sir.
18        Q.  Is that your signature on
19   the third page?
20        A.  Yes, sir.
21        Q.  Now, the report refers on
22   the second page to the Tortora yacht
23   specifically.
24        Do you see that?
```



**James DeCrescenzo Reporting**, LLC

215.564.3905  InnovatingLitigation  FAX  215.751.0581
1880 JFK Blvd , 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

62

1    A.  Yes.
2    Q.  Viking VKY55-945 is a hull
3  number and that's the hull number
4  that corresponds with the Tortora
5  yacht; is that right?
6    A.  That is correct.
7    Q.  And that yacht has a name.
8  The name is Javelin; is that right?
9    A.  I believe that's correct.
10    Q.  Okay.  And you refer in
11  this report, in the second full
12  paragraph on the second page, to the
13  global nature of the gel coat
14  cracking witnessed on the Tortora
15  yacht during your visit to New Gretna
16  where Viking has a facility.
17      Is that right?
18    A.  That's correct.
19    Q.  And that was your only
20  visit to see the Tortora yacht or did
21  you see it on other occasions?
22    A.  I think that's the only one
23  that I recall.
24    Q.  Did you see any other

63

1  Viking yachts that are the subject of
2  cracking claims in this litigation?
3    A.  At the -- no.
4    Q.  Have you ever, during the
5  time since you first started working
6  on this matter for Atlantic Mutual to
7  the time that you issued this report,
8  personally inspected any other Viking
9  yachts on which there's been gel coat
10  cracking that is the subject of the
11  claim in this case?
12    A.  Just photographs.  That's
13  it.
14    Q.  The only yacht that you've
15  personally inspected was the Tortora
16  yacht, Hull Number 55-945, and you
17  did that in 2004, 2005 when you were
18  working on behalf of Atlantic Mutual;
19  is that right?
20    A.  That is correct.
21    Q.  And the only yacht that you
22  sampled, the only Viking yacht that
23  you sampled, from which you examined
24  samples, was the Tortora yacht, Hull

64

1  Number 55-945; is that right?
2    A.  That's correct.
3    Q.  You haven't sampled any of
4  the other Viking yachts that may be
5  the subject of claims in this case?
6    A.  No, sir.
7    Q.  Am I right?
8    A.  That's correct.
9    Q.  I'm sorry.  I have to do
10  that to make sure we're on the same
11  page.
12      Now, have you -- there's no
13  reference in the body of your report,
14  the three pages, to any Post Marine
15  yachts, right?
16    A.  That's correct.
17    Q.  Am I right that you have
18  not personally inspected any Post
19  Marine yachts?
20    A.  That is also correct.
21    Q.  And you have not sampled
22  any Post Marine yachts?
23    A.  That is correct.
24    Q.  Okay.  You refer at the

65

1  bottom of the second page of your
2  report to the sampling of the Hull
3  Number 55-945, the Tortora yacht; is
4  that right?
5    A.  Yes.
6    Q.  Let me just ask you a
7  question about that, if I may.
8      MR. BIZAR:  Let's just go
9  off the record for a second while I
10  look for a particular document.
11      THE VIDEOGRAPHER:  Going
12  off the video record.  The time is
13  10:04 a.m.
14      (There was a pause in the
15  proceedings.)
16      MR. BIZAR:  Let's go back
17  on the record.
18      THE VIDEOGRAPHER:  Back on
19  the video record at 10:04 a.m.
20  BY MR. BIZAR:
21    Q.  Mr. Jones, I'm going to
22  have the court reporter mark as Jones
23  Exhibit 3 a two-page document that
24  appears to be an e-mail from Stephen

**JDR**

**James DeCrescenzo Reporting**, LLC

215.564.3905          InnovatingLitigation          FAX  215.751.0581
1880 JFK Blvd , 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

---

**66**

1 Murphy to you dated April 7, 2004.
2 (Exhibit Jones 3 was marked
3 for identification.)
4 BY MR. BIZAR:
5 Q. You now have Jones Exhibit
6 3 in front of you. Would you take a
7 moment and look over this two-page
8 document and let me know when you're
9 through.
10 A. (Witness reviews exhibit.)
11 Okay.
12 Q. Exhibit 3 is an e-mail that
13 you received from Mr. Murphy; is that
14 right?
15 A. Yes, sir, it is.
16 Q. And Mr. Murphy was
17 associated with a company called
18 Castle Rock Risk.
19 Do you see that?
20 A. Yes, sir.
21 Q. And what was Castle Rock
22 Risk or what is it?
23 A. They were associated with
24 Atlantic Mutual in some form.

---

**67**

1 Q. And they were involved in
2 the investigation that you were
3 involved in with regard to the
4 cracking experienced in the Tortora
5 yacht, Hull Number 55-945; is that
6 right?
7 A. That's my understanding.
8 Q. And did you ever meet Mr.
9 Murphy?
10 A. Yes, sir.
11 Q. And what was his experience
12 or background? Do you know?
13 A. I don't recall.
14 Q. Did he seem professional
15 and knowledgeable about what he was
16 doing?
17 A. Oh, yes.
18 Q. And he worked with a fellow
19 name Claudio Crivici?
20 A. Yes.
21 Q. Did I pronounce it
22 correctly?
23 A. Your guess is as good as
24 mine.

---

**68**

1 MR. BIZAR: Just show
2 laughter on the transcript.
3 BY MR. BIZAR:
4 Q. And Mr. Crivici worked for
5 Castle Rock as well?
6 A. I believe that was the
7 connection.
8 Q. And did he seem also
9 knowledgeable and professional about
10 what you were investigating?
11 A. Yes, sir.
12 Q. Okay. And Mr. Murphy in
13 this e-mail to you was reporting on
14 the sampling from Motor Yacht
15 Javelin, which is Hull Number 55-945,
16 correct?
17 A. Correct.
18 Q. And that's the sampling, in
19 other words, the sampling that's
20 being referred to on April 7, 2004 in
21 this Exhibit 3 to your deposition is
22 the same sampling that you're
23 referring to in your report at the
24 bottom of page 2; is that right?

---

**69**

1 A. That's correct.
2 Q. There's no other sampling
3 that's been done?
4 A. Not to my knowledge.
5 Q. And the eight samples that
6 are referenced here are the same
7 eight samples from the flybridge and
8 the port topside corner and the aft
9 deck hatch and the foredeck and the
10 transom that are referenced in your
11 report where you refer to the aft
12 deck hatch and the flybridge and the
13 Venturi and the transom, et cetera?
14 A. That's correct.
15 Q. And what did the sampling
16 involve, as you recall it?
17 A. Well, the sampling was
18 basically taking what we call a hull
19 saw. It's a saw blade. It's a
20 circular saw blade and it cuts out
21 what we call a plug. And it might be
22 an inch in diameter, might be two
23 inches in diameter or anywhere in
24 between.

**JDR**

**James DeCrescenzo Reporting**, LLC

215.564.3905          InnovatingLitigation          FAX 215.751.0581
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

70

1    And the idea on this one
2   was to just take the sample through
3   the affected area into the laminate,
4   and I believe we just took the outer
5   skin in the case of cord samples.  I
6   don't recall that we went all the way
7   through.
8       But on the areas that were
9   single skin, such as the Venturi and
10  the flybridge combing and things of
11  that nature, those are single skin
12  and we would have taken the whole
13  thing.
14   Q.  And what did you do with
15  the samples once they were taken?
16   A.  What I did is I sectioned
17  them and polished the edges and then
18  inspected them under a microscope.
19   Q.  So when you say optically
20  examined them, what you mean by
21  that -- those are the terms you use
22  in your report -- what you mean by
23  that is that you looked at them
24  through a microscope?

71

1    A.  Correct.
2    Q.  You eyeballed them, right?
3    A.  Optically.
4    Q.  Optically with the help of
5   a microscope?
6    A.  Yes, sir.
7    Q.  Okay.  Now, in your
8   description of the samples, just so I
9   understand you, you say in each case
10  of these eight samples, in each case,
11  I'm reading from your report now,
12  "The gel coat crack extended through
13  the gel coat and into the skin coat
14  with the exception of two samples
15  which only displayed cracks through
16  the gel coat and not into the
17  laminate."
18   A.  Yes, sir.
19   Q.  Does that refresh your
20  recollection --
21   A.  Yes, sir.
22   Q.  -- about how the samples --
23   A.  It does.
24   Q.  So earlier your testimony

72

1   was a little bit off; is that right?
2    A.  Yeah.  Yes, sir, that's
3   correct.
4    Q.  So in each case the crack
5   went all the way through the gel coat
6   into the skin coat with the exception
7   of only two that were in the gel
8   coat?
9    A.  Yes, sir.
10   Q.  Right?
11   A.  That is correct.
12   Q.  And you then say, "When gel
13  coat cracks for whatever reason,
14  there's an energy that's released at
15  failure.  This energy can travel into
16  the underlying laminate causing
17  damage to the laminate."
18   A.  That's correct.
19   Q.  Do you see that?
20      And then you say, "The six
21  samples which displayed damage to the
22  underlying skin coat laminate had no
23  visible voids, delamination or other
24  manufacturing defects that could have

73

1   caused the failures."
2      Do you see that?
3    A.  Yes, sir.
4    Q.  Now, is it your testimony
5   that those are the only kinds of
6   manufacturing or use or handling
7   conditions that can cause cracking of
8   gel coat into the laminate?
9      In other words, when you
10  say no visible voids, delamination or
11  other manufacturing defects, is it
12  your testimony that only visible
13  voids, delamination or other
14  manufacturing defects can cause
15  cracking through the gel coat and
16  into the laminate?
17   A.  Well, very often a void, an
18  air void, let's take for an example,
19  that is a phenomena that occurs in
20  polyester boat building --
21   Q.  Absolutely.
22   A.  -- quite readily.
23   Q.  Yep.
24   A.  And each air bubble is

**JDR**

**James DeCrescenzo Reporting**, LLC

215.564.3905                    Innovating Litigation                    FAX  215.751.0581
                       1880 JFK Blvd , 6th Floor, Philadelphia, PA 19103
                                      www.JDReporting.com

74

1  actually an area for high stress
2  concentration.
3      Q.  Yep.
4      A.  Under load the stress will
5  go to a discontinuity and an air void
6  is a discontinuity. So in areas of
7  high stress that would be a site for
8  possible initial failure.
9          In this case, though it
10  was -- there was no visible void
11  right at the end.
12         Now, when I say visible,
13  you know, I'm going down to about a
14  half a thousandths in diameter. So
15  that's actually pretty small. It
16  would take an electron microscope to
17  get down to the nano size.
18      Q.  You didn't use an electron
19  microscope?
20      A.  No, I did not. There's
21  manufacturing issues and there's
22  external issues.
23      Q.  Right.
24      A.  So as far as manufacturing

75

1  issues, there was nothing that really
2  jumped out at me. The thicknesses
3  were all appropriate. The
4  thicknesses of the gel coat were --
5      Q.  The thicknesses in the
6  samples that you looked at?
7      A.  Yes, sir.
8      Q.  Okay.
9      A.  They were appropriate. The
10  skin coat looked like it had been
11  well consolidated. The resin content
12  looked appropriate. Everything
13  looked, you know, fairly normal,
14  fairly consistent with what I would
15  expect out of --
16      Q.  Did you investigate the
17  possibility of impact stresses in
18  de-molding or other
19  manufacturing-type problems?
20      A.  I considered those,
21  certainly.
22      Q.  And you ruled them out?
23      A.  Yes, sir.
24      Q.  And that was based on what

76

1  Viking told you about their
2  manufacturing techniques?
3      A.  No, no. That was just from
4  a visible inspection. Those type of
5  stress lines, if I will, are very
6  distinctive in their pattern. And --
7      Q.  You didn't see that in
8  these particular samples?
9      A.  No, no.
10      Q.  How are they distinctive?
11  What would you expect to see that you
12  didn't see? Do you recall?
13      A.  Well, if it was stress --
14  no. If it was mechanical stress
15  related, say from pulling the part or
16  the part being impacted or the part
17  going through flexure or being too
18  limber, there would be very
19  distinctive stress lines that would
20  follow.
21          In the case of flexibility
22  being too flexible, the stress line
23  would manifest itself along the edges
24  of reinforcement, a frame, a

77

1  bulkhead, something of that nature.
2  And they would be fairly linear.
3          The stress lines in a
4  panel, regardless of if it's a deck
5  panel or whatever, a bottom panel, a
6  hull side, whatever, those are
7  typically framed out with bulkheads
8  or stringers or any type of
9  stiffener.
10          And those are oriented
11  either longitudinally, typically
12  longitudinally or transversely in the
13  boat. And they have the -- they are
14  the end -- they provide the end
15  conditions for that panel.
16          Stress goes to the edge of
17  the panels. You don't normally find
18  it in the middle of a panel. It
19  would be at the edges where it's
20  constrained, where there's a hard
21  point.
22          So those lines, those
23  stress lines, would be linear, fairly
24  linear, parallel. They would

**JDR**

**James DeCrescenzo Reporting**, LLC

215.564.3905          InnovatingLitigation          FAX  215.751.0581
1880 JFK Blvd , 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

78

1 actually, in essence, outline the
2 structure.
3 In the case of an impact,
4 if it's a backside impact, like a
5 bulkhead trying to push its way
6 through the deck, or some sort of
7 backside impact, it would be a star
8 crack, very distinctive.
9 If it was a frontal impact,
10 somebody dropping a heavy object onto
11 the deck or a strike of some sort,
12 typically those are annular rings.
13 De-molding stress lines
14 would be along feature lines. They
15 would be at the deck to the
16 superstructure, that connection
17 there, or a feature at the hull of
18 the deck line or at the radius in the
19 bottom of the cockpit liner.
20 That's where they would be
21 and they would be very distinctive.
22 They would also be linear, and they
23 would follow that feature, whatever
24 that feature is. That was not the

79

1 case in this boat.
2 Q. When you say in your report
3 that the gel coat crack extended
4 through the gel coat and into the
5 skin coat for six of the samples,
6 that means that the crack was fairly
7 deep, correct?
8 A. A gel coat layer's roughly
9 20 thousandths of an inch and the
10 skin coat might be 30 or 40
11 thousandths. So I guess that's a
12 relative number.
13 Q. What I mean is that the
14 crack goes beneath the gel coat into
15 the layers that are below the gel
16 coat?
17 MR. WEISZ: Object to the
18 form.
19 MR. BIZAR: Let me fix my
20 question.
21 BY MR. BIZAR:
22 Q. When you say in your report
23 that the gel coat crack extended
24 through the gel coat and into the

80

1 skin coat, it's not a gel coat crack
2 that is simply confined.
3 It's not a crack that is
4 simply confined to the gel coat
5 layer, but it's a crack that extends
6 beneath the gel coat layer; is that
7 right?
8 A. Yes. Most of the cracking
9 that I've ever seen has extended into
10 the underlying laminate for some
11 reason.
12 Q. And in this case that was
13 true for six of your eight samples?
14 A. That's correct.
15 Q. And the underlying laminate
16 is stronger in its constitution than
17 the gel coat layer; isn't that right?
18 A. In the fact that the gel
19 coat is unreinforced, yes.
20 Q. The gel coat is
21 unreinforced and it's applied
22 relatively thinly, correct?
23 A. That's correct.
24 Q. When it's properly applied,

81

1 it should be -- well, do you
2 recall -- do you know offhand what
3 the application guidelines are from
4 CCP for its 953 Series gel coat?
5 A. I believe it's 18 to 22
6 thousandths wet.
7 Q. So 18 plus or minus two
8 milliliters; is that right?
9 A. Yeah. 18 to 20.
10 Q. Okay. So as between the
11 gel coat and the underlying layers,
12 the underlying layers are
13 substantially stronger than the gel
14 coat; isn't that right?
15 A. Yes, sir.
16 Q. And the force that can be
17 exerted on the gel coat from the
18 underlying layers can be extreme;
19 isn't that right?
20 A. Yeah. It depends on the
21 load condition but I understand.
22 Q. You agree with my
23 statement? In other words, the
24 underlying layers are working against

**JDR**

**James DeCrescenzo Reporting, LLC**

215.564.3905

Innovating Litigation
1880 JFK Blvd , 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

FAX 215.751.0581

82

1  an unreinforced, very thin skin,
2  outer coat layer, the gel coat.
3        And when they're heated or
4  cooled, they expand and that — the
5  consequence of that is pressure
6  against the gel coat; isn't that
7  right?
8        MR. WEISZ: Object to the
9  form.
10       THE WITNESS: I don't know
11 if I really follow you. The heating
12 and expanding, what do you mean?
13 BY MR. BIZAR:
14    Q.  Well, you understand that
15 materials have something called a
16 coefficient of thermal expansion,
17 right?
18    A.  Correct.
19    Q.  And there may be a
20 different coefficient of thermal
21 expansion for the laminate than there
22 is for the gel coat?
23    A.  Very possibly.
24    Q.  And there could be even a

83

1  disconnect between the coefficient of
2  thermal expansion for the laminate
3  and the gel coat in the sense that
4  the gel coat may not expand enough
5  when the laminate expands for the two
6  to work in harmony?
7     A.  Or it could expand greater
8  than.
9     Q.  Right. And either way
10 there could be an issue?
11    A.  There could be.
12    Q.  Whose responsibility is it
13 to determine whether the gel coat
14 works with a particular laminate
15 schedule, the gel coat manufacturer
16 or the boat manufacturer?
17    A.  Well, laminate schedules
18 are quite wide in their application.
19 Everybody — every builder has a
20 different thought as to what their
21 laminate schedule ought to be.
22    Q.  Correct.
23    A.  Now, yes, I would agree
24 that the laminate is much stronger,

84

1  most likely an order of magnitude or
2  two than the gel coat. I think your
3  question is whose responsibility is
4  it.
5        Well, I mainly believe that
6  it's the gel coat manufacturer
7  because it would be like me putting
8  paint on steel.
9        You know, paint is a very
10 thin coating. Steel is very rigid,
11 very strong, you know, and it would
12 be very analogous to spraying a thin
13 gel coat onto a heavily reinforced
14 fiberglass part.
15       The order of magnitude of
16 strength and stiffness is going to be
17 very similar. So you are applying a
18 coating onto something that is
19 purposely very rigid.
20       So I really think it's more
21 on the coating manufacturer's due
22 diligence to provide the best
23 material for the application. They
24 know what the application is.

85

1     Q.  Okay. Well, let me ask you
2  a different set of questions that are
3  related to what we've just discussed.
4        CCP, as a gel coat
5  manufacturer, makes a gel coat that
6  is intended to be used in a wide
7  variety of marine applications,
8  right?
9     A.  They have dozens of
10 formulations, yes.
11    Q.  Let's take the 953 is
12 intended to work with a wide variety
13 of laminate schedules, right?
14    A.  Correct.
15    Q.  And CCP makes a gel coat
16 that it offers for sale and the
17 manufacturer is responsible for
18 building the boat, correct?
19    A.  That's correct.
20    Q.  And the manufacturer
21 decides whether that gel coat is
22 appropriate for its boat or not,
23 right?
24    A.  Very often the builder will

**JDR**

**James DeCrescenzo Reporting**, LLC

215.564.3905                    InnovatingLitigation                    FAX  215.751.0581
                        1880 JFK Blvd , 6th Floor, Philadelphia, PA 19103
                                    www.JDReporting.com

86

1  rely on the formulator, the gel coat
2  manufacturer, to give them the best
3  advice.
4      It's my experience that the
5  people who develop the materials,
6  whether it's gel coat or resin or
7  whatever it is, know that product
8  better than anybody else.
9      So, as a builder, you go to
10 your resin supplier, your gel coat
11 supplier, and you say, listen, this
12 is my application. This is what I am
13 intending to do. What's your best
14 idea? This is what I'm looking for.
15 What do you think?
16     And because the gel coat
17 manufacturer, and in this case, CCP,
18 is very well respected in the
19 industry for producing a fine
20 product.
21     They've produced
22 documentation that is used worldwide
23 as a guide on the application and
24 troubleshooting of gel coats.

87

1      So when you go to somebody
2  like this, you would -- it's been my
3  experience to bring the supplier in
4  early.
5   Q.  Maybe if they had had you
6  helping them, it would have not
7  worked out the way it did. Let me
8  ask you this question.
9   A.  Well, I don't know.
10  Q.  Does CCP have control over
11 the manufacturer's laminate schedule
12 or does the manufacturer?
13  A.  Oh, the manufacturer does.
14  Q.  And does the manufacturer
15 have control over the materials that
16 they use or does CCP? I mean, you
17 mentioned --
18  A.  I'm sorry. What materials?
19  Q.  You mentioned advice and
20 consultation and working with
21 somebody.
22     Who decides what materials
23 the manufacturer is going to use, the
24 manufacturer or the material

88

1  supplier?
2   A.  Well, it's ultimately the
3  manufacturer's -- the builder's
4  responsibility to say, yes, I am
5  going to buy that product.
6      But I don't know -- I can't
7  recall of any builder that I've
8  worked with that doesn't consult with
9  either the resin supplier or the gel
10 coat supplier or even the
11 reinforcement supplier.
12  Q.  And you've worked with
13 builders who have done testing on
14 their materials as well?
15  A.  Oh, certainly. But I don't
16 know of anybody that doesn't call up
17 the manufacturer, have the
18 manufacturer or the supplier come in
19 and say, gee, you know, I'm looking
20 for this color and it's got to be
21 brilliant, it's got to last, you've
22 got to use good pigments, you've got
23 to -- you know, this is a boat.
24     It's going to go out in the

89

1  industry. And the marine industry
2  produces thousands of boats per week.
3   Q.  You haven't done any
4  testing of CCP's gel coat for
5  purposes of this report, in other
6  words, for purposes of the opinions
7  that you've issued as of August 2007;
8  is that right?
9   A.  For this report, no.
10  Q.  And you haven't done any
11 testing comparing 953 versus 952 gel
12 coat or any other CCP gel coat
13 formulations for purposes of this
14 report; is that right?
15  A.  For the purposes of this
16 report, that's correct.
17  Q.  And you haven't analyzed
18 the gel coat formulation of the 953
19 or the 952 gel coats for purposes of
20 this report?
21  A.  No, sir.
22  Q.  Am I right?
23  A.  That's correct.
24  Q.  And you haven't analyzed

**JDR**

**James DeCrescenzo Reporting**, LLC

215.564.3905

InnovatingLitigation
1880 JFK Blvd , 6ᵗʰ Floor, Philadelphia, PA 19103
www.JDReporting.com

FAX 215.751.0581

90

1    the gel coat chemistry of CCP's gel
2    coat for purposes of this report?
3        A.  No.  I'm not a chemist.
4        Q.  So your conclusion that
5    it's a material defect in the gel
6    coat basically was arrived at by
7    eliminating other possible causes by
8    a process of elimination; is that
9    right?
10       A.  Yes, sir.  And historical
11   evidence.
12       Q.  And historical evidence is
13   the evidence of Viking's experience
14   with prior series of gel coat, is
15   that it?
16       A.  No.  It's actually an
17   industry-wide issue, you know,
18   performance.
19       Q.  I don't understand what you
20   mean.
21       A.  Well, this is --
22       Q.  This is a unique situation;
23   is that what you're saying?
24       A.  This is an incredibly

91

1    unique situation.  I've only seen it
2    one time before.
3        Q.  And we'll get to that one
4    time before but let me just make sure
5    I understand you.
6            When you say that this is
7    an incredibly unique situation, you
8    say that -- you're referring to the
9    gel coat cracking of a nature -- of
10   the nature described in your report
11   is a unique situation?
12       A.  Well, it's -- yes.  It's so
13   global in nature and it encompasses
14   different manufacturing processes
15   from closed mold to open mold to
16   resin transfer, a wide number of
17   laminate schedules.
18           Essentially every part
19   exposed on the outside of the boat
20   had cracks in it, and that was
21   extraordinary.  You know, like I say,
22   I've only seen it one other time.
23       Q.  Okay.  We'll get to the one
24   other time.

92

1            You've only seen one boat,
2    which is the Tortora yacht, with this
3    problem personally, correct?  In
4    other words, you haven't --
5        A.  For this case?
6        Q.  Yes.
7        A.  For the Viking/Post versus
8    CCP --
9        Q.  Yes.
10       A.  -- there's only one boat
11   that I looked at, yes.
12       Q.  And you've never seen a
13   Post boat --
14       A.  That's correct.
15       Q.  -- personally?
16       A.  Well, for this case.
17       Q.  Right.  And have you ever
18   been to the Post manufacturing
19   facility for this case?
20       A.  No.  I witnessed some video
21   application.
22       Q.  But you didn't make a
23   personal visit or inspection of the
24   Post --

93

1        A.  No, I didn't.
2        Q.  -- manufacturing facility?
3        A.  No, I didn't.
4        Q.  And you didn't go to Post
5    and review documents at Post?
6        A.  No, sir, I didn't.
7            MR. BIZAR:  We need to
8    change the tape so let's do that.
9            THE VIDEOGRAPHER:  Going
10   off the video record.  The time is
11   10:28 a.m.  This is the end of tape
12   one.
13           (A break was taken at this
14   time.)
15           THE VIDEOGRAPHER:  Back on
16   the video record at 10:37 a.m.  This
17   is the start of tape two.
18   BY MR. BIZAR:
19       Q.  So in your testimony a
20   couple moments ago that the situation
21   that you've seen in the Tortora yacht
22   is unique, am I to understand that
23   you haven't seen any such situation
24   in other instances where CCP gel coat

**James DeCrescenzo Reporting**, LLC

215.564.3905          InnovatingLitigation          FAX  215.751.0581
                   1880 JFK Blvd , 6th Floor, Philadelphia, PA 19103
                        www.JDReporting.com

94

1  has been involved?
2      A.  Yes, I have.
3      Q.  You have seen it in other
4  instances?
5      A.  Yes.
6      Q.  Okay.  What are those other
7  instances?
8      A.  Well, it was just one.
9      Q.  Okay.
10      A.  And it was --
11      Q.  So the one other time
12  before was a CCP gel coat?
13      A.  Yes, sir, it was.
14      Q.  Okay.  Tell me about that.
15      A.  Well, this was something
16  that I caused.  It was something that
17  I actually did intentionally but it
18  wasn't -- I didn't anticipate the
19  phenomena.  And this was a case where
20  I had built a boat and then post
21  cured it in an oven.
22          And when it came out of the
23  oven, the gel coat was globally
24  cracked and the phenomena looked very

95

1  similar to what I saw with the
2  Tortora boat.  It was so extensive
3  and so extraordinary.
4      Q.  What was the gel coat in
5  question that was used in that
6  instance?
7      A.  It was the Armorflex gel
8  coat and I don't remember the exact
9  batch or product code number.
10      Q.  Was it 953, 952?
11      A.  Yeah.  I think it was the
12  953.
13      Q.  Do you know one way or the
14  other?
15      A.  I could look it up in my
16  records, but, as I sit here today,
17  no, I don't recall.
18      Q.  Is that the basis for your
19  opinion in this report?  That
20  information is not disclosed in your
21  report and it's not disclosed in your
22  documents so I want to know if that's
23  the basis for your opinion in any way
24  because I'm going to move to strike

96

1  it.
2      A.  No, no.  It's just
3  something that I had seen before.
4      Q.  In the field have you seen
5  an instance of this gel coat cracking
6  comparable to what you saw in the
7  Tortora boat before?
8      A.  No.
9      Q.  When was this work that you
10  did with the boat that you post cured
11  in an oven?
12      A.  2002.
13      Q.  Did you contact CCP as the
14  gel coat manufacturer about that
15  situation?
16      A.  No.  I knew why it
17  happened.
18      Q.  And why did it happen?
19      A.  Different coefficients of
20  thermal expansion.
21      Q.  As between the gel coat and
22  the laminate?
23      A.  Yes, sir.
24      Q.  And did the cracking in

97

1  that case occur immediately?
2      A.  Oh, yes.
3      Q.  It didn't take four or five
4  years to develop?
5      A.  No.
6      Q.  And is it your
7  understanding that with regard to the
8  Tortora boat, the cracking took
9  several years to develop?
10      A.  That's my understanding.
11      Q.  The Tortora boat was built
12  in 1999?
13      A.  It was a 2000 year model.
14      Q.  2000 year model?
15      A.  But it was started near the
16  end of '99.
17      Q.  And the cracking was
18  pointed out in 2004; is that right?
19      A.  I believe so.  I believe
20  that was the date.
21      Q.  In your situation that you
22  described in your plant, the cracking
23  resulting from different coefficients
24  of thermal expansion occurred

**JDR**

**James DeCrescenzo Reporting**, LLC

InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                                    FAX  215.751.0581

98

1   immediately as opposed to the Tortora
2   situation where cracking of the gel
3   coat occurred a number of years
4   later?
5       A.  Yes.  Some of it did happen
6   immediately, but some of it was
7   progressive.
8       Q.  But some of it at least
9   happened immediately?
10      A.  Yes, sir.
11      Q.  Did you issue a report or
12  do anything in connection with
13  that --
14      A.  No.
15      Q.  -- boat?
16      A.  No, sir.
17      Q.  Did you repair the boat?
18      A.  Yes, sir.
19      Q.  How did you do that?
20      A.  I stripped the gel coat off
21  and repainted it.
22      Q.  And what did you repaint it
23  with?
24      A.  It was an allgrip U.S.

99

1   Paints product.  It was an LPU that
2   we used.
3       Q.  You didn't reapply gel
4   coat?
5       A.  No, sir.
6       Q.  Now, you understand that
7   CCP from time to time gets reports of
8   gel coat cracking by various
9   customers, right?
10      A.  I would have to assume
11  that.
12      Q.  You would assume that
13  because all manufacturers get gel
14  coat cracking reports; isn't that
15  right?
16      A.  I would assume that, too.
17  I'm not a gel coat manufacturer, so
18  I'm not privy.
19      Q.  But you know that gel coat
20  cracking is a common phenomenon in
21  the marine industry?
22      A.  Very common.
23      Q.  And, in fact, you say that
24  in your report.

100

1       A.  Yes, I do.
2       Q.  And you were provided in
3   this case some CCP documents
4   referring to cracking situations,
5   right?
6       A.  Yes.  Yes, I was.
7       Q.  MasterCraft, Skier's Choice
8   are some such situations.
9       A.  I remember those.
10      Q.  And those cracking
11  instances have nothing to do with
12  your opinion here?
13      A.  No.
14      Q.  Isn't that right?
15      A.  That's correct.
16      Q.  In other words, those
17  situations are not this same unique
18  situation that you've described?
19      A.  Not at all.
20      Q.  Those are normal instances
21  of cracking that can be identified as
22  caused by something specific?
23      A.  Yes, sir.
24      Q.  Okay.  Now, the opinion

101

1   that you've reached in this case is
2   based, as you put it, on your
3   examination of the Tortora boat and
4   historical knowledge, right?
5       A.  That's correct.
6       Q.  And you've extrapolated
7   from your examination of the Tortora
8   boat to other Viking boats and to all
9   the Post boats; isn't that right?
10      A.  That's correct.
11      Q.  You haven't done any work
12  on these other boats yourself?
13      A.  No.
14      Q.  It's purely by
15  extrapolation?
16      A.  That's correct.
17      Q.  Okay.  Now, with regard to
18  the Tortora boat, are you certain
19  that Viking provided you with all the
20  information relevant to that boat?
21      A.  I wouldn't know.
22      Q.  Okay.  Let me mark a
23  document.  Let me do it this way.
24      In your report you identify



**James DeCrescenzo Reporting**, LLC

102

1  on a reference list the materials
2  that you consulted in connection with
3  your work.
4      A.  That's correct.
5      Q.  And there are no Post
6  Marine documents listed.
7      A.  That's right.
8      Q.  So you didn't consult any
9  Post Marine documents; is that right?
10     A.  I didn't have any, no.
11     Q.  And there are only very few
12  Viking documents.
13     A.  That's correct.
14     Q.  Is that because you didn't
15  have any of those documents either?
16     A.  Those were the ones that I
17  referred to specifically.  I would
18  have to say that I read a raft, a
19  couple of banker boxes full of
20  documents.
21     Q.  These are the ones you --
22     A.  But those are the ones that
23  were specific to what I was
24  investigating, yes.

103

1      Q.  Did you ignore documents
2  that were maybe contradictory to your
3  position?
4      A.  No.  No.
5          MR. BIZAR:  Let me mark
6  this document.
7  BY MR. BIZAR:
8      Q.  So why is it that gel coat
9  thickness can cause gel coat
10  cracking?
11     A.  If it's too thick, it's a
12  brittle, unreinforced layer, fairly
13  thin, not very strong.
14     Q.  And why then does it crack?
15     A.  Well, if it's thick, it's
16  even more brittle than a thin layer.
17  And being a thicker, unreinforced
18  layer, it is more prone to cracking.
19     Q.  So the application of gel
20  coat in accordance with the gel coat
21  manufacturer's specifications is
22  something that's important.
23         Would you agree?
24     A.  Oh, certainly.

104

1      Q.  And the training of the
2  people who do the application of the
3  gel coat is something that's
4  important as well?
5      A.  Yes, sir.
6      Q.  And ensuring that the
7  people who do the gel coat
8  application properly is important
9  also, correct?
10     A.  Yes, sir.
11     Q.  And the manufacturer has
12  control over the gel coat
13  application, not CCP as a gel coat
14  materials supplier?
15     A.  That's correct.
16     Q.  In other words, it's done
17  in the boat building facility, not in
18  CCP's factories, right?
19     A.  Yes, sir.
20         MR. BIZAR:  We'll mark this
21  as Jones 4 I think.
22         (Exhibit Jones 4 was marked
23  for identification.)
24  BY MR. BIZAR:

105

1      Q.  I'm going to hand to you a
2  document that was marked at one of
3  the Viking depositions and it is a
4  multiple-page document that has some
5  boat dimensions on it.
6          The boat referenced is
7  55-945 and it has a variety of
8  measurements of gel coat thickness,
9  which I will represent to you have
10  been testified about by Viking
11  witnesses.
12         Take a moment, look it
13  over.
14     A.  (Witness reviews exhibit.)
15     Q.  Let me ask you, you didn't
16  review any deposition testimony of
17  any of the Viking witnesses; is that
18  right?
19     A.  No, I don't believe I have.
20     Q.  And you didn't -- you've
21  never seen Exhibit 4 before today --
22     A.  No.
23     Q.  -- is that right?
24     A.  That's correct.



**James DeCrescenzo Reporting**, LLC

106

1    Q.  And if I represent to you
2   that these numbers shown on Exhibit 4
3   are measurements of gel coat
4   thickness on the Tortora boat, at
5   various parts of the Tortora boat,
6   does that seem to comport with what
7   the document says?
8       You can look through the
9   document.
10    A.  Yeah.  I don't know how
11  they took the measurements but, yeah,
12  this would be...
13    Q.  Let me do it this way.
14      55-945 is the Tortora boat,
15  right?
16    A.  Yes, sir.
17    Q.  Okay.  And in the
18  lower-right corner there's something
19  that says VK.  That means it comes
20  from the Viking files.
21      And you see Viking listed
22  on a number of these pages, right?
23    A.  Yes, sir.
24    Q.  And you understand that

107

1   this is an outline of the Tortora
2   boat?
3     A.  This looks like an outline
4   of the hard top, yes.
5     Q.  Right.  And then the second
6   page is an outline of the port
7   passage, open flybridge?
8     A.  Yes, sir.
9     Q.  And the third page, do you
10  see what that is an outline of or can
11  you tell me what that would be an
12  outline of?
13    A.  That looks like the back of
14  the superstructure.
15    Q.  Okay.  And the fourth page,
16  what would that be an outline of, the
17  forward deck?
18    A.  That would be the
19  deckhouse, not the deck itself.
20    Q.  And then the next page,
21  page 3603, what would that be an
22  outline of?
23    A.  Wait a minute.  I'm sorry.
24  I missed the page that you were

108

1   referring to.
2     Q.  So that's the forward deck?
3     A.  And, yes, that's the
4   forward deck.
5     Q.  And that's page 3602?
6     A.  3602, correct.
7     Q.  See, you're so experienced
8   you know exactly where to look for
9   the page number.
10      And then page 3603 is the
11  deckhouse?
12    A.  This would be the
13  deckhouse, correct.
14    Q.  Okay.  And you see written
15  on a number of these pages, including
16  the page we're on, 3603, "55-945 TC
17  thickness," right?
18    A.  Okay.
19    Q.  Do you see that?
20    A.  TC thickness.
21    Q.  On the right side in
22  handwriting?
23    A.  Yes, I do see that.
24    Q.  And then you see on the

109

1   prior page the words "TC thickness"?
2     A.  Yes.
3     Q.  Right?  And then the page
4   before that says "thickness," right?
5     A.  Yes.
6     Q.  So can you understand this
7   document as referring to gel coat
8   thickness?
9     A.  If the numbers relate to
10  gel coat thickness, I can understand
11  the documents.
12    Q.  And the measurements here
13  are in many respects, not all
14  respects but in many respects
15  substantially higher than 18 plus or
16  minus two milliliters.  Would you
17  agree?
18    A.  Yes.  Not uncommon.
19    Q.  Whether common or uncommon,
20  the measurements on this boat, the
21  Tortora yacht, which experienced
22  global cracking, are in many respects
23  substantially higher than 18 plus or
24  minus two milliliters?

**JDR**

**James DeCrescenzo Reporting**, LLC

215.564.3905          InnovatingLitigation          FAX  215.751.0581
1880 JFK Blvd , 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

110

1    A.  Yes.  In some respects,
2  yes.
3    Q.  I mean, if you look at page
4  3601 on the right column, are you
5  with me?
6    A.  Yes.
7    Q.  35, 34, 40, 33, 42, 62, 80.
8      Do you see those
9  measurements?
10    A.  Yes.
11    Q.  And on the opposite side
12  you have 36, 38, 26.
13      Do you see those
14  measurements?
15    A.  Yes, I do.
16    Q.  And then on the next page,
17  some of the places are 34, 26, 34,
18  28.
19      Do you see that?
20    A.  Yes.
21    Q.  And on the page after that
22  you have measurements all over the
23  map from 17 all the way up to 42.
24      Do you see that?

111

1    A.  Yes, I do.
2    Q.  So these -- assuming that
3  these are gel coat thickness
4  measurements on the Tortora yacht,
5  these measurements are substantially
6  thicker than the manufacturer's
7  specifications, yes or no?
8    A.  A portion of them are, yes.
9    Q.  Okay.  And in your
10  investigation of manufacturing
11  processes at Viking, what attention
12  did you pay to gel coat thickness in
13  the application of gel coat, 953
14  Series gel coat, to Viking yachts
15  other than the Tortora yacht?
16    A.  Well, in the application it
17  was pretty much a standard procedure
18  for the gel coat operator or one of
19  his helpers to have a gel coat
20  thickness gauge.
21    Q.  A wet gauge, a mil gauge?
22    A.  A mil gauge called a wet
23  film thickness gauge or gel gauge.
24  And, you know, at points during their

112

1  application he would use the gauge to
2  determine where they were and...
3    Q.  That was something that you
4  saw personally?
5    A.  Yes, sir.
6    Q.  But you didn't see it at
7  the time that the Tortora yacht was
8  made because you're not a time
9  traveler; isn't that right?
10    A.  That's correct.
11    Q.  And you didn't see it at
12  the time the other yachts that are at
13  issue in this case were made because
14  you didn't go back in time to see
15  those yachts when they were built?
16    A.  No.  I haven't developed
17  that technique yet.
18    Q.  Okay.  Something that only
19  happens on TV apparently.
20      Now, let me -- and you
21  didn't see any yacht building
22  techniques at Post, did you?
23    A.  No, I didn't.
24    Q.  Now, during the course of

113

1  your investigation into this problem,
2  did you have a chance to look at a
3  variety of CCP documents?
4    A.  Oh, yes.
5    Q.  And CCP reports on
6  inspections and CCP reports on tests?
7    A.  Yes.
8    Q.  Did you at any time in your
9  review of those documents think that
10  the CCP people writing those
11  documents were anything other than
12  honest and truthful in their
13  depiction of what they had seen or
14  done?
15    A.  Are we talking about their
16  in-house test documents and QA
17  documents --
18    Q.  Yes.
19    A.  -- and formulation
20  documents --
21    Q.  Yes.
22    A.  -- and things of that
23  nature?  Yes.
24    Q.  You thought they were

JDR

**James DeCrescenzo Reporting**, LLC

InnovatingLitigation
1880 JFK Blvd , 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                              FAX  215.751.0581

114

1  honest and truthful in the reporting
2  of those results?
3       MR. WEISZ:  Object to the
4  form.
5       THE WITNESS:  I would
6  assume so.  I hate to assume but...
7  BY MR. BIZAR:
8    Q.  Let me give you the
9  question a different way and try and
10  cure my problem that Mr. Weisz has
11  objected to.
12      Have you any information to
13  suggest to you that the CCP personnel
14  recording test results were anything
15  other than honest and truthful in
16  their recording of those results
17  based on the documents you reviewed?
18    A.  Well, based on the
19  documents and based on my experience
20  with CCP and certain personnel from
21  CCP, I have always respected them as
22  being professional and upright and
23  honest.
24    Q.  Thank you.  And with regard

115

1  to CCP inspection reports on boats
2  that they inspected that you may have
3  seen in the course of your
4  investigation in this matter, did you
5  ever see any inspection reports, any
6  root cause analyses prepared by CCP
7  that were anything other than honest
8  and truthful?
9       MR. WEISZ:  Object to the
10  form.
11      THE WITNESS:  They appeared
12  so.
13  BY MR. BIZAR:
14    Q.  You have no reason to
15  believe that they weren't being
16  truthful?
17    A.  They all seemed to be
18  one-sided but I would -- I believe
19  they reported what they saw and what
20  they believed.
21    Q.  Thank you.
22      MR. BIZAR:  Let's mark as
23  the next Jones document which is
24  Exhibit 5.

116

1       (Exhibit Jones 5 was marked
2  for identification.)
3  BY MR. BIZAR:
4    Q.  I've placed in front of you
5  a --
6    A.  Can I say something with
7  respect to this document here?
8    Q.  The Tortora boat document?
9    A.  Yeah.
10   Q.  Meaning Exhibit 4?
11   A.  Correct, Exhibit 4.
12   Q.  Is it in response to one of
13  my questions?  Are you amending an
14  answer?
15   A.  No.  I'm not amending an
16  answer.
17   Q.  Okay.  The way --
18   A.  It's just an observation
19  that I had.
20   Q.  The way -- no.  The answer
21  is you can't.
22   A.  Okay.
23   Q.  You don't get to just
24  speak.  You have to answer the

117

1  questions.
2    A.  Okay.
3    Q.  With regard to -- I showed
4  you the Tortora boat thickness
5  measurements in Exhibit 4.  Let me
6  show you Exhibit 5, which I'll
7  represent to you is a three-page
8  document produced from CCP in this
9  case.  Take a moment and look it
10  over.
11   A.  (Witness reviews exhibit.)
12  Okay.
13   Q.  Have you seen this Exhibit
14  5 before?
15   A.  I may have.
16   Q.  It's not a document that's
17  listed on your list of documents
18  reviewed or relied on?
19   A.  Yeah.
20   Q.  This refers to a boat
21  manufactured by Post using, among
22  other things, 953 Series gel coat.
23      Do you agree?
24   A.  Yes, sir.

**JDR**

**James DeCrescenzo Reporting**, LLC

215.564.3905                                                    FAX  215.751.0581

InnovatingLitigation
1880 JFK Blvd , 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

---

118

1    Q.  And that's reflected on the
2  part inspection form on the second
3  page, right?
4    A.  That's correct.
5    Q.  And there's a reference to
6  the summary of what the CCP technical
7  service representative found on this
8  boat, is there not?
9    A.  Yes, sir.
10    Q.  And the reference refers to
11  the gel coat being 70 to 75
12  milliliters thick, correct?
13    A.  Mils is not milliliters but
14  it's –
15    Q.  I'm sorry.  Millimeters?
16    A.  Millimeters
17    MR. WEISZ:  No.  It's not
18  millimeters either.
19    THE WITNESS:  No, no, no.
20  It's – pardon me?  I'm sorry.  It's
21  actually a term for thousandths of an
22  inch.
23  BY MR. BIZAR:
24    Q.  Okay.  Let me correct it.

---

120

1  for identification.)
2  BY MR. BIZAR:
3    Q.  Jones Exhibit 6 is a
4  two-page document from Viking files
5  that's a series of e-mails dated on
6  or around May 20, 2005 with regard to
7  a boat that's being examined.
8    And the boat has a hard top
9  that was made with CCP's 953WK227
10  Snow White gel coat.
11    Do you see that?
12    A.  Yes.
13    Q.  It's at the bottom.
14    A.  Yes.
15    Q.  The e-mail exchange is
16  between Mr. Kasinski, Mr. Beltran and
17  Bill Heller, right?
18    A.  Yes, sir.
19    Q.  And Mr. Kasinski asks Mr.
20  Heller whether the cracking was due
21  to the CCP gel coat or was it applied
22  too heavy.
23    Do you see that?
24    A.  I see that.

---

119

1    A.  75 thousandths of an inch.
2    Q.  It refers to the gel coat
3  being 70 to 75 thousandths of an inch
4  thick?
5    A.  Yes, sir, it does.
6    Q.  And that's substantially
7  thicker than 18 plus or minus two
8  mils.  Would you agree?
9    A.  I would agree.
10    Q.  And you never inspected
11  visually, yourself, or optically
12  examined, to use your terminology,
13  any Post Marine boat at issue in this
14  case?
15    A.  No, I never have.
16    Q.  And you have no reason to
17  believe that this inspection report
18  is false or flawed in any way?
19    A.  I have no reason to believe
20  that.
21    Q.  Let me show you some other
22  documents, if I may.
23    MR. BIZAR:  This is 6.
24    (Exhibit Jones 6 was marked

---

121

1    Q.  And the answer from Mr.
2  Heller to Mr. Kasinski was, "John,
3  yes, there was an excessive amount of
4  gel coat film thickness in certain
5  areas."
6    Do you see that?
7    A.  I do.
8    Q.  And, as we discussed,
9  thickness can cause gel coat
10  cracking?
11    A.  Yes, it can.
12    Q.  And this is a boat that you
13  haven't examined before?
14    A.  That is also correct.
15    Q.  And you've not seen this
16  document before; is that also
17  correct?
18    A.  Not to my recollection.
19    Q.  Okay.
20    MR. BIZAR:  Let's mark this
21  one and the next one, the two pages.
22    (Exhibit Jones 7 was marked
23  for identification.)
24  BY MR. BIZAR:

---

**JDR**

**James DeCrescenzo Reporting**, LLC

215.564.3905                    Innovating Litigation                    FAX  215.751.0581
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

122

1    Q.  Mr. Jones, I've handed you
2  Exhibit 7, which is a two-page
3  document with Viking Bates Numbers
4  dated as of January 19, 2000.  Take a
5  moment and look that over.
6    A.  (Witness reviews exhibit.)
7  Okay.
8    Q.  Have you seen this document
9  before?
10    A.  Not to my recollection.
11    Q.  And you know who Juan
12  Beltran is at Viking?
13    A.  No.
14    Q.  He writes in this document,
15  "Please be advised," all in capitals,
16  and again the text of the document is
17  in capitals, "We have a problem with
18  the thickness of gel coat in our
19  fiberglass parts and I spoke with you
20  guys before.
21    "It looks like nothing is
22  being done.  This time you're going
23  to sign this note, signature."
24    Do you see that?

123

1    A.  Yes, I do.
2    Q.  And there's a signature by
3  a Mr. James Parker and then there's a
4  signature as well on the second page,
5  which is identical, by Ramon
6  Quinones.
7    Do you see that?
8    A.  Yes, I do.
9    Q.  And, again, thickness can
10  cause gel coat cracking?
11    A.  Yes, it can.
12    Q.  And this document is dated
13  as of 2000, the year 2000?
14    A.  That's correct.
15    Q.  And it refers back to a
16  conversation that Mr. Beltran may
17  have had with these individuals prior
18  to that time?
19    MR. WEISZ:  Object to the
20  form.
21  BY MR. BIZAR:
22    Q.  Does it not?
23    MR. WEISZ:  I still object
24  to the form.

124

1    THE WITNESS:  That's what
2  it appears.
3  BY MR. BIZAR:
4    Q.  And, again, this is a
5  document that you don't recall seeing
6  in connection with your
7  investigation?
8    A.  That's correct.
9    Q.  Let's move on from
10  thickness to another topic related to
11  manufacturing, if we may.
12    Would you agree with me
13  that moisture is a factor in the
14  manufacture of fiberglass parts that
15  could affect the performance of those
16  parts in the field?
17    A.  Yes, it can
18    (Exhibit Jones 8 was marked
19  for identification.)
20  BY MR. BIZAR:
21    Q.  Let me hand to you what
22  we've had the court reporter mark as
23  Exhibit 8 to your deposition.  It's a
24  one-page Viking document.  Take a

125

1  moment and look it over.
2    A.  (Witness reviews document.)
3  Okay.
4    Q.  This is a memorandum, an
5  e-mail memorandum, by Juan Beltran to
6  Stan Blair with carbon copies to
7  others.  It refers in handwriting in
8  the upper right corner to a licking
9  problem.  I think he means leaking
10  problem.
11    Would you agree with that,
12  based on the text of the memo?
13    A.  Yes.  I see where it says
14  leaking.
15    Q.  It says, "Subject:  Water
16  Leak" and then it refers in the text
17  to leaking, correct?
18    A.  That's correct.
19    Q.  The text is "The roof over
20  the 48 hull mode" --
21    THE VIDEOGRAPHER:  We're
22  going off the video record.  The time
23  is 11:05.
24    (There was a pause in the



**James DeCrescenzo Reporting**, LLC

126

1 proceedings because of a technical
2 difficulty.)
3       THE VIDEOGRAPHER: Back on
4 the video record. The time is
5 11:11 a.m.
6 BY MR. BIZAR:
7    Q. The text of Exhibit 8 of
8 the e-mail message itself refers
9 to -- is as follows: "The roof over
10 the 48 hull mode is leaking bad. I
11 have spots in the skin coat from the
12 water that we had to grind out on
13 48431.
14       "This could cause problems
15 later. We have made a lot of work
16 orders and I send o e-mail to Frank
17 Moser on 8-16-03 about this
18 situation. Could you please look
19 into this situation?
20       "We also have a lot of
21 other leaks over other hull molds
22 with 5 gallon pails. We made work
23 orders and e-mail for the 56 hull
24 mode and 45 hull mode have the same

127

1 problems.
2       "Could you please look into
3 the situation, please. Thank you,
4 Juan Beltran."
5       Do you see that?
6    A. Yes, sir.
7    Q. And that's a document that
8 you didn't see in connection with
9 your investigation --
10    A. No.
11    Q. -- into manufacturing at
12 Viking, correct?
13    A. That's correct.
14       MR. BIZAR: Let's mark the
15 next exhibit.
16       (Exhibit Jones 9 was marked
17 for identification.)
18 BY MR. BIZAR:
19    Q. Jones Exhibit 9 is a
20 one-page document from Viking's
21 files. Take a moment and look that
22 through.
23    A. (Witness reviews exhibit.)
24    Q. The subject of this

128

1 exhibit, Exhibit 9, is "Leaks on the
2 roof in Viglass," which means
3 fiberglass?
4    A. I --
5    Q. You don't know?
6    A. That I don't know.
7    Q. Okay. It's another e-mail
8 message from Juan Beltran to various
9 people complaining about leaks in
10 their manufacturing area; is that
11 right?
12    A. Yes. This does say, "licks
13 on the ruff" -- ruff.
14    Q. Mr. Beltran's native
15 language is not English, but you get
16 the sense of it?
17    A. I get the gist of the
18 message.
19    Q. And they're talking about
20 dripping water on top of lamination
21 damaging the body and it needs to be
22 fixed.
23       Do you see that?
24    A. Yes, I see that.

129

1    Q. And you don't know if
2 problems like the problem described
3 in Exhibit 9 or Exhibit 8 existed in
4 prior years?
5    A. No. I don't know if it was
6 prior or during the construction of
7 any of the boats.
8    Q. Or subsequent?
9    A. Or subsequent. No, I
10 don't.
11    Q. You didn't see this
12 document as part of your
13 investigation?
14    A. No.
15       MR. BIZAR: Let's go to the
16 next one.
17       (Exhibit Jones 10 was
18 marked for identification.)
19 BY MR. BIZAR:
20    Q. Jones Exhibit 10 is a
21 four-page document from Viking's
22 files as well dated March 23, 2005.
23 The subject is the "Roof Leaking
24 Water" and there are pictures

JDR

**James DeCrescenzo Reporting**, LLC

InnovatingLitigation
1880 JFK Blvd , 6ᵗʰ Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                                      FAX 215.751.0581

---

130

1  attached to the e-mail message
2  pointing out the places on the roof.
3      They're not the clearest
4  pictures but pointing out the places
5  on the roof presumably where there
6  are leaks.
7      A.  Yes, I see that.
8      Q.  And it states, "Frank, the
9  roof on top of the 52 hull mold is
10 leaking water really bad.  We have
11 work orders made.  You fixed this
12 before and it's still leaking water.
13      "We need this to be done
14 again and properly so we don't have
15 to deal with warranty issues later
16 on.
17      "I hope this could be done
18 as soon as possible.  I'm sending you
19 pictures of the leak and what's being
20 damage.  If you have any questions,
21 let me know.  This is very hot.  It
22 needs to be done right away.
23 Thanks."
24      Do you see that?

---

131

1      A.  Yes, I see that.
2      Q.  Again, you don't know if
3  that -- if such problems had existed
4  in the period 1997 to 2004?
5      A.  No, I have no idea.
6      Q.  And you didn't see this
7  document as part of your
8  investigation?
9      A.  That's correct.
10     MR. BIZAR:  Let's mark this
11 one.
12     (Exhibit Jones 11 was
13 marked for identification.)
14 BY MR. BIZAR:
15     Q.  Exhibit 11 is a two-page
16 document that is from Viking's files.
17 The first page is handwritten, but
18 the second page, which may be easier
19 on your eyes, is the typewritten
20 version.
21     A.  (Witness reviews exhibit.)
22     Q.  It's another message from
23 Juan Beltran to a variety of people
24 relating to the manufacturing

---

132

1  conditions at the Viking plant and
2  referring to specifically plastic in
3  the egg crate area and issues with
4  the dust collectors because -- and
5  I'm reading, I'm quoting it now,
6  "Because we have a big problem with
7  the dust when we patch in gel coating
8  and allgrip, this machines blow air
9  and dust all over the place and
10 contaminate all areas."
11     Did I read that excerpt
12 correctly?
13     A.  Yes, you did.
14     Q.  And this is a document that
15 you didn't see as part of your
16 investigation; is that right?
17     A.  No, I did not.
18     Q.  And you don't know what
19 period of time this problem existed
20 or whether it existed during the
21 period when the boats in question
22 were being manufactured; is that
23 right?
24     A.  I'm not sure it's during

---

133

1  their manufacturing, but it may be
2  between their Post finishing, in the
3  finished area.
4      Q.  But there's not --
5      A.  But I don't -- you know.
6      Q.  I'm not asking you to
7  speculate.  My question is simply you
8  don't know what period of time this
9  problem existed or whether it existed
10 during the period in time when the
11 boats in question were being
12 manufactured?
13     A.  No, I do not.
14     Q.  Okay.  And you didn't
15 consider this document as part of
16 your investigation?
17     A.  No, I did not.
18     (Exhibit Jones 12 was
19 marked for identification.)
20 BY MR. BIZAR:
21     Q.  I had the court reporter
22 mark another two-page document.
23 Again, this is from Viking's files
24 and it's partly handwritten and then

---

**JDR**

**James DeCrescenzo Reporting**, LLC

215.564.3905       InnovatingLitigation       FAX  215.751.0581
1880 JFK Blvd , 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

134

1  the text is on the second — is on
2  the first page. This has been marked
3  as Exhibit 12.
4      Have you seen this document
5  before today?
6      A. No, sir.
7      Q. This document refers to a
8  heater. "The only heater that works
9  in the hull area is the north side
10 between the 6148 mold. The other two
11 do not work. Could you please look
12 into this matter."
13     Do you see that?
14     A. Yes, sir.
15     Q. Temperature conditions in
16 the manufacturing plant are
17 significant in the manufacturing of
18 fiberglass, would you agree with
19 that?
20     A. They can be.
21     Q. And they can, if not
22 appropriate, produce problems that
23 appear later on?
24     A. Usually they appear right

135

1  away but yes.
2      Q. And this is a document that
3  you didn't see prior to today? You
4  said that a moment ago.
5      A. That's correct.
6      Q. And you didn't consider it
7  as part of your investigation into
8  the manufacturing practices at
9  Viking?
10     A. That's also correct.
11     (Exhibit Jones 13 was
12 marked for identification.)
13 BY MR. BIZAR:
14     Q. Defendant's Exhibit 13 is a
15 three-page document, again, on the
16 subject of the heater dated December
17 9, 2002.
18     It states in the text part
19 to Dan Passarelli from Juan Beltran
20 and James Parker, "Could you send
21 someone to check the heater in the
22 hull area in Viglass.
23     "None of them are working.
24 We gelled the 61580 this morning and

136

1  it was about 65 degrees.
2      "Now I'm skinning the hull
3  and it's about 55 degrees in the hull
4  area. We are going to have problems
5  later with things not curing right.
6  I'm just following up. I talked to
7  your secretary already with this
8  e-mail."
9      Do you see that?
10     A. Yes.
11     Q. This is a document -- well,
12 again, temperature issues are issues
13 that can affect gel coat performance?
14     A. Yes, they can.
15     Q. And this is a document that
16 you didn't consider in connection
17 with your investigation into
18 manufacturing practices at Viking?
19     A. That's also correct.
20     Q. And you haven't seen it, in
21 fact, prior to today; is that right?
22     A. That is also correct.
23     Q. And you haven't seen, well,
24 any documents related to

137

1  manufacturing conditions at Post;
2  isn't that right?
3      A. That's correct.
4      Q. Do any of these documents
5  in any way affect your opinion about
6  the quality of the manufacturing
7  practices at Viking?
8      A. Well, no, it doesn't change
9  any at all. It sounds like they're
10 well educated in what can and cannot
11 affect the performance of the
12 materials.
13     And they're aware of the
14 situation and they're, you know,
15 attempting to remedy it as best that
16 they can.
17     Water leaks and cold
18 temperature and high temperatures are
19 very common.
20     Q. And gel coat thickness is
21 common as well?
22     A. Oh, sure. They can range
23 all over the place.
24     Q. And so confronted with

**JDR**

**James DeCrescenzo Reporting**, LLC

215.564.3905

InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

FAX 215.751.0581

138

1  these documents, you still think that
2  the manufacturing practices at the
3  Viking plant were totally fine and
4  are not in any way to be faulted in
5  connection with the gel coat cracking
6  issue; is that right?
7      A.  I would say that the
8  construction processes and QA and QC
9  of what exists in the Viking plant
10  and what I believe to have existed
11  over the period of time that I've
12  been familiar with them is probably
13  an order of magnitude better than the
14  standard in the industry.
15      So I would say, yes, it has
16  not affected my opinion at all.
17      Q.  And you have the same
18  opinion with regard to Post?
19      A.  Yes, sir.
20      Q.  And your basis for the
21  opinion with regard to Post is just
22  your knowledge of their general
23  reputation in the industry?
24      A.  No.  I've had

139

1  communications with the people at
2  Post and I've interviewed the head of
3  the glass shop and the people who
4  have actually done the spraying.
5      And, you know, here's a
6  company that has people that have
7  been employed by that company for 17
8  years or 23 years and well educated
9  in their process.
10      And they seem to know what
11  the responsibilities are and what the
12  proper procedures are.
13      Q.  The people that you
14  interviewed at Post, can you identify
15  them by name?
16      A.  I don't recall their names,
17  no.
18      Q.  Did you take notes during
19  those interviews?
20      A.  Yeah.
21      Q.  Were the notes produced to
22  me?
23      A.  I don't know if they were
24  or not.  I don't -- you know, I don't

140

1  even know if I kept them, to be
2  honest with you.
3      MR. BIZAR:  Just for good
4  form sake, can you hand me the
5  Subpoena?
6      (Exhibit Jones 14 was
7  marked for identification.)
8  BY MR. BIZAR:
9      Q.  Exhibit 14 is a copy of a
10  Subpoena to you.
11      Have you seen this before?
12      A.  I'm sorry.  What's the date
13  on this?
14      Q.  August 28, 2007.
15      A.  Yeah.  I must have seen it,
16  yes.
17      Q.  And attached to the cover
18  page is a series of document requests
19  that begin under the page captioned
20  Document Requests?
21      A.  Yes.
22      Q.  And did you produce all the
23  documents that you had in your
24  possession in response to these

141

1  requests?
2      A.  Yes, sir.
3      Q.  Now, turning our attention
4  back to your report, if we can, you
5  have not identified any documents
6  from a company or any information
7  from a company called Performance
8  Cruising.
9      Is that right?
10      A.  I don't recall them, no.
11      Q.  Are you familiar with a
12  company called Performance Cruising?
13      A.  No.
14      Q.  Have you seen the report of
15  the defendants' expert, Dr. Strong,
16  in this case?
17      A.  Oh, yes.  Yes.
18      Q.  Did you read that report?
19      A.  Yes, I did.
20      Q.  Did you see reference to
21  Performance Cruising in that report
22  or don't you recall?
23      A.  Yes.  I believe there was a
24  reference.



**James DeCrescenzo Reporting**, LLC

215.564.3905     InnovatingLitigation     FAX  215.751.0581
1880 JFK Blvd , 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

142

1    Q.  Are you familiar with
2  Performance Cruising from your work
3  in the marine industry?
4    A.  No, sir.
5    Q.  If I represented to you
6  that Performance Cruising was a
7  manufacturer of catamarans and
8  trimarans in Annapolis, Maryland,
9  would that be news to you?
10   A.  It sure would.
11   Q.  And if I represented to you
12 that Performance Cruising used not
13 merely the same formulation of gel
14 coat as Post Marine but the same gel
15 coat from the same batches, the same
16 manufacturer's batches, would that
17 also be news to you?
18   A.  Yes.
19   Q.  And if I represented to you
20 that Performance Cruising had not had
21 experience, cracking experience, with
22 those batches of gel coat that Post
23 Marine had had, would that be news to
24 you?

143

1    A.  Yes.
2    Q.  And if I represented to you
3  that Performance Cruising, the boats
4  on which Performance Cruising had
5  used its -- withdrawn.
6        If I represented to you
7  that Performance Cruising had used
8  the CCP 953 Series gel coat that
9  comes from the same batches as Post
10 Marine's 953 Series gel coat on boats
11 that were used in extreme cold
12 temperature climates, would that be
13 news to you?
14   A.  Sure.
15   Q.  And if I represented to you
16 that using the same batches of gel
17 coat, the same formula of gel coat,
18 on boats used in cold weather climate
19 Performance Cruising had not had a
20 cracking experience like Post Marine,
21 that would be news to you as well; is
22 that right?
23   A.  That's correct.
24   Q.  And you've never seen the

144

1  Affidavit of Tony Smith in this case
2  that attests to all those facts,
3  right?
4    A.  Not that I can recall.
5    Q.  And you haven't seen the
6  deposition testimony of Tony Smith or
7  the exhibits to that deposition
8  either?
9    A.  That's also correct.
10   Q.  And does that in any way
11 change your opinion that the gel coat
12 is materially defective?
13   A.  No.
14   Q.  Why not?
15   A.  Just from what I've
16 witnessed in the boat, in Mr. --
17   Q.  Tortora?
18   A.  -- in Mr. Tortora's boat
19 and what has been related to me by
20 both Viking and Post as the wide
21 number of boats that are very similar
22 in cracking phenomena and the fact
23 that the cracks do not have any rhyme
24 or reason to them as far as being

145

1  coincident with stress lines or hard
2  spots or anything of that nature.
3        They're so global and so
4  random and it's almost bizarre, you
5  know, how global it is.  I've never
6  seen that, except in the one
7  instance.
8        And the fact that this
9  Performance -- you say that
10 Performance catamaran has been using
11 the same batch or did use the same
12 batch and their boats went to cold
13 climates, I know nothing about how
14 long they were there, whether -- the
15 duration, you know, how many times,
16 what the cycle of temperature was.
17       I know nothing about it.
18 So I couldn't respond to that.  I
19 wouldn't know.
20   Q.  So you can't respond
21 because you don't have enough
22 information?
23   A.  I don't have enough
24 information.  And even if everything

**JDR**
**James DeCrescenzo Reporting**, LLC

InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                                              FAX  215.751.0581

### 146

1  that you have told me, if it were all
2  true, it still wouldn't change my
3  opinion. What I saw is what I saw
4  and --
5    Q. What you saw in the one
6  boat, the Tortora boat?
7    A. Yeah. And what has been
8  represented to me by people that I
9  trust and have confidence in, that
10  the other boats are, I'll say in
11  quotes, all the same. You know, no,
12  it doesn't change my opinion at all.
13    Q. So just to be clear, you
14  haven't considered any of the
15  information that's been available in
16  the record in this case with regard
17  to the experience of Performance
18  Cruising using 953 Series gel coat
19  made by CCP, correct?
20    A. That is correct.
21    Q. And you haven't -- and the
22  fact that they used the same gel coat
23  formula, same batches, in cold
24  weather climates is immaterial to

### 147

1  your opinion?
2    A. Well, I would just have to
3  look at the record on the Viking and
4  Post boats. Not every boat they used
5  953 cracked.
6    Q. Well, we'll get to that in
7  a second. I'm just focused right now
8  on the Performance Cruising.
9    A. It correlates. It
10  doesn't -- you know, doesn't change
11  my opinion at all.
12    Q. So the fact that the
13  Performance Cruising boats made from
14  the same batches as Post Marine boats
15  doesn't crack in your view is akin to
16  the fact that or equivalent to the
17  fact that some Post and some Viking
18  boats have not cracked; is that
19  right?
20    A. Yes, sir.
21    Q. And why is it that in your
22  view if the gel coat is materially
23  defective, why is it that some Post
24  and Viking boats have not cracked?

### 148

1    A. I believe that it's related
2  to environmental exposure.
3    Q. So use conditions,
4  conditions in the field, the way the
5  boats are handled affects gel coat
6  cracking?
7    MR. WEISZ: Object to the
8  form.
9  BY MR. BIZAR:
10    Q. Is that right?
11    MR. BIZAR: I'm sorry. Is
12  your objection that it's compound?
13    MR. WEISZ: No. It's
14  objecting that it assumes facts not
15  in evidence.
16    MR. BIZAR: Okay.
17    THE WITNESS: I'm sorry.
18  Could you --
19  BY MR. BIZAR:
20    Q. Sure.
21    A. -- repeat it?
22    Q. Are use conditions, meaning
23  conditions in the field and the way
24  boats are handled, do those

### 149

1  conditions affect gel coat cracking?
2    A. Certainly.
3    Q. And do environmental
4  conditions, temperature, thermal
5  qualities, thermal conditions, do
6  those affect gel coat cracking?
7    A. Yes, sir, they do.
8    Q. And when you say that the
9  experience of Performance Cruising
10  not having cracks with boats made
11  with the same batches as Post and the
12  experience of Post and Viking in not
13  having cracks in some of their boats
14  in your view are equivalent, is that
15  because they may have equivalent use
16  conditions in the field or equivalent
17  environmental conditions?
18    A. Possibly. That could be a
19  reason, sure.
20    Q. Do you have any other
21  explanation for the fact that the
22  boats have not all cracked if the gel
23  coat is materially defective?
24    A. I believe it's -- I believe

**James DeCrescenzo Reporting**, LLC

215.564.3905      InnovatingLitigation      FAX 215.751.0581
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

150

1  it's exposure.
2    Q.  And you haven't made any
3  systematic study of the ways in which
4  boats were exposed, boats in
5  question, boats made at Post and
6  Viking with 953 Series gel coat were
7  exposed to the temperature or the
8  environment or how they were used in
9  the field, right?
10    A.  It's been my understanding
11  that the major portion of the boats
12  that were affected have been cold
13  climate boats.
14    Q.  I understand that that's
15  your testimony, but my question is
16  you haven't done a systematic study
17  on all the boats on which 953 Series
18  gel coat has been applied?
19    A.  I apologize.  No.  I have
20  not made a systematic study of that.
21    Q.  You haven't interviewed the
22  owners; you haven't gone to the
23  marinas and looked at the boats; you
24  haven't looked at any records

151

1  relating to how those boats have been
2  maintained; is that right?
3    A.  That is correct.
4    Q.  And, in fact, your
5  understanding that the boats were
6  exposed to cold weather climates
7  comes from Viking and Post personnel
8  telling you that; is that right?
9    A.  Yes, sir.
10    Q.  And that's a fact that
11  you've taken at face value, right,
12  or --
13    A.  Sure.
14    Q.  -- as an assumption in your
15  analysis?
16    A.  Sure.
17    Q.  Now, just to get this off
18  the table, in your report you say,
19  "The gel coat manufacturer of the
20  product used in the Viking and Post
21  vessels has always promoted their
22  products as the best products of this
23  type available and their expertise
24  and knowledge is well respected and

152

1  referred to throughout the composites
2  industry."
3    That's on the second page
4  of your report in the first full
5  paragraph.
6    That's CCP, right?
7    A.  That's correct.
8    Q.  And CCP is well regarded
9  and a company that you respect.
10    You testified to that
11  earlier?
12    A.  Yes, I did.
13    Q.  And that's -- their general
14  reputation for fine manufacturing and
15  fine quality products is known in the
16  marine industry; is that right?
17    A.  That's their general
18  reputation, correct.
19    Q.  And you're familiar with
20  other gel coat manufacturers, right?
21    A.  Certainly.
22    Q.  You're familiar with HK?
23    A.  HK.
24    Q.  And Interplastics?

153

1    A.  Yes.
2    Q.  And have you done any
3  evaluation of their gel coats for
4  purposes of your report in this case?
5    A.  No.
6    Q.  Have you looked at any
7  documents that they -- that we
8  obtained from HK or Ashland or any
9  other third party as part of your
10  analysis in this case?
11    A.  I remember an Ashland
12  document.  I remember an HK document.
13    MR. BIZAR:  Let's look at
14  the HK documents first.
15    (Exhibit Jones 15 was
16  marked for identification.)
17  BY MR. BIZAR:
18    Q.  I've had the court reporter
19  mark some documents that were
20  obtained from Ashland in response to
21  a Subpoena in this case.
22    And I believe that these
23  documents are among the documents
24  that you referenced in your report as

**JDR**

**James DeCrescenzo Reporting,** LLC

215.564.3905      InnovatingLitigation      FAX  215.751.0581
1880 JFK Blvd , 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

154

1  having been reviewed by you.
2    A.  Yes, sir.
3    Q.  So you recall seeing these
4  documents as part of your work in
5  this case?
6    A.  Yes, I do.
7    Q.  Do you know what these
8  documents show?
9    A.  They show the results of
10  exposure testing.
11    Q.  Carried out by HK?
12    A.  I believe so.
13    Q.  And what was the exposure
14  testing testing of?  Do you know?
15    A.  Gel-coated panels.
16    Q.  Do you know anything about
17  the composition of those gel-coated
18  panels, how they were made?
19    A.  No, I don't.
20    Q.  Do these tests mean
21  anything to you?
22    A.  Without studying them and
23  drawing graphs and looking at them,
24  the numbers are just the numbers.

155

1    Q.  And did you rely on these
2  test results in any way in reaching
3  your opinion?
4    A.  No.
5    Q.  Okay.  That's all I need to
6  know.
7      So this document, although
8  it's disclosed in your report, has
9  nothing to do with your conclusions;
10  is that right?
11    A.  That's correct.
12    Q.  Let's look at the Ashland
13  documents next.
14      Ashland is a company that
15  supplies materials to the plaintiffs;
16  is that right?
17    A.  I believe so.
18    Q.  Do you know what Ashland
19  supplies to Viking for purposes of
20  the boats at issue in this case?
21    A.  I believe they are the sole
22  supplier of the resin that's used.
23    Q.  The back-up resin, the
24  laminating resin?

156

1    A.  Yes.  I believe they have
2  two different types that they use or
3  a number of different types that they
4  use.
5    Q.  And do you know what, if
6  anything, Ashland supplies to Post?
7    A.  No, I don't recall.
8    Q.  Is it your understanding
9  that Ashland has an interest in not
10  being held responsible -- well, let
11  me do it this way.  Withdrawn.
12      Would it be fair to presume
13  that Ashland has an interest in not
14  being held responsible for the gel
15  coat cracking at issue with regard to
16  the Viking and/or Post boats?
17      MR. WEISZ:  Object to the
18  form.
19      THE WITNESS:  I think it
20  would be fair to presume they don't
21  want to get any on them.
22  BY MR. BIZAR:
23    Q.  It's not a stretch of the
24  imagination --

157

1    A.  Yeah.
2    Q.  -- to assume that, right?
3    A.  Yeah, yeah.
4      MR. BIZAR:  Okay.  Let's
5  mark this as 16.
6      (Exhibit Jones 16 was
7  marked for identification.)
8  BY MR. BIZAR:
9    Q.  The court reporter has
10  marked as Exhibit 16 to your
11  deposition, Mr. Jones, a collection
12  of documents that were obtained
13  pursuant to a Subpoena from Ashland.
14      And these documents, are
15  they documents that you've seen
16  before?
17    A.  Yes.
18    Q.  And they were documents
19  that you actually saw in connection
20  with your work in this case; is that
21  right?
22    A.  Yes.
23    Q.  And did you rely on these
24  documents in any way in connection

**JDR**

**James DeCrescenzo Reporting**, LLC

215.564.3905          InnovatingLitigation          FAX  215.751.0581
1880 JFK Blvd , 6th Floor, Philadelphia. PA 19103
www.JDReporting.com

---

**158**

1  with your work?
2      A.  I'd really have to read
3  them again to know.
4      Q.  As you sit here today, do
5  you know whether you -- do you recall
6  whether you relied on them in any
7  way?
8      A.  I think I used it as
9  another data point in what I was
10  looking at and I didn't see anything
11  that was -- struck me as being --
12      Q.  Conclusive?
13      A.  Yes.
14      Q.  There was nothing
15  conclusive in these documents; is
16  that right?
17      A.  Right.
18      Q.  Do you know -- I'm sorry.
19      A.  Yeah.  Nothing that struck
20  me as, you know, nailing it right
21  down.
22      Q.  You understand these
23  documents as reflecting the results
24  of various tests that were carried

---

**159**

1  out by Ashland --
2      A.  That's right.
3      Q.  -- on materials?
4      A.  That's right.
5      Q.  And do you understand
6  whether these tests included -- do
7  you know what materials were being
8  tested?
9      A.  Well, it was pretty much
10  the base resin.
11          They were looking at
12  different resins that Viking and I
13  guess -- I think this is just geared
14  toward the Viking Company, the
15  different resins that they were using
16  and whether or not they were
17  adequately cured and whether or not
18  they were an issue in the gel coat
19  cracking, whether they could be
20  pointed out as being an issue.
21      Q.  Do you understand that they
22  looked at both core resins and the
23  white gel coat as well?
24      A.  Yes.

---

**160**

1      Q.  And do you know whether the
2  white gel coat in question was CCP's
3  white gel coat?
4      A.  Not without reading the
5  documents again.
6      Q.  Do you recall whether it
7  was?
8      A.  No, I don't recall.
9      Q.  If you just would -- and
10  just to be clear, you said a moment
11  ago that nothing stood out in these
12  documents to you.  It was just
13  another data point.
14          Did you rely on them in any
15  way for your opinion in the case?
16      A.  Just that it kind of
17  confirmed my opinion that it wasn't
18  the base laminate.  There wasn't
19  something out of whack with the
20  resin.  And that was the data point.
21      Q.  I'll just direct your
22  attention to the page that has the
23  Bates number ASH 17, which has the
24  Jones Bates Number 720.  The Jones

---

**161**

1  one is the one at the very bottom.
2  Tell me when you're there.
3      A.  I'm here.
4      Q.  Look through that page and
5  focus on the summary, if you would.
6      A.  Uh-huh.
7      Q.  Do you see that underlining
8  of the first sentence?
9      A.  Yes.
10      Q.  Is that your handwriting?
11      A.  I don't think so.
12      Q.  Okay.  It says there, "DMA
13  results show undercure in the gel
14  coat material as seen by an increase
15  in Tg for the 2nd scan results."
16          Do you see that?
17      A.  Yes, sir.
18      Q.  Tell me what that means in
19  English.
20      A.  Well, what that means is
21  that the DMA test essentially
22  heats -- adds heat to the laminate or
23  to the material that they're
24  measuring or analyzing and it

---

**JDR**

**James DeCrescenzo Reporting**, LLC

InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                                              FAX  215.751.0581

Case 1:05-cv-00538-JEP-JS  Document 162-3  Filed 07/15/08  Page 43 of 58  PageID: 5125
VIDEOTAPED DEPOSITION OF DANIEL EVAN JONES, III 1/30/08

42 (Pages 162 to 165)

---

162

1    measures the glass transition
2    temperature, the Tg.
3        And they run it through
4    again a second time to get a
5    percentage cure, and this is -- they
6    actually measure the heat going in
7    and the heat coming out. And if
8    there's residual heat, then that
9    means that there's an undercure
10   situation.
11       Q.  What does that mean, an
12   undercure situation?
13       A.  That means that there has
14   not been complete cross-linking
15   between the constituents of that
16   layer.
17       Q.  And what causes that?
18       A.  Anything.
19       Q.  Does that tell you anything
20   about the quality of the gel coat?
21       A.  Well, it could be the
22   quality of the gel coat. It could
23   be --
24       Q.  The test?

---

163

1        A.  It could be the tech. It
2    could be anything. You know, the
3    percentage of catalyst that went in
4    on that particular day, the guy
5    didn't hold his tongue to the left
6    when he pulled the trigger. It could
7    be any number of things.
8        Q.  So the result means nothing
9    one way or the other?
10       A.  It doesn't surprise me.
11   I've seen this before.
12       Q.  It doesn't show that the
13   gel coat material is defective, does
14   it?
15       A.  Somebody could look at that
16   and say, well, you know, let's look a
17   little further. You know, it's a
18   data point that says that, well,
19   yeah, we did find something, you
20   know, in a routine investigation.
21   And this is fairly routine.
22       Q.  And how -- let me just
23   direct your attention to the page
24   740, DEJ 740. Mr. Keenan is a

---

164

1    district manager for Ashland and he's
2    writing to another Ashland person.
3        At the bottom of the page
4    he writes, "Jim, I'm not certain. I
5    would guess that these are caused by
6    uncured gel coat seeping into the
7    laminate but question, question?"
8        Do you see that?
9        A.  Yeah. Usually uncured gel
10   coat seeping into the laminate,
11   that's more of a visual thing. You
12   can actually see that.
13       Q.  If you look to the next
14   page in the document, 741, you can
15   see that they're referring to
16   pictures and reports from cut-outs
17   that Viking had asked for analysis
18   on. You can see that at the bottom
19   of the page.
20       A.  Okay.
21       Q.  And then immediately above
22   that e-mail they refer to electron
23   scanning micrographs from Ashland
24   Analytical and they say, "I am not

---

165

1    sure we learned anything as to the
2    root cause." Right?
3        A.  Right.
4        Q.  Do you see that?
5        And then above that they
6    talk about potentially running a
7    coefficient for linear thermal
8    expansion to look for a root cause
9    and then on the next page there's the
10   comment from Bob Keenan.
11       Are any of these analyses
12   in any way analyses that you relied
13   on or considered as part of your
14   opinion in this case?
15       A.  Well, I've relied on them
16   that this is -- I believe that these
17   tests were valid.
18       If you look at the acreage
19   that a boat builder produces, the
20   acreage of gel coat surface that a
21   builder produces in any given period
22   of time, to find a few spots here and
23   there would not surprise me at all.
24   It would not be uncommon.

---

**JDR**

**James DeCrescenzo Reporting**, LLC

Innovating Litigation
1880 JFK Blvd , 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                                          FAX  215.751.0581

166

```
 1      Q.  What do you mean by that,
 2   to find a few spots?  You mean a few
 3   spots where the building was not up
 4   to snuff?
 5      A.  Oh, you have a guy that is
 6   spraying gel coat, let's just take
 7   that application for a moment.
 8      Q.  Fine.
 9      A.  And he's got areas — let's
10   say we're gel coating this table.
11   Well, it's very easy to gel coat a
12   nice flat plane.  But then when you
13   gel coat in here —
14      Q.  It's more complicated?
15      A.  — it's much more
16   complicated.  And you wind up with
17   thick areas and thin areas and it's
18   just an artifact of the construction
19   process.
20          Most of the stuff, whether
21   it's too thick or it's too thin, will
22   show up before the boat gets out the
23   door.
24      Q.  Is that true when the gel
```

167

```
 1   coat is not cured properly as well?
 2      A.  Yes, sir.  Yes, sir.  Very
 3   often that will be discovered in the
 4   finishing department or after they
 5   put a black stripe on it or something
 6   of that nature.  It sits out in
 7   commissioning for a little while.
 8          A lot of that will come up.
 9   And while the boat's at the factory,
10   they can attend to those and those
11   are considered fairly routine.
12          Not a big surprise there.
13   None of this is really a surprise.
14   Well, except for the global nature
15   but the — to have spots here and
16   there is — no, it's not a big
17   surprise.
18      Q.  So you understand these
19   test results as reported by Ashland
20   in these e-mail exchanges which we've
21   looked at very briefly as referring
22   to issues where there may have been
23   undercuring or things within the
24   manufacturer's control?
```

168

```
 1      A.  They may be in the
 2   manufacturer's control, yes.
 3      Q.  And you don't view these as
 4   in any way conclusive one way or the
 5   other?
 6      A.  It's like hearing that
 7   knock in your engine and going around
 8   and trying to figure out what it is.
 9   Yep, there's a knock and it's not
10   this, it's not this, it's not this.
11          So that leaves a few other
12   doors open.  It's that type of thing.
13   It's not conclusive.  It doesn't go
14   to the root cause.  It just
15   eliminates a couple areas.
16      Q.  Do any of these tests
17   eliminate the gel coat?
18      A.  No.
19      Q.  Did you — and, again, you
20   looked at this but you reached your
21   opinion independent of this
22   information, meaning you looked at
23   Exhibit 16?
24      A.  I considered it.
```

169

```
 1      Q.  But your opinion is your
 2   opinion?  It's not based on your
 3   testing?
 4      A.  No.
 5      Q.  Is that right?
 6      A.  That's correct.
 7          MR. BIZAR:  Let's take a
 8   five-minute break.
 9          THE VIDEOGRAPHER:  Going
10   off the video record.  The time is
11   11:49 a.m.
12          (A break was taken at this
13   time.)
14          THE VIDEOGRAPHER:  We are
15   back on the video record.  The time
16   is 12:35 p.m.  This is the start of
17   tape three.
18   BY MR. BIZAR:
19      Q.  Good afternoon, Mr. Jones.
20      A.  Good afternoon.
21      Q.  We were talking this
22   morning, in part, about the work that
23   you did on behalf of Atlantic Mutual
24   with regard to the Tortora yacht in
```

**JDR**

**James DeCrescenzo Reporting**, LLC

215.564.3905

InnovatingLitigation
1880 JFK Blvd , 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

FAX  215.751.0581

170

1 an earlier period prior to your
2 engagement in this case.
3     Do you recall that?
4   A. Yes.
5   Q. Just to be clear, you were
6 hired by Atlantic Mutual for that
7 matter; is that right?
8   A. That's correct.
9   Q. And Atlantic Mutual was the
10 insurer for whom?
11   A. Mr. Tortora.
12   Q. And how did Atlantic Mutual
13 find you; do you know?
14   A. I've worked with them
15 before.
16   Q. And had you worked with
17 them prior to that -- to being hired
18 for that project?
19   A. Yes, sir.
20   Q. And have you worked with
21 them since that project?
22   A. Yes, I think so.
23   Q. They haven't expressed any
24 displeasure with the work that you've

171

1 done?
2   A. No, no.
3   Q. And the work that you've
4 done for them you've always tried to
5 use your best judgment?
6   A. Yes, sir.
7   Q. And to be independent and
8 impartial?
9   A. Yes, sir.
10   Q. And to answer the questions
11 that you are asked to address in a
12 professional and comprehensive way;
13 is that right?
14   A. That's correct.
15   Q. And in connection with the
16 work that you did for Atlantic
17 Mutual, you did the investigation
18 that included the optical
19 examination, the sampling that we
20 discussed?
21   A. That's correct.
22   Q. And you claim that you
23 wrote a report for them?
24   A. I believe I did. I

172

1 couldn't tell you for sure, but I
2 believe I did.
3   Q. Okay. And that report
4 would have been something that you
5 would have tried to be careful,
6 objective and impartial in as well;
7 is that right?
8   A. Certainly.
9     MR. BIZAR: Let me mark as
10 the next document this e-mail.
11     (Exhibit Jones 17 was
12 marked for identification.)
13 BY MR. BIZAR:
14   Q. I've had the court reporter
15 mark a one-page document as Exhibit
16 17. It appears to be a series of
17 e-mails between you and Mr. Lonni
18 Rutt and then Mr. Rutt passing that
19 e-mail on to various other people.
20     And the e-mails are dated
21 September 9 in terms of your e-mail
22 to Mr. Rutt and Mr. Rutt's e-mail
23 forwarding your message is September
24 10.

173

1     Do you see that?
2   A. Yes, sir.
3   Q. And in your e-mail -- first
4 of all, is that your e-mail to Mr.
5 Rutt?
6   A. Yes, sir.
7   Q. And you write -- and you
8 wrote it on or around September 9 --
9   A. Yes, sir.
10   Q. -- 2004? And it regards
11 the boat Javelin, which is the
12 Tortora yacht?
13   A. Yes, sir.
14   Q. And it reflects the work
15 that was done as part of your
16 investigation on behalf of Atlantic
17 Mutual; is that right?
18   A. That's correct.
19   Q. And in your e-mail message
20 to Mr. Rutt you write, "Lonni, I have
21 copies of the work performed by TRI
22 and will forward them along. As for
23 a written opinion, I was not asked to
24 produce one as the work was

**James DeCrescenzo Reporting**, LLC

215.564.3905      InnovatingLitigation      FAX 215.751.0581
1880 JFK Blvd , 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

174

1   inconclusive as to a direct cause.
2       "As we discussed, it did
3   point out that manufacturing was not
4   the cause."
5       Do you see that?
6   A.  Yes, I do.
7   Q.  Does that refresh your
8   recollection as to whether or not you
9   prepared a written opinion to
10  Atlantic Mutual?
11  A.  Yes, it sure does.
12  Q.  And so you don't think, now
13  having read this exhibit, Exhibit 17,
14  that you, in fact, prepared a written
15  opinion to Atlantic Mutual?
16  A.  It appears that I did not.
17  Q.  And you, therefore, did not
18  prepare a written opinion that said
19  that the gel coat was materially
20  defective to Atlantic Mutual; is that
21  right?
22  A.  That's correct.
23  Q.  And TRI, which is
24  referenced in this e-mail, what is

175

1   TRI?
2   A.  Texas Research Institute.
3   Q.  And that was an institute
4   that you had engaged to look at the
5   samples; is that right?
6   A.  That's correct.
7   Q.  And they carried out a
8   number of tests?
9   A.  Yeah.  There was a couple
10  that they did.
11  Q.  Do you recall what the
12  tests were?
13  A.  I think it was DMA and –
14  yeah, I think it was just the DMA
15  test.  And they ran it twice to get
16  the Tg and also again to get the
17  heated exotherm.
18  Q.  And the Tg is glass
19  transition temperature?
20  A.  Yes, sir.
21  Q.  And the heated exotherm,
22  just tell it to me like I'm six years
23  old in the words of Denzell
24  Washington, what is that?

176

1   A.  The heat of exotherm is
2   when you put a known amount of heat
3   into a material and it gives off more
4   heat than you put in.
5       Exotherm is a reaction when
6   two chemicals are -- you either have
7   endothermic or exothermic reactions.
8   They either take heat or they cause
9   heat.
10      Exotherm is causing heat.
11  And when you put additional heat in,
12  it drives the cure to completion and
13  in the process it will give off heat.
14  Q.  And these tests, are they
15  tests on the gel coat material?
16  A.  Yes.
17  Q.  And as you report in your
18  e-mail to Mr. Rutt, the testing that
19  was done by TRI was inconclusive as
20  to a direct cause?
21  A.  Yes, sir.
22  Q.  So the TRI testing, the DMA
23  testing and the Tg, I'm sorry, the
24  DMA testing and the heated exotherm

177

1   testing were inconclusive.
2       They did not demonstrate
3   that the gel coat was to blame for
4   the cracking; is that right?
5   A.  It also – as I state in
6   the report, that it did not – you
7   know, the manufacturer was not the
8   cause either.
9   Q.  It said – well, just so
10  I'm clear, it didn't say that the gel
11  coat was the cause, right?
12  A.  Correct.
13  Q.  And it didn't say that the
14  manufacturer was the cause?
15  A.  Correct.
16  Q.  Okay.
17      MR. BIZAR:  Let's mark
18  this.
19      (Exhibit Jones 18 was
20  marked for identification.)
21  BY MR. BIZAR:
22  Q.  I've had the court reporter
23  hand to you as Defendant's Exhibit 18
24  a multi-page document that consists

**JDR**

**James DeCrescenzo Reporting**, LLC

InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                                              FAX  215.751.0581

---

**178**

1  of a fax transmittal, an e-mail, and
2  then a series of DSC thermogram
3  graphs. Take a moment and look that
4  over.
5      A. Okay.
6      Q. Do you recognize
7  Defendant's Exhibit 18?
8      A. Yes, sir.
9      Q. Tell me what it is.
10     A. This was the results of the
11 testing that TRI did.
12     Q. In connection with the
13 Tortora boat?
14     A. That's correct.
15     Q. This is the testing that
16 you reported to Mr. Rutt was
17 inconclusive?
18     A. Yes, sir.
19     Q. That did not cast blame for
20 the cracking on the manufacturer or
21 on the gel coat manufacturer?
22     A. That is correct.
23     Q. Okay. And TRI is
24 independent in this process, right?

---

**179**

1      A. Yes, sir.
2      Q. They have no interest, no
3  financial stake one way or the other;
4  isn't that right?
5      A. That's correct.
6      Q. And the e-mail, which is
7  the second page of Defendant's
8  Exhibit 18, is an e-mail to you at
9  D.E. Jones & Associates dated May 1,
10 2004, 10:17 a.m.
11     Do you see that?
12     A. Yes.
13     Q. Did you see that e-mail and
14 the attachments?
15     A. Yes, I did.
16     Q. And did you receive it on
17 or around that date?
18     A. That's -- yeah, I would
19 assume so.
20     Q. And the person who wrote
21 the e-mail is Art.
22     Is that Art Wolf?
23     A. Yes, it is.
24     Q. And Mr. Wolf -- tell me

---

**180**

1  what Mr. Wolf does at TRI Associates.
2      A. Mr. Wolf does not work for
3  TRI.
4      Q. Oh, who does he work for?
5      A. I think it's B.F. Goodrich
6  now.
7      Q. Okay. At the time of this
8  e-mail did he work for TRI?
9      A. No.
10     Q. Why is he involved in
11 sending this e-mail then? Do you
12 know?
13     A. He's a friend. He used to
14 work for me.
15     Q. I see.
16     A. And I value his opinion.
17     Q. So you asked him to look at
18 the test results?
19     A. Uh-huh.
20     Q. As an independent person
21 whose opinion you value?
22     A. Uh-huh.
23     Q. And he had no financial
24 stake in the matter either?

---

**181**

1      A. None.
2      Q. Like you at the time, he
3  was working to give an objective,
4  impartial assessment, correct?
5      A. That's correct.
6      Q. And when it says
7  Frptestguru@aol.com, was that Mr.
8  Wolf's e-mail address?
9      A. Yes, sir.
10     Q. So he's writing to you from
11 his e-mail address and you received
12 this e-mail, right?
13     A. That's correct.
14     Q. Read the text of the
15 e-mail.
16     A. I've read it.
17     Q. Okay. He says, "I have
18 reviewed the FTIR and DSC data you
19 sent."
20     Is that the data that's
21 attached to this e-mail?
22     A. That's correct.
23     Q. He then says, "I would have
24 the following comments. FTIR - the

---

182

1 two infrared scans are essentially
2 the same so the two samples were
3 formulating" -- "formulated using the
4 same organic constituents.
5 "The peaks, which represent
6 structure and functional groups, are
7 the same."
8 Did I read that correctly?
9 A. That's right.
10 Q. And what is the FTIR?
11 A. Four-year transform
12 infrared spectroscopy.
13 Q. So it's an infrared scan;
14 is that right?
15 A. That's correct.
16 Q. And the two scans, is he
17 looking at one sample that's cracked
18 and one sample that's not cracked?
19 A. Yeah. The top one on page
20 4120, VK 004120, the last page, it
21 doesn't identify the top scan but my
22 recollection -- let's see, gel coat
23 1A. Yes, these are both from the
24 Tortora boat.

183

1 Q. Was one affected and one
2 not affected or were they both
3 affected?
4 A. No. I believe -- I don't
5 recall. I believe all the samples
6 that we took from the Tortora boat,
7 my recollection is they all were
8 affected.
9 Q. Okay. And he then writes
10 in his e-mail to you, Mr. Wolf
11 writes, "DSC - the graph marked 'gel
12 coat round sample' shows a little
13 reactivity left, represented by an
14 exotherm around 115 degrees to 120
15 degrees Celsius.
16 "This is normal for
17 thermoset polyester resins. None of
18 these resins cure completely at
19 ambient temperatures."
20 Do you see that?
21 A. Yes.
22 Q. And the DSC, tell me what
23 that refers to.
24 A. Differential scanning

184

1 calorimeter.
2 Q. And he then writes, "There
3 does not appear to be anything wrong
4 or different about this data. So
5 without further information, I would
6 conclude that the gel coat damage was
7 caused by some other source.
8 "Perhaps the vessel was
9 under a tarp or covered for several
10 years in storage, perhaps the vessel
11 was stored downwind of a spray booth
12 or paper mill, perhaps the damage was
13 caused by a poor buffing job (large
14 grit), perhaps the vessel was
15 acid-washed."
16 Do you see that?
17 A. Yes.
18 Q. And I read that correctly?
19 A. Yes, you did.
20 Q. Mr. Wolf then writes, "I
21 would look for chemical, biological,
22 mechanical or environmental agents
23 for the cause of this damage. The
24 pictures you sent look more like

185

1 gouges and not like typical gel coat
2 cracks.
3 "After the damage was done,
4 the gouges became more noticeable,"
5 I'm sorry, "became noticeable when
6 they filled with dirt/buffing,
7 compound/wax."
8 Do you see that?
9 A. Yes, I do.
10 Q. And I read that correctly?
11 A. Yes, you did.
12 Q. And then he says, "This is
13 just hypothesis based on what I've
14 seen. Hope this helps, Art."
15 So Mr. Wolf is writing to
16 you and he says, in essence, that he
17 doesn't think the gel coat is to
18 blame; isn't that right?
19 MR. WEISZ: Object to the
20 form.
21 THE WITNESS: I don't know
22 if I could interpret that out of it.
23 It was inconclusive.
24 BY MR. BIZAR:

**JDR**

**James DeCrescenzo Reporting**, LLC

Innovating Litigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                    FAX 215.751.0581

---

186

1    Q. Okay. So the best you'll
2  say is that it's inconclusive as to
3  the cause?
4    A. Yeah.
5    Q. And that was consistent
6  with the information that you
7  transmitted to Mr. Rutt?
8    A. Yes.
9    Q. So your opinion on behalf
10  of Atlantic Mutual was the source of
11  the gel coat cracking witnessed on
12  the Tortora yacht was inconclusive as
13  to cause?
14    A. Yes, sir.
15      MR. WEISZ: Objection to
16  form.
17      THE WITNESS: Yes, I do.
18  BY MR. BIZAR:
19    Q. Did you ever see a report
20  by CCP regarding the gel coat
21  cracking in the Tortora yacht?
22    A. I don't recall. I don't
23  believe I did.
24      MR. BIZAR: Let me mark

---

187

1  this.
2      (Exhibit Jones 19 was
3  marked for identification.)
4  BY MR. BIZAR:
5    Q. Defendant's Exhibit 19 is a
6  multi-page document titled
7  "Determination of the Root Cause of
8  Cracking in Viking Boat #55-945,"
9  dated June 4, 2004.
10      And attached to it at the
11  end as the last page is a file copy
12  of a letter from Ed Malle to Bill
13  Heller at Viking dated June 8, 2004.
14      Have you seen this document
15  before today?
16    A. No.
17    Q. In the cover letter, which
18  I can -- you can just turn your
19  attention -- well, take as long as
20  want -- take as long as you need to
21  take to look through the document,
22  then let me know when you're done.
23    A. (Witness reviews document.)
24  Okay.

---

188

1    Q. So you did not consider
2  Defendant's Exhibit 18 in connection
3  with your opinion in this case; is
4  that right?
5    A. I don't recall seeing this,
6  so I guess that would be correct.
7    Q. And the conclusions that
8  Mr. Malle summarizes in his
9  transmittal letter to Mr. Heller,
10  which is the last page of this
11  exhibit, essentially is the same?
12  I'm sorry?
13    A. I stand corrected.
14    Q. So you do think you saw it?
15    A. I did review this.
16    Q. Okay. And the conclusions
17  that Mr. Malle summarizes in the last
18  page of his letter -- in the last
19  page of the exhibit, his letter to
20  Mr. Heller, is that "It's reasonable
21  to conclude that the cracking
22  witnessed in 55-945 was a result of
23  treatments or conditions outside of
24  the control of either CCP or Viking

---

189

1  Yacht Company."
2      Do you see that?
3    A. No.
4    Q. Last page.
5    A. (Indicating.)
6    Q. Do we not have the
7  document? I'm sorry. I thought when
8  I had described the document, you had
9  this page.
10    A. Mine goes up to CCP 08152.
11    Q. We're going to make a
12  correction. I'm going by the DEJ
13  numbers, which are up to 197.
14    A. I have 196.
15    Q. We'll fix that right now.
16      MR. BIZAR: Let's just go
17  off the record for a second.
18      THE VIDEOGRAPHER: Going
19  off the video record. The time is
20  12:52 p.m.
21      (A break was taken at this
22  time.)
23      THE VIDEOGRAPHER: Back on
24  the video record. The time is

---

**James DeCrescenzo Reporting**, LLC

215.564.3905          InnovatingLitigation          FAX 215.751.0581
1880 JFK Blvd , 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

190

1  1:01 p.m.
2      MR. BIZAR: When we marked
3  Defendant's Exhibit 18 (sic), I
4  thought we were marking a document
5  that included Bates numbers from DEJ
6  191 through 197 but apparently we
7  only went up to 196 on the copy.
8      We've now made a copy of
9  the document that includes page 197
10  and I'd like to have that
11  substituted, if I may, for Exhibit
12  18. So if --
13      THE WITNESS: 19.
14      MR. BIZAR: 19 rather. So
15  if you could take Exhibit 19 off-line
16  and put in Exhibit 19 with the right
17  pages, that would be terrific.
18      (Exhibit Jones 19 was
19  re-marked for identification.)
20      MR. BIZAR: Let's start
21  again.
22  BY MR. BIZAR:
23    Q. Mr. Jones, I've handed you
24  as Defendant's Exhibit 19 a document

191

1  that has Bates numbers DEJ 191
2  through 197. Take a moment, look
3  this over, particularly the last
4  page.
5    A. (Witness reviews document.)
6  Okay.
7    Q. Mr. Malle in the
8  transmittal letter to Mr. Heller, the
9  page that has Bates Number DEJ 197,
10  has a paragraph summarizing the
11  results of the various tests that CCP
12  did as part of its investigation.
13      Is that right?
14    A. That's correct.
15    Q. And those tests are also
16  summarized in the investigation
17  report and the conclusions which are
18  set forth in that paragraph are
19  summarized on pages 196 and 197; is
20  that right?
21    A. That's correct.
22    Q. And the conclusions are
23  essentially the same as the
24  conclusions of TRI; isn't that right?

192

1    A. That's correct.
2    Q. The testing was
3  inconclusive as to the source of the
4  gel coat cracking. It could not cast
5  blame on the gel coat and it could
6  not cast blame on Viking's
7  manufacturing process; isn't that
8  right?
9    A. That's correct.
10    Q. And you don't have any
11  basis for disagreeing with or,
12  rather, you didn't have any basis for
13  disagreeing with Mr. Malle's
14  conclusions at the time of your
15  discussions with Atlantic Mutual in
16  the fall of 2004; is that right?
17    A. I don't believe I saw this
18  in 2004.
19    Q. Okay. But you did see the
20  TRI results at the time?
21    A. Yes, sir, I did.
22    Q. And you'd have no basis for
23  disagreeing with those results?
24    A. No, no. TRI, I was okay

193

1  with those.
2    Q. And you don't think that
3  you saw this report to Viking in
4  2004?
5    A. No. I wouldn't have seen
6  it until --
7    Q. Until this litigation?
8    A. Yes, sir.
9    Q. Do you disagree with the
10  summary that Mr. Malle has provided
11  and the content of this investigative
12  report by CCP?
13    A. Yes. I do agree with it as
14  far as the testing that was
15  performed.
16    Q. I'm sorry. You agree with
17  it?
18    A. Yes. As far as the testing
19  that was performed.
20    Q. So you agree that the test
21  results reported in this
22  investigation report are true and
23  accurate as reported in this report,
24  Defense Exhibit 19?

JDR

James DeCrescenzo Reporting, LLC

215.564.3905

InnovatingLitigation
1880 JFK Blvd , 6ᵗʰ Floor, Philadelphia, PA 19103
www.JDReporting.com

FAX 215.751.0581

194

1    A.  They are representative of
2  the tests that were performed.
3    Q.  And the results obtained as
4  a result of those tests?
5    A.  Yes.
6    Q.  And the conclusions that
7  Mr. Malle drew or that CCP drew from
8  those test results, do you understand
9  those conclusions as being accurate?
10    A.  Accurate to the tests that
11  were performed.
12    Q.  Okay.  And you didn't do
13  any testing on your own of the
14  Tortora yacht, correct?
15    A.  No.  Of the Tortora, no, I
16  did not.
17    Q.  The work that you did in
18  this case -- well, let me go back.
19        Do you know that the
20  Tortora boat was repaired by Viking?
21    A.  Yes, I do.
22    Q.  Were you consulted with
23  regard to those repairs?
24    A.  They told me what they were

195

1  going to do and what my opinion was.
2    Q.  And what did they tell you?
3    A.  They told me they were
4  going to strip it and re-gel coat it.
5    Q.  Did they tell you what gel
6  coat they were going to use?
7    A.  I don't recall.
8    Q.  Did you counsel them with
9  regard to what gel coat they should
10  use?
11    A.  I don't recall.
12    Q.  Do you know whether CCP or
13  its agents and representatives
14  expressed a view as to the repair
15  methods that were going to be
16  employed in repairing the Tortora
17  yacht?
18    A.  No, I wouldn't know that.
19    Q.  Did you ever inspect the
20  Tortora yacht after it was repaired?
21    A.  Not to my recollection, no.
22    Q.  In fact, the only time that
23  you recall seeing the Tortora yacht
24  was in connection with the sampling

196

1  that you did and the work that you
2  did on behalf of Atlantic Mutual;
3  isn't that right?
4    A.  That's right.
5        MR. BIZAR:  Mark this as
6  Defendant's Exhibit 20.
7        (Exhibit Jones 20 was
8  marked for identification.)
9  BY MR. BIZAR:
10    Q.  I've had the court reporter
11  mark a document as Defendant's
12  Exhibit 20.
13        That's a multi-page letter
14  from a lawyer named Rich Mannella at
15  Atofina dated April 23, 2004 to a
16  lawyer named Don Sweetman at Gennet,
17  Kallman.
18        Have I accurately described
19  Exhibit 20?
20    A.  Yes.
21    Q.  And Atofina, I'll represent
22  to you, at the time of this letter
23  was responsible for assisting CCP
24  with regard to legal disputes.  Okay?

197

1    A.  Okay.
2    Q.  Do you know Mr. Sweetman?
3    A.  Not personally, but I
4  believe that I worked with him.
5    Q.  And he was -- you worked
6  with him in connection with your work
7  on behalf of Atlantic Mutual; is that
8  right?
9    A.  That's right.
10    Q.  And he was, in fact, the
11  person who gave you permission to
12  collaborate with Viking?
13    A.  I believe that's true.
14    Q.  Okay.  And Mr. Mannella
15  writes to Mr. Sweetman and on the
16  last page of the letter, in the
17  second-to-last paragraph, this is the
18  page that has the Bates number VK
19  1624, Mr. Mannella writes, "In
20  addition, CCP believes the cracking
21  exhibited by this five year-old
22  vessel extends into the laminate
23  layers.
24        "As such, CCP does not



**James DeCrescenzo Reporting**, LLC

198

1  believe the repairs (stripping the
2  hull and respraying the gel coat
3  layer) is appropriate.
4      "Therefore, CCP does not,"
5  not is underlined, "recommend the use
6  of any CCP gel coat product for the
7  repairs being undertaken."
8      Do you see that?
9    A.  Yeah, I sure do.
10   Q.  And CCP -- you understand
11  that CCP is telling them not to use
12  their gel coat to repair the boat?
13   A.  Yes, I do.
14   Q.  Do you know whether Viking
15  used CCP's gel coat to repair the
16  Tortora boat?
17   A.  No.  I wouldn't know, but I
18  know why they recommend that.
19   Q.  Tell me why.
20   A.  Well, because they do not
21  like to use their materials -- CCP
22  does not like to have their material
23  used for post finishing applications.
24      The gel coat is formulated

199

1  to be an in-mold coating.
2      And what that means is that
3  it's supposed to go onto a mold
4  surface and then a laminate placed
5  behind it to -- essentially the
6  additional heat of the laminate helps
7  drive the cure through.  And that's
8  the whole reason.
9      They don't like it post
10  applied, although I have employed CCP
11  in the refinishing of the Typhoon
12  Lagoon slides at Disney World in
13  Orlando and were very successful.
14      In fact, it was far
15  superior than the original in-mold
16  coating.  So...
17   Q.  I'll tell them that you
18  appreciated the work.  But my
19  question is really --
20   A.  I've already told them.
21   Q.  My question is really you
22  understand this direction as being
23  clear and unequivocal not to use
24  CCP's products in the repair of the

200

1  Tortora yacht, right?
2    A.  I understand that that's
3  their opinion.
4    Q.  Right?
5    A.  Yeah.
6    Q.  Okay.  Do you know whether
7  CCP's 953 Series gel coat was used in
8  the repair of the Tortora boat?
9    A.  No.
10   Q.  You said you don't know?
11   A.  No, I don't know.
12   Q.  If it was used, would you
13  view that as being the responsibility
14  of the manufacturer, in other words,
15  the manufacturer's choice?
16   A.  Meaning the builder's
17  choice?
18   Q.  Yes.  The builder's choice.
19   A.  Oh, certainly, it would be
20  the builder's choice.
21   Q.  Okay.  Now, I asked you
22  earlier today about Dr. Strong's
23  report.  You said that you had
24  reviewed it.

201

1    A.  I read it last night.
2    Q.  Had you not read it prior
3  to last night?
4    A.  No.  Last night was the
5  first time I saw it.
6    Q.  And you haven't read it in
7  connection with the opinion that you
8  issued in this report -- in this
9  case; is that right?
10   A.  That's correct.
11   Q.  And your opinion was not in
12  response to that report?
13   A.  No.  Last night was the
14  first time I had seen it.
15   Q.  And so you are not going to
16  be addressing his report in your
17  testimony at trial; is that correct?
18   A.  No.  I wouldn't imagine I
19  would be.
20   Q.  You have provided to us as
21  part of your compliance with our
22  subpoena a collection of invoices for
23  the time that you spent on this
24  matter?

**JDR**

**James DeCrescenzo Reporting**, LLC

215.564.3905

InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

FAX  215.751.0581

```
                              202
1      A.  Okay.
2      Q.  Did you know that?
3      A.  I'm sure I did.
4          MR. BIZAR:  And I'd like to
5   just mark these as the next exhibit,
6   which is 21.
7          (Exhibit Jones 21 was
8   marked for identification.)
9   BY MR. BIZAR:
10     Q.  The invoices that I have
11  from the production are numbered DEJ
12  pages 2, 3, 4 and 5.
13         Do you see that?
14     A.  Okay.
15     Q.  Are these an accurate
16  collection of your bills in this
17  matter to date?
18     A.  To the best of my
19  knowledge, yes.
20     Q.  And the first invoice,
21  which is the last page -- we're going
22  in reverse chronological order -- is
23  dated as of October 13, 2006.
24         Do you see that?
```

```
                              203
1      A.  Yes.
2      Q.  And that reflects all of
3   your work on this engagement up until
4   that time; is that right?
5      A.  We're looking at --
6      Q.  Page five.
7      A.  Page five. As of -- from
8   September to October 13, yes.
9      Q.  And it shows basically 18
10  hours or so of work?
11     A.  Yes, sir.
12     Q.  And some of that time
13  includes time that you spent reading
14  Viking DDP binder?
15     A.  Yes.
16     Q.  What does DDP refer to?
17     A.  I think that's a typo and
18  it should say CCP.
19     Q.  Okay.
20     A.  I don't know what DDP would
21  be, so that's my guess.
22     Q.  German Democratic Republic.
23  So CCP.
24         And that binder was
```

```
                              204
1   prepared for you by Mr. Weisz; is
2   that right?
3      A.  Correct.
4      Q.  And what material was in
5   that binder?
6      A.  Reams and reams of
7   information, some of which is listed
8   at the back of my report in the
9   reference list.
10     Q.  And it's a single binder,
11  to the best of your recollection?
12     A.  Oh, I would be surprised if
13  it was just one.
14     Q.  It says only binder.  It
15  doesn't say binders.
16     A.  Correct.
17     Q.  Do you recall one way or
18  the other?
19     A.  I believe there were more
20  than one.
21     Q.  Okay.  And this information
22  was compiled or selected for you by
23  Mr. Weisz?
24     A.  Yes, sir.
```

```
                              205
1      Q.  What criteria did he
2   employ?
3      A.  I have no idea.
4      Q.  Did you tell Mr. Weisz what
5   to provide you?
6      A.  No, no.
7      Q.  So he decided -- he
8   selected documents to provide to you;
9   is that right?
10     A.  Yes, I would assume so.
11     Q.  And you understand that the
12  documents that have been provided to
13  you in this case, which are listed in
14  your report in the reference list of
15  materials, are not the entirety of
16  the documents that have been produced
17  in this lawsuit; is that right?
18     A.  Oh, I understand that.
19     Q.  Okay.  And you didn't tell
20  Mr. Weisz what information to give
21  you?
22     A.  No, sir.
23     Q.  Okay.  If you look at the
24  next document, which is the
```

**James DeCrescenzo Reporting**, LLC

215.564.3905      InnovatingLitigation      FAX  215.751.0581
1880 JFK Blvd , 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

**206**

1 document -- the invoice dated
2 December 4, 2006. That's page four.
3   A. Yeah.
4   Q. You see there --
5   A. DDP.
6   Q. -- reading "Viking DDP from
7 Mr. Weisz."
8   A. Yeah.
9   Q. And, again, that is the
10 same binder or same information; is
11 that right?
12   A. Yes.
13   Q. So you're continuing to
14 read that information, right?
15   A. Yes.
16   Q. And then there's a
17 reference to an e-mail to R. Rushing
18 regarding test procedures?
19   A. Yes.
20   Q. Who is Mr. Rushing?
21   A. He was the senior chemist
22 at TRI.
23   Q. So was he involved in or
24 supervising the test results that had

**207**

1 been done on behalf of Atlantic
2 Mutual back in 2004?
3   A. Yes, sir.
4   Q. And did Mr. Rushing respond
5 to your e-mail or speak with you?
6   A. Yeah. We must have had a
7 conversation.
8   Q. Do you recall what was
9 said?
10   A. No, I don't recall exactly.
11   Q. Okay.
12   A. I'm not sure what
13 procedures we were talking about at
14 that time.
15   Q. Do me a favor and turn back
16 to the prior page, which is page 5.
17 It says, "Travel and on site, Miami,
18 Florida, airfare, return travel."
19     Do you see that?
20   A. Yes.
21   Q. What was that trip about?
22   A. That was going to spend a
23 little time with Mr. Weisz.
24   Q. Did you meet him in his

**208**

1 office?
2   A. Yes.
3   Q. And what did you discuss
4 there?
5   A. We discussed the documents
6 and the litigation and, you know,
7 where my forte was and, you know,
8 just help him get our arms around the
9 situation.
10   Q. Did he discuss with you
11 what he was looking for in the case?
12   A. Yeah, I guess so. Yes, I'm
13 sure we did.
14   Q. Okay. And what did you
15 say?
16   A. Well, I told him what I was
17 able to do.
18   Q. What your expertise or
19 qualifications were?
20   A. Yeah, yeah.
21   Q. These 14 hours that's
22 reflected here as a time entry for
23 September 28, 2006, a substantial
24 portion of that includes the travel

**209**

1 to and from Miami; is that right?
2   A. That would have been four
3 hours.
4   Q. Did you drive?
5   A. No.
6   Q. You took a plane?
7   A. Yeah.
8   Q. And the balance of it was
9 meeting with Mr. Weisz or did you
10 spend some time waiting for the
11 plane?
12   A. Well, it's a one-hour plane
13 trip and there's travel to the
14 airport and waiting time and then you
15 get on the plane and you travel
16 there. And we spent the major
17 portion of the day together.
18   Q. Did you spend ten hours
19 with Mr. Weisz?
20   A. Probably pretty close to
21 it.
22   Q. Did you look at documents
23 while you were with him?
24   A. Yes, sir.

**JDR**

**James DeCrescenzo Reporting**, LLC

215.564.3905          InnovatingLitigation          FAX 215.751.0581
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

210

1    Q.  And those documents are
2  documents that would have been
3  identified to me?
4    A.  Yes, sir.
5    Q.  They're included among the
6  documents listed in your report?
7    A.  The documents that I've
8  received are probably close to two
9  banker's box full.
10    Q.  Okay.
11    A.  And what I listed here was
12  the ones that I used in direct
13  reference to what I was --
14    Q.  Okay.
15    A.  The rest of them, I looked
16  at them.
17    Q.  Didn't feel the need to?
18    A.  Most of them I read.  Some
19  of them were gobbledygook or gook and
20  I just read them but....
21    Q.  The second page of Defense
22  Exhibit 21, the page numbered page
23  3 --
24    A.  Okay.

211

1    Q.  -- refers to your travel to
2  and from a meeting in Vero Beach?
3    A.  Yes, sir.
4    Q.  And that was a meeting with
5  Dr. Caruthers?
6    A.  That's correct.
7    Q.  And Viking personnel?
8    A.  Yes, sir.
9    Q.  There were no Post
10  personnel present at that meeting; is
11  that right?
12    A.  No.  That's correct.  There
13  wasn't anybody from Post there.
14    Q.  And you've billed an entire
15  day, 12-and-a-half-hour day, for that
16  trip, right?
17    A.  That's right.  I drove over
18  in the morning and drove back that
19  evening.
20    Q.  And do you recall how long
21  the actual meeting with Dr. Caruthers
22  lasted?
23    A.  No, I don't.  But it was a
24  real good portion of the day, six

212

1  hours maybe, eight hours.
2    Q.  If Dr. Caruthers billed for
3  half a day for that meeting, would
4  that refresh your recollection that
5  it was a half a day?
6    A.  That would be about right,
7  four to six hours, something like
8  that.
9    Q.  But you would defer to Dr.
10  Caruthers if his bill was specific on
11  the length of the meeting?
12    A.  He was -- I think this was
13  a place that he was staying at on
14  vacation or something --
15    Q.  On vacation, correct.
16    A.  -- like that, so yeah.
17    Q.  Okay.  Now, while we're on
18  the subject of Dr. Caruthers, have
19  you had a chance to read his report?
20    A.  No, sir.
21    Q.  Have you ever seen his
22  report?
23    A.  No, sir.
24    Q.  Did you see his report in

213

1  draft form?
2    A.  No, sir.
3    Q.  Is your report in any way
4  or your opinion in this case in any
5  way contingent upon any of his
6  findings?
7    A.  No.
8    Q.  Is it in any way based on
9  any of his findings?
10    A.  Well, I've never seen his
11  report, so no.
12    Q.  And he also issued a
13  supplemental report.  I assume you
14  haven't seen that?
15    A.  I haven't seen any of his
16  work.
17    Q.  So your opinion and your
18  report is not in any way based on his
19  supplemental report either?
20    A.  That's correct.
21    Q.  There are also opinions
22  that were issued by four other
23  individuals, Peter Maryott, Philip
24  Barton, Earl Hall, and Philip



**James DeCrescenzo Reporting**, LLC

215.564.3905          InnovatingLitigation          FAX  215.751.0581
1880 JFK Blvd , 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

214

1 Robeson.
2 Did you see any of their
3 reports in this case?
4 A. No, not that I recall.
5 Q. And your opinion then is
6 not based on any of their opinions or
7 their reports either?
8 A. No, sir.
9 Q. And you're not offering any
10 opinion or you don't intend to offer
11 any opinion at trial regarding the
12 cost of repairs that Post or Viking
13 may have had to make in this case?
14 A. No. I would have -- having
15 done a lot of repair procedures for
16 broken boats, I would have a pretty
17 good handle on it, but, you know, on
18 what it would take to do the job.
19 But, no, I haven't been tasked to do
20 that.
21 Q. And you haven't done that
22 in your report?
23 A. That's correct.
24 Q. Okay. The final page of

215

1 the bill, I'm sorry, of Defendant's
2 Exhibit 21, which is actually the
3 first page, page two, refers to a
4 variety of teleconferences that you
5 had with Mr. Weisz and Dr. Caruthers.
6 Do you see that?
7 A. Yes, sir.
8 Q. Tell me what you discussed
9 with Dr. Caruthers during those
10 telephone conferences.
11 A. I think Dr. Caruthers was
12 getting ready to, I don't know, maybe
13 formulate some questions or get his
14 mind around what -- the situation.
15 And he -- I think his words
16 were he wanted to get the advice of
17 somebody that had a little gray hair
18 on the shop floor.
19 And Art certainly has that
20 kind of gray hair, that kind of
21 experience. And we just went back
22 and forth a couple of times.
23 Q. And Mr. Wolf was involved
24 in these discussions?

216

1 A. I called him, yes.
2 Q. And you conferenced-in Dr.
3 Caruthers?
4 A. No, I did not.
5 Q. But there's a reference to
6 a teleconference with Dr. Caruthers
7 and Mr. Wolf.
8 Are those separate calls?
9 A. Separate calls.
10 Q. I see.
11 A. It just happened to be on
12 the same day.
13 Q. So Mr. Wolf has never
14 spoken with Dr. Caruthers, as far as
15 you know, in connection with Dr.
16 Caruthers' work in this matter?
17 A. I wouldn't know.
18 Q. Okay. But you were never
19 involved in any such conversation?
20 A. No. That's correct.
21 Q. And in terms of the review
22 and report writing, that's referenced
23 as having occurred on August the 18th
24 and 19th, 2007.

217

1 Is that correct?
2 A. That's what it says, yes.
3 Q. When did you reach the
4 opinions expressed in your report?
5 When in relation to the date on which
6 you wrote the report did you reach
7 the opinions you expressed?
8 A. Probably well before that.
9 Q. And that was based on the
10 work that's reflected in these bills?
11 A. Yes, sir.
12 Q. Is there any work -- are
13 there any other bills that have not
14 been provided to me that are
15 outstanding?
16 A. No, there are not.
17 Q. Do you expect to submit any
18 additional bills?
19 A. Just for today.
20 Q. Do you have any ongoing
21 projects that are related to the
22 opinion that you would offer in this
23 case?
24 A. No. I have no ongoing

JDR
James DeCrescenzo Reporting, LLC

215.564.3905          InnovatingLitigation          FAX 215.751.0581
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

**218**

1  projects at the moment.
2       MR. BIZAR: Let's take a
3  five-minute break. I may be done.
4       THE VIDEOGRAPHER: Going
5  off the video record. The time is
6  1:23 p.m.
7       (A break was taken at this
8  time.)
9       THE VIDEOGRAPHER: Back on
10  the video record. The time is
11  1:24 p.m.
12  BY MR. BIZAR:
13     Q.  In your written report, Mr.
14  Jones, you refer on the first page to
15  the phenomenon of gel coat cracking,
16  and you have two paragraphs about gel
17  coat cracking there.
18       Do you see that? It's the
19  third and fourth paragraphs that I'm
20  referring to.
21     A.  Yes.
22     Q.  And you list a number of
23  different causes of gel coat
24  cracking, "laminate problems, too

**219**

1  tight of a fit, not enough
2  reinforcement, voids, delamination,
3  de-molding," and it goes on.
4       Do you see that?
5     A.  Yes, sir.
6     Q.  All of those problems that
7  you've identified in these two
8  paragraphs are problems that relate
9  to the manufacturing process by the
10  boat builder; is that right?
11     A.  Correct. That is correct.
12     Q.  And they relate to the
13  application of the gel coat during
14  that process or other things that
15  occur during that process; is that
16  right?
17     A.  Well, it's also the
18  handling of the boat after, after the
19  fact, the structure of the boat,
20  whether it's adequately structured.
21  Yes. It's basically around the
22  manufacturer.
23     Q.  And in the course of your
24  experience in the marine industry and

**220**

1  having heard about gel coat problems,
2  read about them, seen gel coat
3  problems over the course of time,
4  would you say that the majority of
5  gel coat cracking problems result
6  from either application or
7  misapplication of the gel coat or
8  handling issues in the manufacturing
9  process?
10     A.  Yes.
11       MR. BIZAR: I have nothing
12  further at this time.
13       MR. WEISZ: We'll read.
14       MR. BIZAR: Thank you very
15  much for your time, David.
16       THE WITNESS: That's quite
17  all right. Thank you.
18       THE VIDEOGRAPHER: This is
19  the end of tape three and concludes
20  the videotaped deposition of David
21  Evan Jones on January 30, 2008 at
22  1:26 p.m.
23       (Witness excused.)
24       (Concluded at 1:26 p.m.)

**221**

1         WITNESS CERTIFICATION
2
3       I hereby certify that I
4  have read the foregoing transcript of
5  my deposition testimony, and that my
6  answers to the questions propounded,
7  with the attached corrections or
8  changes, if any, are true and
9  correct.
10
11
12  _____
    DATE      DAVID E. JONES, III
13
14
15
16
17
    _____
    PRINTED NAME
18
19
20
21
22
23
24

**JDR**

**James DeCrescenzo Reporting**, LLC

215.564.3905          InnovatingLitigation          FAX  215.751.0581
                1880 JFK Blvd , 6ᵗʰ Floor, Philadelphia, PA 19103
                        www.JDReporting.com