```
                      UNITED STATES DISTRICT COURT
                         DISTRICT OF NEW JERSEY

VIKING YACHT COMPANY, a New      :
Jersey Corporation; and POST     :
MARINE CO., INC., a New Jersey:
Corporation,                     :    HONORABLE JOSEPH E. IRENAS
                                 :
            Plaintiffs,          :
                                 :    CIV. NO. 05-538 (JEI/JS)
      v.                         :
                                 :
COMPOSITES ONE LLC, a Foreign    :            OPINION
Limited Liability Company;       :
CURRAN COMPOSITES, INC., a       :
Missouri Corporation; C TWO      :
LLC, a Foreign Limited           :
Liability Company; and TOTAL     :
COMPOSITES, INC., a Delaware     :
Corporation joint d/b/a/ COOK    :
COMPOSITES AND POLYMERS, a       :
fictitiously named Delaware      :
Partnership,                     :
                                 :
            Defendants.          :
```

**APPEARANCES:**

HENRY J. TYLER, Esq.
P.O. Box 537
Mullica Hill, NJ 08062

BERGER SINGERMAN
By: Michael O. Weisz, Esq.
200 South Biscayne Boulevard
Suite 100
Miami, FL 33131
    Counsel for Plaintiffs

BUCHANAN INGERSOLL PC
By: Steven E. Bizar, Esq., Landon Y. Jones, Esq.
1835 Market Street, 14th Floor
Philadelphia, PA 19103

By: P. Kevin Bobson, Esq.
213 Market Street, 3rd Floor
Harrisburg, PA 17101
    Counsel of Defendant Cook Composites and Polymers

**IRENAS,** Senior District Judge:

Presently before the Court is Defendant's Motion to Exclude the Opinions and Testimony of David E. Jones (Docket No. 162). The Court has reviewed the submissions of the parties, and for the reasons set forth below, Defendant's Motion will be granted in part and denied in part.

## I.

Viking Yacht Company ("Viking") and Post Marine Co., Inc. ("Post") (collectively, "Plaintiffs") are luxury yacht manufacturers. They brought suit against Defendant Cook Composites and Polymers, Co. ("CCP") to recover damages resulting from the cracking of gel coats on yachts Plaintiffs manufactured using CCP's 953 Series gel coat. The Court has extensively discussed the facts and history of this case in its previously issued opinions on cross Motions for Summary Judgment, Motions for Reconsideration, the more recent Motion to Bifurcate the Trial of Liability and Damages.[1] As a result of this Court's previous holdings, Plaintiffs' surviving claims are: (1) breach of express warranty, (2) fraudulent misrepresentation, and (3) violation of the New Jersey Consumer Fraud Act, N.J. Stat. Ann.

---

[1] *See Viking Yacht Co. v. Composites One, LLC*, 2008 WL 5244411, No. 05-538 (D.N.J. Dec. 16, 2008); *Viking Yacht Co. v. Composites One, LLC*, 2007 WL 2746713, No. 05-538 (D.N.J. Sept. 18, 2007); *Viking Yacht Co. v. Composites One, LLC*, 496 F. Supp. 2d 462 (D.N.J. 2007).

§ 56:8-2.

Plaintiffs retained David E. Jones, III, a "naval architect and marine engineer," with a specialty in "structural composites,"[2] (Jones Dep. at 7:24-8:2), "for the purpose of determining if the procedures, methods or equipment used in the gelcoat[3] application process varies from that used within the marine industry and whether or not the manufacturing process affected the performance or reliability of the gelcoat product used." (Jones Rep. at 1.) Jones tested on one Viking yacht that exhibited cracking,[4] toured Viking's facilities and conducted interviews with its employees, watched videos of some procedures at Post, and reviewed a number of documents provided by Plaintiffs' counsel.

Jones issued a three page report. The first page of the report discusses the prevalence of minor gel coat cracking in the

---

[2] Jones is also the president of D.E. Jones & Associates, Inc., an "[e]ngineering firm providing support for design, naval architecture, structural and failure analysis, production and manufacturing systems/processes for effective prototyping and production, research and application analysis, prototyping and sourcing, application analysis and QA/QC programs." (Jones CV at 1.)

[3] At all other points throughout this litigation the term "gelcoat" has appeared as two words ("gel coat"). In his report, Jones writes "gelcoat" as one word. For the sake of consistency with the Court's other opinions in this case, the Court will use "gel coat" except when directly quoting Jones's report.

[4] Jones examined and took samples from vessel # VKY55945H900, known over the course of this litigation as "the Tortora yacht."

marine industry, and the ease with which it can be repaired, but concludes that "[t]his is not the type of cracks that can be seen on the many Viking and Post vessels represented in the documents provided." (Jones Rep. at 1.) Jones states:

> The gelcoat cracking, as seen on vessel # VKY55945H900 at the Viking Facility in New Gretna, New Jersey was global in nature, essentially affecting nearly every gelcoated fiberglass part on the boat. The pattern of the cracks was fairly random in orientation and alignment and did not follow the typical lines of mechanical stress or was the result of mold stresses or poor fit or manufacturing defects. The issue was found on resin transfer-molded (RTM) parts using one resin system and on hand-laid open-molded parts using another resin system. Vacuum molded, pressure molded and contact molded parts using a variety of resins on the same vessel exhibiting the same pattern of gelcoat cracking. The only common denominators left in this scenario are the gelcoat used (the same type throughout) and the environment the boat had existed in.

(Id. at 2.) Jones notes that "[t]he boats come from all over the country and are exposed to a wide variety of climate and environmental conditions.[5] Each boat has different service and operational duties, different maintenance schedules and operated in various sea conditions and seasonal changes." (Id.) Therefore, Jones concludes that "[t]he only common denominator in this instance is the gelcoat used; all of the same type and all produced by the same manufacture [sic]." (Id.)

Jones goes on to discuss the quality control standards at both Viking and Post. He then discusses the testing he performed

---

[5] "[E]nvironmental conditions" seemingly refer to "temperature, thermal qualities, [and] thermal conditions." (Jones Dep. at 149:3-7.)

4

on the eight samples he took from the Tortora yacht, six of which contained cracking that "extended through the gelcoat and into the skin coat." (Id.) He concludes that "[t]he six (6) samples which displayed damage to the underlying skin coat laminate had no visible voids, delamination or other manufacturing defects that could have caused the failures." (Id.)

Ultimately, Jones concludes:

> The occurrence of cosmetic gelcoat cracking is not uncommon in the marine industry but the global nature and magnitude of these cracks is. Historically speaking, an occurrence of this type and the global extent of gelcoat cracking of this type is unheard of; rarely found. It is my opinion that the occurrence of the gelcoat cracking evident in the Viking Yacht Company and the Post Marine Company is a material defect in the gelcoat itself and not in the manufacturing process of building the parts or the application and handling of the material itself. Gelcoat is expected to last with only minor cosmetic issues of color and gloss fade but not to catastrophically fail as found in the Viking and Post product. Fiberglass boats have been demonstrated to last for decades and with hundreds of thousands of new boats per year being produced in this country alone with near automotive-grade finished of marine-grade gelcoat and still the incidence of global gelcoat cracking such as found in this case is rare if found at all.

(Id. at 3.)

In the instant Motion, CCP seeks to exclude Jones's opinions and testimony. For the foregoing reasons, CCP's Motion will be granted in part and denied in part.

**II.**

"Under the Federal Rules of Evidence, it is the role of the

trial judge to act as a 'gatekeeper' to ensure that any and all expert testimony or evidence is not only relevant, but also reliable." *Kannankeril v. Terminix Int'l, Inc.*, 128 F.3d 802, 806 (3d Cir. 1997) (citing *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993)). Federal Rule of Evidence 702 "has three major requirements: (1) the proffered witness must be an expert, i.e., must be qualified; (2) the expert must testify about matters requiring scientific, technical or specialized knowledge; and (3) the expert's testimony must assist the trier of fact." *Pineda v. Ford Motor Co.*, 520 F.3d 237, 244 (3d Cir. 2008) (Irenas, S.D.J., sitting by designation).[6] Admissibility under the third requirement, the "fit" requirement, "depends in part on 'the proffered connection between the scientific research or test result to be presented and particular disputed factual issues in the case.'" *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 743 (3d Cir. 1994) (quoting *United States v. Downing*, 753

---

[6]Rule 702 specifically provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702.

F.2d 1224, 1237 (3d Cir. 1985)). "The burden is on the proponent of the testimony to prove its admissibility by a preponderance of proof." *NN&R, Inc. v. One Beacon Ins. Group*, No. 03-5011, 2006 WL 2845703, at *2 (D.N.J. Sept. 29, 2006).

"An expert opinion is not admissible if the court concludes that an opinion based upon particular facts cannot be grounded upon those facts." *Fedorczyk v. Caribbean Cruise Lines, Ltd.*, 82 F.3d 69, 75 (3d Cir. 1996). Further, "if an expert opinion is based on speculation or conjecture, it may be stricken." *Id.*; *see also Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) ("But nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered.").

### III.

#### A.

CCP challenges Jones's opinion, arguing both that his methodology was unreliable, and that his opinion does not fit the facts of the case. With respect to methodology, CCP argues that Jones's method of ruling in possible causes, and then ruling them out to reach the conclusion that the only remaining cause is a "material defect in the gel coat product itself," is flawed. CCP

7

analogizes to a medical expert performing a differential diagnosis to determine the cause of a particular injury or illness.  Medical experts will often attempt to offer a definitive statement regarding the cause of a given illness or injury without adequately ruling out other possible causes.  However, doing so renders the methodology unreliable, and therefore, inadmissible.[7]  While a medical expert must perform testing to rule out alternative causes, "a physician need not conduct every possible test to rule out all possible causes of a patient's illness, 'so long as he or she employed sufficient diagnostic techniques to have good grounds for his or her conclusion.'"  *Heller v. Shaw Indus., Inc.*, 167 F.3d 146, 156 (3d Cir. 1999).

With this framework in mind, the Court will examine the tests Jones actually performed.  Jones took eight samples from different areas of the hull of the Tortora yacht, (Jones Dep. at

---

[7] *See, e.g.*, *Magistrini v. One Hour Martinizing Dry Cleaning*, 180 F. Supp. 2d 584, 609 (D.N.J. 2002) ("While an expert is not required to rule out all alternative possible causes of a plaintiff's disease, 'where a defendant points to a plausible alternative cause and the doctor offers no reasonable explanation' for why he still concludes that the chemical was a substantial factor in bringing about the plaintiff's disease, 'that doctor's methodology is unreliable.'") (quoting *Kannankeril*, 128 F.3d at 807); *Diaz v. Johnson Mathey, Inc.*, 893 F. Supp. 358, 376 (D.N.J. 1995) (excluding expert medical testimony on issue of specific causation where physician "did little, if anything, to rule out alternative causes" and either "ignored" or offered "no satisfactory reason" for discounting "several alternative possible causes" for plaintiff's asthma identified by defendant).

69:5-70:13), and examined them under with a high-power microscope to look for voids, delamination, thickness problems, impact, demolding, and laminate issues.[8] (Jones Rep. at 2; Jones Dep. at 73:4-79:1.) After completing his examination, he sent the samples to the Texas Research Institute (TRI) for additional testing. (Jones Dep. 175:3-177:15.) Jones also spoke with Mr. Tortora regarding how he cared for his yacht. (Id. at 53:21-55:11.) Lastly, he toured the Viking facility, interviewed some of their personnel, and watched video of gel coat being sprayed at the Post facility.

One of the particular bases for his conclusion was the "unique" nature of the gel coat cracking in this case, relying on his experience in the industry. Describing the "unique" nature of the gel coat cracking, Jones noted, "[i]t's so global in nature and it encompasses different manufacturing processes from closed mold to resin transfer, a wide number of laminate schedules. Essentially every part exposed on the outside of the boat has cracks in it, and that was extraordinary." (Jones Dep.

---

[8] CCP repeatedly makes light of Jones's "optical[] examin[ation]." (Jones Rep. at 2.) However, according to Jones, the microscope used went "down to about a half a thousandths in diameter. . . . It would take an electron microscope to get down to the nano size." (Jones Dep. at 74:12-17.) Jones similarly explained how he cut the samples, the dimensions of the samples, and what was done to the samples prior to being examined. (Id. at 69:5-70:18.) Despite CCP's assertions otherwise, Jones's examination of the samples consisted of considerably more than "eyeball[ing] them." (Id. at 71:2.)

at 91:12-21.) Jones considered how the extent and pattern of the cracking on the Tortora yacht is unlike the "distinctive" patterns one would expect to find if the cracking were caused by "mechanical stress," "impact," or "demolding stress." (Id. at 75:16-79:1.) Furthermore, these initial observations led him to look for specific manufacturing defects when he conducted his microscopic examination. (Id.) Specifically, Jones looked for, and found no "voids" or "air bubbles." (Id. at 73:9-74:11.) Similarly, upon microscopic examination the "thickness," and "resin content" of the gel coat were "appropriate," and the "skin coat looked like it had been well consolidated." (Id. at 74:24-75:15.)

CCP argues that this case is similar to *Oddi v. Ford Motor Co.*, where the Third Circuit affirmed the district court's exclusion of expert testimony because the purported expert had not tested his hypotheses and his inquiry was "haphazard" and "intuitive." 234 F.3d 136, 156 (3d Cir. 2000). In *Oddi*, a truck driver was injured in an accident, and the plaintiff wanted to offer an "accident reconstruction/design engineer . . . to testify that the truck was defectively designed." *Id.* at 146. As is the case here, the expert's qualifications were not challenged, but rather the methodology used in reaching his conclusions. There, the expert offered several possibilities for how the defect in the plaintiff's truck could have been fixed to

10

avoid an injury. However, upon review of the expert's deposition testimony, the court concluded that he had conducted no testing to support his theories. Furthermore, the expert failed to properly consider alternative theories. *Id.* at 158.

Unlike the expert in *Oddi*, Jones did actually perform his own tests to reach his primary conclusion that the cracking was not caused by the manufacturing process. Additionally, he relied on his knowledge of cracking patterns based on his experience in the industry eliminating certain other possible causes.[9] It may be true that Jones's conclusions would be more strongly supported if he had performed additional testing, taken more samples, or reviewed additional documentation. However, the Third Circuit has been clear that an expert's testimony resting on "good grounds" is admissible, "even if the judge thinks that there are better grounds for some alternative conclusion, and even if the judge thinks that a scientist's methodology has some flaws such that if they had been corrected, the scientist would have reached

---

[9] Jones also relied on observations made at the Viking facility, as well as his interviews of Viking personnel in evaluating Viking's quality control standards. In all likelihood, the visit to Viking's facility and the interviews with its personnel were the only sources available to Jones to provide evidence of Viking's manufacturing procedures at the time the Tortora yacht was built. Thus, the Court concludes that these observations and discussions were sufficiently reliable to permit Jones to incorporate them into his analysis. CCP, of course, will have an opportunity to explore Jones's reliance on both his observations and discussions via cross-examination.

11

a different result." *Paoli*, 35 F.3d at 744.  Therefore, Jones may testify about the "unique" global nature of the cracking in the Tortora yacht, as well as his opinion that the cracking in the Tortora yacht (or any other yacht proven to exhibit similar global cracking patterns) was not caused by manufacturing defects.

**B.**

**1.**

In the course of this litigation, issues have arisen as to the impact that using or storing a yacht in cold weather might have on the incidence of gel coat cracking.  Jones concludes that "the environment the boat has existed in" is not a factor which explains the "high incidence of gelcoat [sic] cracking . . . ." (Jones Rep. at 2.)  He bases this opinion on information provided by Plaintiffs, that "[t]he boats come from all over the country and are exposed to a wide variety of climate and environmental conditions."  (Id.)[10]

Even assuming the truth of this last observation, Jones's

---

[10] Jones's deposition testimony on this point somewhat differed from his report.  He testified that the reason some Viking and Post yachts have cracked, and others did not, is "related to environmental exposure," (Jones Dep. at 147:21-148:2), and that it is his "understanding that the major portions of the boats that were affected have been cold climate boats." (Id. at 150:2-13.)  Again, his only source of this information appears to be the Plaintiffs.

12

conclusion is not based on any expertise he possesses. He has no chemistry background or expertise which would enable him to express a reliable opinion on the impact of temperature fluctuations on gel coat cracking. Nor does he really have any meaningful data respecting the environmental conditions or temperatures in which the numerous Post or Viking Yachts were used or stored.

Without the Court making a definitive ruling at this time, it may be that Plaintiffs' attorney will be permitted to argue that the jury should infer that the environment or temperature at which a yacht was used or stored was irrelevant to the incidence of gel coat cracking, because (if proven) the Viking and Post yachts were used and stored under widely varying conditions, an inference which may not need to be directly supported by expert testimony. However, this conclusion couched as expert testimony does not involve Jones's "scientific, technical, or other specialized knowledge" such as to justify its admissibility under Federal Rule of Evidence 702.

**2.**

Jones also opines that the Tortora yacht's gel coat cracking was actually caused by a "material defect in the gelcoat [sic] product itself." (Jones Rep. at 3.) While he has effectively ruled out a number of causes of cracking related to

13

manufacturing, many other known causes of cracking were not ruled out.  As discussed above in Part III.A, Jones reliably ruled out voids, delamination, thickness problems, impact, demolding, and laminate issues.  However, at his deposition he also acknowledged that moisture and temperature conditions in the manufacturing plant (Jones Dep. at 124:12-17, 134:15-20, 136:11-14), as well as "use conditions" and "environmental conditions" can all affect gel coat cracking.  (Id. at 148:22-149:19.)

As noted earlier, Jones is not a chemist, and he performed no analysis of the formulation of the 952 or 953 Series gel coats to determine whether a defect in gel coat itself was a possible contributor to the problem.  (Id. at 89:3-90:18.)[11]  While Jones did send samples to TRI to testing, the only testing done on the gel coat itself was inconclusive as to the ultimate cause of the cracking.  (Id. at 175:3-177:4.)

Jones reached his conclusion regarding a "material defect" in the gel coat "by eliminating other possible causes by a process of elimination" and "historical evidence."  (Id. at 90:4-18.)  However, "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the

---

[11] Unlike Plaintiffs' chemical expert, Dr. Caruthers, or CCP's chemical expert, Dr. Strong, Jones simply does not have the background, nor did he perform testing to support a conclusion as to whether or not the formulation of the 953 Series gel coat itself was in some way defective.

14

expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Joiner*, 522 U.S. at 146. There is such an analytical gap between ruling out some, but not all, of the known causes, and ruling in a completely untested cause based solely on "historical evidence" from the "industry." (Jones Dep. at 90:4-18.)

Accordingly, Jones's testimony will be excluded to the extent he opines that environmental conditions could not be the cause, or that the cause was a "material defect in the gelcoat [sic] product itself." (Jones Rep. at 3.)

### C.

The same is generally true about the extension of Jones' conclusions about the Tortora yacht to all Viking and Post boats that he did not examine. While there are hundreds of yachts at issue in this case, Jones only conducted tests on one of them. (Jones Dep. at 63:4-65:14.) Jones admits that his conclusion regarding all the other yachts is "purely by extrapolation" of his conclusions regarding the Tortora yacht. (Id. at 100:24-101:16.) Furthermore, Jones relied heavily on the representations made to him by Plaintiffs' personnel that all the yachts that exhibited cracking were "all the same." (Id. at 146:7-11.) Similarly, Jones did not conduct a "systematic study

15

on all the boats on which 953 Series gel coat has been applied," "interview[] owners," "[go] to marinas to look at boats," or "look[] at any records relating to how those boats were maintained." (Id. at 150:2-151:3.)

Employing, again, the medical expert analogy, "a physician who evaluates a patient in preparation for litigation should seek more than a patient's self-report of symptoms or illness and hence should either examine the patient or review the patient's medical records simply in order to determine that a patient is ill and what illness the patient has contracted." *Paoli*, 35 F.3d at 762. However, as just discussed, Jones effectively took Plaintiffs' word for the fact that the gel coat cracking on all the affected boats were the same, and then concluded that whatever did or did not affect the Tortora yacht must have been the same as all the others in this case. While Jones tested the Tortora yacht, "with respect to those [yachts which Jones] did not examine, [he] had little, if any data with which to rule out alternative causes" of the cracking. *Id.* at 764. There can be no question that there is an analytical gap between Jones's findings regarding the Tortora yacht, and a conclusion that the factors ruled out as possible causes of gel coat cracking on the Tortora yacht were not causes in all of the other yachts in this case. *See Joiner*, 522 U.S. at 146.

That being said, while Jones did not actually conduct

16

testing on any other yachts, in at least some instances, he did review photographs or repair records of some other yachts at issue in this case. To the extent that Jones concluded that the cracking in those particular yachts picture was substantially similar to the cracking in the Tortora yacht, Jones may testify as such.

**IV.**

For the reasons set forth above, CCP's Motion will be granted and part and denied in part. Jones may testify regarding different cracking patterns, the "unique" global nature of the cracking in the Tortora yacht, and his elimination of certain manufacturing causes that he specifically looked for and eliminated. Jones may also testify that if any Viking or Post yacht exhibits gel coat cracking similar to that found on the Tortora yacht, such cracking would not result from any of the specific manufacturing defects excluded in his analysis of the Tortora yacht. However, all of Jones's testimony regarding specific yachts is limited to the Tortora yacht and boats where Jones has reviewed either pictures or documentation supporting a conclusion that the cracking in those boats is substantially similar to the cracking in the Tortora yacht. Jones's testimony will be excluded to the extent that he eliminated environmental conditions as a potential cause and concludes that the cause of

17

the gel coat cracking was a "material defect in the gelcoat [sic] product itself."

Dated: May 20, 2009

                               s/ Joseph E. Irenas
                               **Joseph E. Irenas, S.U.S.D.J.**